## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AUDI OF AMERICA, INC.,** | : | **Civil No. 3:16-CV-2470** |
| | : | |
| **Plaintiff** | : | **(Judge Jones)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **BRONSBERG & HUGHES** | : | |
| **PONTIAC, INC., d/b/a WYOMING** | : | |
| **VALLEY AUDI,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.     INTRODUCTION

The purpose of this Order is to address and resolve a discovery dispute over the defendant's assertion that 54 documents that have been withheld from production in this case are privilege communications, either subject to the attorney-client privilege or the common-interest privilege, which is an extension of the attorney-client privilege to instances involving two or more parties who share a substantially identical legal interest, permitting counsel to share communications without waiving the privilege.  The plaintiff has moved the Court to compel production, arguing that no privilege applies.  Upon consideration, and for the reasons explained below, the Court agrees that the limited set of documents

identified on the defendant's privilege log are subject to the common-interest and attorney-client privileges, and therefore need not be disclosed. The plaintiff's motion to compel will therefore be denied.

## II.   **BACKGROUND**

On December 13, 2016, Audi of America, Inc., ("Audi") brought this breach of contract action, alleging that Bronsberg & Hughes Pontiac, Inc., d/b/a Wyoming Valley Audi ("Wyoming Valley") breached certain terms of an Audi Dealer Agreement into which the parties entered on January 1, 1997, when it entered into an Asset and Real Estate Purchase Agreement (the "Purchase Agreement") with the Napleton Group ("Napleton"). Audi alleged that the Purchase Agreement, which was signed on July 11, 2016, included the sale of Wyoming Valley's Audi assets in violation of Audi's own right of first refusal and its right to refuse to consent to the transaction on reasonable grounds. (Doc. 1.) In January of 2017, Audi sought, and obtained, a preliminary injunction from the district court, temporarily enjoining Wyoming Valley from consummating the Purchase Agreement while this litigation was pending. (Doc. 30.) That order currently remains in effect, and the district court has scheduled a further hearing for June 28, 2017, to assess whether to maintain the injunction.

While the parties prepare for that hearing, they have been engaged in discovery that has at times been contentious. This order addresses one such

disagreement relating to Wyoming Valley's assertion that some 54 documents that would otherwise be responsive to Audi's discovery requests are shielded by the attorney-client privilege, the common-interest privilege or otherwise are confidential attorney work product.

On February 21, 2017, the Court ordered Wyoming Valley to produce four categories of documents to Audi within 20 days, including "[c]ommunications between Wyoming Valley and [Napleton] relating to the [Purchase Agreement] or the First Addendum," and "Wyoming Valley's internal documents regarding the [Purchase Agreement] and First Addendum." (Doc. 46.) Wyoming Valley took steps to gather, review, and produce the required responsive information, including by reviewing information not only in Wyoming Valley's custody but also with documents in the possession of Arangio & George, Wyoming Valley's outside legal counsel who helped to negotiate the underlying transaction between Wyoming Valley and Napleton. According to Wyoming Valley, this review was a substantial undertaking, and resulted in the production of more than 13,000 responsive documents, including a substantial quantity of communications between Wyoming Valley and Napleton about the Purchase Agreement and the First Addendum over which Wyoming Valley made no claim of privilege.

In the Court's order directing the production of responsive documents, the Court also ordered Wyoming Valley to "provide the plaintiff and the Court with a

detailed privilege log identifying the document and privilege being invoked" with respect to any responsive document being withheld on the basis of privilege or work product protection. (Doc. 46.) On April 5, 2017, Wyoming Valley submitted a 315-entry privilege log to the Court and to counsel. It appears that after this time, the parties continued to meet and confer over Wyoming Valley's privilege claims, resulting in Wyoming Valley producing additional documents, along with another shorter privilege log.[1]

Audi has challenged Wyoming Valley's argument that the 54 documents identified on the privilege log are privileged and non-discoverable, and the Court has reviewed the documents *in camera*. Audi disputes that any of the documents are subject to privilege or work-product protection, and therefore has requested that the Court compel Wyoming Valley to disclose all of them. Wyoming Valley maintains that nearly all of the documents exchanged between counsel for Wyoming Valley and Napleton which are identified on the privilege logs constitute work product and that all of them are subject to the common-interest privilege, arguing in turn that each of these documents was either prepared in anticipation of litigation, or constituted attorney work product that was permissibly exchanged between counsel for Wyoming Valley and Napleton because of these parties'

---

[1] The parties also engaged in additional discovery relating to Audi's motion for contempt, an issue that has now become moot since the undersigned declined to certify a contempt to the district court.

4

alleged shared legal and commercial interest in defending against Audi's attacks on the Purchase Agreement and what they perceived as threatened litigation.

This discovery dispute presents a close question, and one that is made somewhat more difficult to resolve because although Pennsylvania law recognizes the common-interest privilege that Wyoming Valley has asserted, Pennsylvania courts have provided very limited guidance in terms of the privilege's application. The Court's review of the way the privilege has been interpreted and applied by other courts within the Third Circuit teaches that one of the most salient factors to be considered is the kind of interest that the parties claim to share. It is clear that purely commercial interests are insufficient to support the common-interest privilege, but it is also true that the privilege is not vitiated simply because parties share commercial interests, so long as they also share substantial legal interests.

This consideration has particular relevance in this case, where the interests shared by Wyoming Valley and Napleton were unquestionably commercial in that both entities were motivated to complete their transaction, but they were also increasingly of a legal nature, particularly after Audi and other manufacturers notified them about concerns that they had regarding the Purchase Agreement and its alleged impact on the manufacturers' rights under their own contracts with Wyoming Valley.

Audi and other manufacturers formally notified Wyoming Valley in late September 2016 of specific concerns that they had with the transaction, and counsel for Wyoming Valley and Napleton promptly began working in tandem to address Audi's stated concerns, which strongly suggested that Audi's concerns were legal in nature and that Audi was seeking to enforce its claimed rights under contract and state law. It is telling that Wyoming Valley does not claim a common-interest privilege over any document that existed or was exchanged before Audi and the other manufacturers sent letters outlining their concerns and specific demands, as this presents a clear moment where the parties recognized that they shared a legal interest in addressing Audi's challenge.

Although it is a close issue, we find that Wyoming Valley and Napleton had sufficiently shared legal and commercial interests in coordinating the responses to Audi to shield the documents on Logs 1 and 3 from disclosure pursuant to the common-interest privilege. The Court's conclusion might have been different if Wyoming Valley and Napleton were seeking to shroud in secrecy documents relating to their negotiations or contractual back-and-forth relating to the Purchase Agreement itself. The fact that they restricted their assertion of the privilege to specific communications occurring after late September 2016, when the manufacturers put them on notice regarding potential legal challenges to the

transaction, supports a finding that the common-interest privilege was appropriately invoked for this narrow set of documents.

Moreover, review of those documents themselves supports the Court's finding that they should be withheld from production since these documents are, in large part, transmittal correspondence between counsel for Wyoming and Napleton that makes clear the parties' joint effort to address the legal issues that Audi had raised with them. Very often, these documents are simply cover letters or emails that accompanied draft documents that the parties were sharing for comment, and which would subsequently be provided to Audi in substantially the same form. In other cases, the correspondence is some brief acknowledgment of communication received from Audi's counsel, and scheduling further discussions between the dealerships in order to prepare a concerted response that addresses the issues Audi was pressing.[2] Although the Court recognizes that Audi may mine these limited pieces of correspondence for significance that might not be immediately apparent, the Court finds that the probative value of the correspondence itself is in large measure especially limited and thus this entire discovery dispute ultimately winds up being about withheld communications which often have very little apparent substance to them.

---

[2] Notably, Wyoming Valley has previously produced some of this correspondence, but has done so in redacted form to mask the substance of counsel's observations or commentary about the legal issues presented.

Accordingly, following review of the parties' briefs and the documents submitted *in camera*, the Court agrees with Wyoming Valley's assertion that the common-interest privilege applies to each of the documents identified on Logs 1 and 3 because Wyoming Valley has effectively demonstrated that it shared with Napleton the kind of substantial parallel legal interests are necessary for the common-interest privilege to be applicable to this narrow set of documents, much of it correspondence between counsel. That the parties may have shared a commercial interest both in seeing this transaction through to closing, and in overcoming Audi's opposition to the deal, does not mean that the dealerships did not also have substantially similar legal interests *vis a vis* Audi, which was seeking to protect its alleged rights under its contract with Wyoming Valley.

It is difficult to read Audi's correspondence in September 2016 as doing anything less than threatening formal legal action and making specific legal demands, which Wyoming Valley and Napleton had a shared interest in addressing. Although they may have previously been on opposite sides of an arms' length transaction, in the fall and winter of 2016, Wyoming Valley's and Napleton's interests converged more closely, and became increasingly intertwined such that Napleton has recently been permitted to intervene in this case to defend the transaction that Audi has attacked. Therefore although the parties may not have shared common legal interests prior to the fall of 2016, the Court finds that

they did so after Audi's September 28, 2016 letter. That letter presented a common legal threat to the parties' common commercial interests. Confronted by this common legal threat, we believe that the parties now had a common legal interest in coordinating a response to this threatened litigation. Because the Court finds that these shared legal interests support invocation of the common-interest privilege, the Court will deny Audi's efforts to compel production of the documents identified on Logs 1 and 3 as to which the common-interest privilege has been asserted.[3]

In addition, Wyoming Valley has asserted that six other documents that were shared between its counsel and its broker, the Tim Lamb Group, which was engaged to advise the dealership with respect to the Purchase Agreement, may be withheld pursuant to the attorney-client privilege. Because the Court finds that the attorney-client privilege extends to such correspondence, Wyoming Valley's assertion of the privilege will be sustained, and Audi's efforts to compel production of these six documents will be denied.[4]

---

[3] These documents include entries 96, 97, 98, 113, 119, 126, 131, 135, 137, 138, 139, 140, 143, 155, 157, 159, 165, 166, 168, 172, 174, 200, 201, 205, 211, 212, 213, 217, 220, 222, 225, 240, 245, 247, 252, 256, 271, 272, 273, 274, 299, 311, 312, 313, and 314.

[4] Wyoming Valley has also argued that many of these documents also constitute confidential attorney work product. Because the application of the common-interest and attorney-client privileges to the small set of documents in this matter is sufficiently clear, there is no need to give separate and further consideration to

## II.   DISCUSSION

### A.   The Attorney-Client and Common-Interest Privileges

Wyoming Valley relies upon the attorney-client privilege, the common-interest privilege, and the work-product doctrine to justify its decision to withhold a number of documents that would otherwise be responsive to Audi's discovery requests.

The United States Court of Appeals for the Third Circuit has summarized the purposes of, and distinctions between, the attorney-client privilege and the work-product doctrine, and the importance of limiting recognition of evidentiary privileges when necessary to achieve their purposes, as follows:

> Though they operate to protect information from discovery, the work-product doctrine and the attorney-client privilege serve different purposes. The purpose behind the attorney-client privilege is " 'to encourage clients to make full disclosure of facts to counsel so that he may properly, competently, and ethically carry out his representation. The ultimate aim is to promote the proper administration of justice.' " *In re Impounded*, 241 F.3d 308, 316 (3d Cir. 2001) (quoting *In re Grand Jury Proceedings*, 604 F.2d 798, 802 (3d Cir. 1979)). The work-product doctrine, by contrast, "promotes the adversary system directly by protecting the confidentiality of papers prepared by or on behalf of

---

whether some or all of these documents may also be withheld on the grounds that they are work product.

> attorneys in anticipation of litigation. Protecting
> attorneys' work product promotes the adversary system
> by enabling attorneys to prepare cases without fear that
> their work product will be used against their clients."
> *Westinghouse Elec. Corp. v. Republic of the Philippines*,
> 951 F.2d 1414, 1428 (3d Cir. 1991) (citations omitted).

*In re Chevron Corp.*, 633 F.3d 153, 164 (3d Cir. 2011).

Rule 501 of the Federal Rules of Evidence provides, in relevant part, as

follows:

> [I]n civil actions and proceedings, with respect to an
> element of a claim or defense as to which State law
> supplies the rule of decision, the privilege of a witness,
> person, government, State, or political subdivision
> thereof shall be determined in accordance with State law.

Fed. R. Evid. 501. Accordingly, in diversity actions, such as the instant litigation,

the law governing evidentiary privileges is supplied by the courts of the state in

which the federal court sits. *See, e.g., Rhone-Poulenc Rorer v. Home Indem. Co.*,

32 F. 3d 851, 861 (3d Cir. 1994); *Maertin v. Armstrong World Indus., Inc.*, 172

F.R.D. 143, 147 (D.N.J. 1997); *McDowell Oil Serv., Inc. v. Interstate Fire & Cas.

Co.*, 817 F. Supp. 538, 545 (M.D. Pa. 1993) (in diversity action, party's assertion

of attorney-client privilege governed by state law); *see also Serrano v. Chesapeake

Appalachia, LLC*, 298 F.R.D. 271, 280 (W.D. Pa. 2014) (observing that in

diversity actions a court "must look to state law for applicable legal principles on issues of privilege.").

The attorney-client privilege is meant to facilitate "full and frank communication between attorneys and their clients." *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007). The privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn v. United States*, 449 U.S. 383, 389 (1981). The privilege "applies to any communication that satisfies the following elements: it must be '(1) a communication (2) made between [the client and the attorney or his agents] (3) in confidence (4) for the purposes of obtaining or providing legal assistance for the client.' " *In re Teleglobe Communications Corp.*, 493 F.3d 345, 359 (3d Cir. 2007) (quoting the Restatement (Third) of the Law Governing Lawyers § 68 (2000)). Thus, the privilege reaches "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance." *Fisher v. United States*, 425 U.S. 391, 403 (1976); *see also In re Ford Motor Co.*, 110 F.3d 954, 965 n.9 (3d Cir. 1997) (communication made by client and an attorney are privileged if made "for the purpose of securing legal advice."); *United States v. Amerada Hess Corp.*, 619 F.2d 980, 986 (3d Cir. 1980).

The privilege applies both to information that the client provides to the lawyer for purposes of obtaining legal advice, as well as to the advice the attorney furnishes to the client. To this end, the Supreme Court has explained that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390.

While recognizing the value served by the privilege, courts must also be mindful that the privilege obstructs the truth-finding process and should therefore be "applied only where necessary to achieve its purpose." *Wachtel*, 482 F.3d at 231; *see also Westinghouse Elec. Corp.*, 951 F.2d at 1423. Therefore because the purpose of the privilege is to protect and promote the "dissemination of sound legal advice," it applies only to communication conveying advice that is legal in nature, as opposed to where the lawyer is providing non-legal, business advice. *Wachtel*, 482 F.3d at 231; *see also Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 152 F.R.D. 132, 137 (N.D. Ill. 1993) (stating that the privilege is inapplicable where the legal advice is incidental to business advice); *Hardy v. New York News, Inc.*, 114 F.R.D. 633, 643 (S.D.N.Y. 1987) ("The attorney-client privilege is triggered only by a client's request for legal, as contrasted with business advice[.]").

One recognized extension of the attorney-client privilege, which effectively extends the privilege to privileged communications that are disclosed to another

lawyer is the community of interest or "common interest" privilege.  Pennsylvania law recognizes the common-interest privilege, but the parties and the Court have uncovered relatively few decisions from Pennsylvania courts actually applying it or defining its reach.  *See Karoly v. Mancuso*, 65 A.3d 301, 315 (Pa. 2013) (observing that "under the prevailing law of this Commonwealth, the joint-client or common-interest privilege could potentially apply."); *see also In re Condemnation by City of Phila.*, 981 A.2d 391, 396-98 (Pa. Commw. Ct. 2009); *Gelman v. W2 Ltd.*, 2016 WL 8716248, at *3 (E.D. Pa. Feb. 5, 2016) (observing that Pennsylvania courts have given the common-interest privilege "very little attention").  The common-interest privilege is not a standalone privilege, but is in effect an extension of the attorney-client privilege, which protects counsel's ability to communicate with counsel for another party with whom his client has a shared legal interest without waiving the attorney-client privilege.

In the absence of substantial guidance from Pennsylvania's own courts, the Court looks to decisions from the other courts that have addressed the scope of the privilege, and its application.  The common-interest privilege "allows attorneys representing different clients with similar interests to share information without having to disclose it to others."  *In re Teleglobe Communications Corp.*, 493 F.3d 345, 364 (3d Cir. 2007).  The purpose of the privilege is to protect communications shared between different individuals or entities and their legal counsel where the

communications are " 'part of an on-going and joint effort to set up a common defense strategy.' " *In the Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp.*, 805 F.2d 120, 126 (3d Cir. 1986) (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir. 1985)).  In order to be entitled to rely on the common-interest privilege, the members of the asserted community of interest "must share at least a substantially similar *legal* interest." *Teleglobe*, 493 F.3d at 365 (emphasis added). "The mere overlap of commercial and legal interests 'does not negate the effect of the legal interests in establishing a community of interest.' " *MobileMedia Ideas LLC v. Apple Inc.*, 890 F. Supp. 2d 508, 517 (D. Del. 2012) (quoting *Teleglobe*, 493 F.3d at 365).  In other words, "[s]ubstantial, not sole, legal interest is required." *Id.*

**B.    The Common-Interest Privilege Covers the Entries on Log 1 that Post-Date September 27, 2016**

In late September 2016, Volkswagen, BMW, Audi and other manufacturers sent formal letters to Wyoming Valley, copying their counsel, declaring that the submission of the Purchase Agreement without apportionment of the purchase price – something that lies at the heart of the instant lawsuit – constituted a "material breach of the Volkswagen Dealer Agreement and a violation of Pennsylvania law." (Doc. 173, Ex. D.)  In its letter, Volkswagen stated that it was preserving "any and all of its contractual and statutory rights, relating to the APA and otherwise to the proposed transaction between Wyoming Valley and the

Napleton Auto Group." (*Id.*) Audi sent a substantially identical letter the following day, also copying its outside counsel. (Doc. 173, Ex. E.) Upon consideration of the form and tone of this correspondence, the Court agrees that the manufacturers' challenges to the Purchase Agreement, which explicitly referred to alleged violations of law and material breaches of contracts, made litigation reasonably foreseeable, and inspired a change in the relationship between Wyoming Valley and Napleton, which now began exchanging correspondence with one another through their respective counsel not only to negotiate the transaction, but to address the manufacturers' concerns and thinly veiled threats of legal action.[5]

Although Wyoming Valley and Napleton were previously parties to an arms' length transaction to which they could, in some respects, be considered adverse to one another, after Audi sent a letter challenging the contract that they had negotiated, these parties had a shared legal as well as commercial interest in defending against Audi's efforts to disrupt the deal. Audi's letter plainly threatened legal challenge to the transaction, and identified its own legal interests that it claimed were infringed. The Court finds that Audi's direct challenge to the transaction also gave rise to a common legal interest shared by the dealerships in

---

[5] Counsel may have continued to negotiate the transaction on behalf of their clients, but the documents submitted for *in camera* review reflect counsel working together to formulate legal responses to Audi's challenge to the deal.

responding to Audi's threats. Indeed, the Court has recognized this commonality of interests in the face of Audi's legal onslaught challenging this agreement and has found that the fact that Napleton is "a party to the Purchase Agreement that lies at the heart of this lawsuit, a transaction that Audi seeks to defeat, and enjoin," warranted allowing Napleton to intervene in this case. (Doc. 167, at 5.) Moreover, in the days leading up to the filing of the complaint, Wyoming Valley and Napleton memorialized what had been apparent since the end of September 2016, committing themselves to a "Common Interest and Joint Defense Agreement. (Doc. 173, Ex. E.)

Audi dismisses the dealerships' asserted common legal interest is a sham, suggesting that it is really no more than an extension of the parties' improper efforts to manipulate the transaction to Audi's detriment. However, Audi's argument would have greater resonance if the conduct of Wyoming Valley and Napleton had not commenced in response to a fairly explicit threat of litigation from Audi aimed at disrupting this contract. In short, the adversarial tone and tenor of Audi's communications crystallized the very common interest which Audi now decries. Moreover, Audi disregards the case law cited above that supports the view that parties may have both legal and commercial interests, and that the existence of commercial interests does not defeat the common-interest privilege so long as the parties have substantially identical legal interests as well. Here, the

Court finds that this requirement is satisfied, since the limited subset of documents exchanged between counsel for the dealerships reflect the shared business and legal interests that animated their responses to Audi's specific and articulated legal challenges to the underlying business transaction. There cannot help but be overlap in the business and legal interests in play, both from the dealerships' perspective, and also from Audi's. After Audi threatened to challenge the transaction, the communication between counsel that has been submitted for *in camera* review shows itself to be predominantly legal in nature, and in furtherance of a joint legal strategy against a common foe, and therefore the Court does not agree with Audi that the interests here were purely commercial in nature.

One of Audi's principal challenges seems to be that because the dealerships were on opposite sides of the commercial transaction that Audi challenged, they can never have a common legal interest in defending the transaction that they negotiated. We disagree. Although Audi construes some of the case law in this area narrowly, the Court finds instructive the decision in *Louisiana Municipal Police Employees Retirement System v. Sealed Air Corporation*, 253 F.R.D. 300 (D.N.J. 2008), in which the court found that parties to a proposed merger transaction had sufficiently common legal interests to trigger the common-interest privilege in defense to the plaintiff's effort to compel production of documents and information. In that case, the plaintiff made a similar argument that the parties to

the proposed merger agreement could not have a common legal interest sufficient to support the privilege, but the court disagreed:

> Sealed Air has shown that it had a sufficient common legal interest with Grace prior to the filing of the first successor liability suit. Prior to the transaction, both Grace and Sealed Air anticipated potential litigation related to asbestos issues. They also retained a substantially similar legal interest in defending against such claims. Plaintiff contends that there was not an identical legal strategy, but that is beside the point. All of the participants interests "need not coincide." Defendant has established that pre-transaction they anticipated the same claims and shared a common-interest in defending against those claims. Thus, defendants have established that the common-interest privilege precludes the discovery sought.

*Id.* at 311. Although this case does not involve a merger, it does involve a commercial transaction for the sale of assets that had the potential to result in legal challenge, which Audi threatened specifically, and which both parties had a shared legal interest in defending. Moreover, the nature of the communications that Wyoming Valley seeks to withhold from production make clear that they were not exchanged solely or even primarily in furtherance of negotiating a commercial transaction, but rather to develop a coordinated response to the threat of litigation from a party that had expressed specific concerns about the deal they had negotiated. As such, the Court is not troubled by finding that the common-interest privilege may shield these discrete pieces of communication between counsel from disclosure, as these documents related directly to the parties' shared legal interests,

rather than to their divergent commercial interests. We also note that Audi is not unfairly prejudiced by the invocation of this privilege in this particular since the privilege that we find only extends to communications which took place after Audi created this common legal interest by alleging that this transaction violated the law and constituted a material breach of contract.

Because the limited set of correspondence and documents that Wyoming Valley has withheld from production are shielded by the common-interest privilege, Audi's efforts to compel production of these documents will be denied.

### C. The Attorney-Client Privilege Applies to the Documents on Log 1 Exchanged Between Wyoming Valley and Its Broker

Wyoming Valley has also argued that a small subset of documents on its privilege log that the dealership exchanged with its broker from the Tim Lamb Group are subject to the attorney-client privilege. The dealership notes that before it began negotiations with Napleton, it retained the Tim Lamb Group, a specialized automobile-dealership broker, which is in the business of helping dealers navigate all aspects of the sale process, including contract negotiations between prospective buyers and sellers. According to Wyoming Valley, it worked with Rob Lee, a Tim Lamb regional director, who helped Wyoming Valley get its dealerships to market, and who took a lead role in helping to negotiate with Napleton. In some instances, Mr. Lee participated in communications with Wyoming Valley's outside counsel who had been engaged as part of the transaction.

As Wyoming Valley notes, "[t]here is substantial authority for the proposition that the [attorney-client] privilege will apply to protect communications with agents of the client who facilitate the transmission and technical interpretation of confidential information flowing between the attorney and the client." 1 Testimonial Privileges § 136 (3d ed.) (citing cases). Thus, privilege persons for purposes of the attorney-client privilege include not only the lawyer and the client, but also "agents of either who facilitate communications between them." Restatement (Third) of the Law Governing Lawyers § 70 (2000). Courts in Pennsylvania and elsewhere routinely rely upon this rule to uphold privilege claims involving agents of the client. *See Serrano v. Chesapeake Appalachia, LLC*, 298 F.R.D. 271, 282-83 (W.D. Pa. 2014) (communications between insurer and carrier, including communication with insured's administrator and broker, privileged); *SmithKline Beacham Corp. v. Apotex Corp.*, 232 F.R.D. 467, 476-77 (E.D. Pa. 2005) ("Presence of a third-party, such as a consultant, does not destroy the attorney-client privilege where that party is the client's agent or possesses 'a commonality of interest with the client.'") (quoting *In re Grand Jury Investigation*, 918 F.2d 374, 386 n.20 (3d Cir. 1990); *Am Standard, Inc. v. Pfizer, Inc.*, Civ. A. No. 83-834, 1986 WL 9713, at *4 (D. Del. Mar. 31, 1986) (extending privilege to "material prepared by outside consultants in response to request by . . . counsel"); *see also Levy v. Senate*, 34 A.3d 243, 254-55 (Pa. Commw. Ct. 2011).

In this case, Wyoming Valley represents that it has already produced communications involving Rob Lee that arose in a non-privileged context, including those that involved Lee and Napleton. On the privilege log, however, Wyoming Valley has identified only six documents, which are email communications, involving Lee and Wyoming Valley's counsel. Each of these emails was generated in June 2016, at a time when Wyoming Valley's outside counsel was helping to facilitate negotiations of the Purchase Agreement. The content of the emails themselves makes clear that Lee should be deemed a privileged person who was engaged for purposes of assisting the client and its counsel specifically with respect to Wyoming Valley's negotiations of its interests under the Purchase Agreement. As such, these six pieces of correspondence are privileged, and Wyoming Valley will not be required to disclose them to Audi.

**IV.    ORDER**

Accordingly, the Court having found that the 54 documents set forth on Wyoming Valley's privilege log are subject either to the common-interest privilege or are otherwise protected by the attorney-client privilege, Audi's motion to compel further production of these documents is DENIED.

So ordered this 8th day of June, 2017.

/s/  *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge