Kathryn L. Simpson, Esquire
Sup. Ct. I.D. No. 28960
Mette, Evans & Woodside
3401 North Front Street
P. O. Box 5950
Harrisburg, Pa 17110-0950
(717) 232-5000 - Phone
(717) 236-1816 - Fax
*klsimpson@mette.com*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AUDI OF AMERICA, INC. An Organizational Unit of Volkswagen Group of America, Inc., A New Jersey Corporation, | |
| Plaintiff/Counterclaim-Defendant, | Case No. 3:16-cv-02470-JEJ |
| v. | Judge John E. Jones III |
| BRONSBERG & HUGHES PONTIAC, INC. d/b/a WYOMING VALLEY AUDI, a Pennsylvania Corporation, | **INTERVENOR-DEFENDANTS' ANSWER AND COUNTERCLAIMS** |
| Defendant, | |
| and | |
| NORTH AMERICAN AUTOMOTIVE SERVICES, INC., an Illinois Corporation; NAPLETON WYOMING VALLEY IMPORTS, LLC, an Illinois Limited Liability Company; MILLENNIUM HOLDINGS, IV, LLC, a Pennsylvania Limited Liability Company; NAPLETON INVESTMENT PARTNERSHIP, LP, an Illinois Limited Partnership; and EFN WYOMING VALLEY PROPERTIES, LLC, an Illinois Limited Liability Company, | |
| Intervenor-Defendants/ Counterclaim-Plaintiffs. | |

Pursuant to the Order of this Court, dated May 16, 2017, ECF #167, Intervenor-Defendants North American Automotive Services, Inc. d/b/a Napleton Automotive Group ("NAAS") and Napleton Wyoming Valley Imports, LLC ("NWVI") (together "Napleton"),[1] along with EFN Wyoming Valley Properties, LLC ("EFN Wyoming Valley") and Millennium Holdings, IV, LLC ("MH4") (together the "Relocation Property Owner"),[2] and also with Napleton Investment Partnership, LP ("NIP") (all collectively "Intervenors") hereby answer the First Amended Complaint ("Amended Complaint," ECF #35) filed by Plaintiff Audi of America, Inc. ("Audi") against Defendant Bronsberg & Hughes Pontiac, Inc. d/b/a Wyoming Valley Audi ("Wyoming Valley"), and plead their Counterclaims against Audi as follows:

---

[1] It is the position of Napleton that NAAS has been and still is the "Buyer" under the Asset Purchase Agreement dated July 11, 2016 (the "APA"), and that the purported assignment to NWVI of the rights of the Buyer under the APA in the fall of 2016 was ineffective, as it did not have the consent of the other parties. *See* APA § 17.2. In an abundance of caution, if it is held that NAAS's assignment to NWVI was effective, NWVI joins in this Intervenor Answer and Counterclaims and asserts the same claims and defenses as NAAS.

[2] Presently, MH4 owns that certain parcel of real property referred to as the Relocation Property. Upon the closing of the APA as described herein, EFN Wyoming Valley will become the owner of the Relocation Property. Thus, depending on whether the APA has closed or not, either EFN Wyoming Valley or MH4, respectively, is entitled to assert the claims and defenses alleged herein.

## ANSWER TO AMENDED COMPLAINT

### PARTIES

1.      Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 1 of the Amended Complaint except admit that, on information and belief, Audi is an organizational unit of Volkswagen Group of America, Inc. ("VW Group") and has a principal place of business in Herndon, Virginia.

2.      Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 2 of the Amended Complaint except admit that, on information and belief, Wyoming Valley is a corporation organized under the laws of the Commonwealth of Pennsylvania and has a principal place of business in Larksville, Pennsylvania.

### JURISDICTION AND VENUE

3.      Deny the allegations in paragraph 3 of the Amended Complaint as calling for a legal conclusion for which no response is required except admit that the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      Deny the allegations in paragraph 4 of the Amended Complaint as calling for a legal conclusion for which no response is required except admit that Wyoming Valley transacts business in the Middle District of Pennsylvania.

5.      Deny the allegations in paragraph 5 of the Amended Complaint as

calling for a legal conclusion for which no response is required except admit that the assets at issue in this litigation are located in the Middle District of Pennsylvania.

## GENERAL ALLEGATIONS

### A.    The Parties' Relationships.

6.    Deny knowledge and information sufficient to form a belief as to the allegations contained in paragraph 6 of the Amended Complaint except admit that, on information and belief, Audi distributes Audi-brand vehicles, parts and accessories for resale to the public through a network of franchised Audi dealerships throughout the United States.

7.    Deny knowledge and information sufficient to form a belief as to the allegations contained in paragraph 7 of the Amended Complaint except admit that, on information and belief, Wyoming Valley is a party to an Audi Dealer Agreement and refers the Court to the Dealer Agreement, which speaks for itself.

8.    Deny knowledge and information and belief as to the allegations contained in paragraph 8 of the Amended Complaint except admit that, on information and belief, Wyoming Valley is also authorized to sell Volkswagen, Mazda, Porsche, BMW, Kia and Subaru motor vehicles as franchised motor vehicle dealers of those respective manufacturers.

### B.    The Parties' Rights Regarding the Transfer of Dealership Assets.

9.    Deny the allegations in paragraph 9 of the Amended Complaint as

calling for a legal conclusion for which no response is required.

10.     Deny the allegations contained in paragraph 10 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Act and the Dealer Agreement, which speak for themselves.

11.     Deny the allegations in paragraph 11 of the Amended Complaint as calling for a legal conclusion for which no response is required.

12.     Deny the allegations in paragraph 12 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Dealer Agreement, which speaks for itself.

13.     Deny the allegations in paragraph 13 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Dealer Agreement, which speaks for itself.

14.     Deny the allegations in paragraph 14 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Act, which speaks for itself.

15.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 15 of the Amended Complaint and refer the Court to the respective manufacturers' franchise agreements, which speak for themselves.

16.     Deny the allegations in paragraph 16 of the Amended Complaint and refer the Court to the Act, which speaks for itself.

**C.      The Asset and Real Estate Purchase Agreement.**

17.      Deny the allegations in paragraph 17 of the Amended Complaint except

admit that on or around July 11, 2016, Wyoming Valley, Napleton, and Napleton's

affiliates entered into the APA, and refer the Court to that document, which speaks

for itself.

18.      Admit the allegations in paragraph 18 of the Amended Complaint.

19.      Deny the allegations in paragraph 19 of the Amended Complaint and

refer the Court to the APA, which speaks for itself.

20.      Deny the allegations in paragraph 20 of the Amended Complaint and

refer the Court to the APA, which speaks for itself.

21.      The allegations in paragraph 21 of the Amended Complaint are not

directed to Intervenors, and thus no responsive pleading is required. To the extent

that the allegations are directed to Intervenors, they are denied.

**D.      Wyoming Valley Has Failed to Provide an Apportionment of the
         Terms of the APA that Are Attributable to the Audi Transfer.**

22.      Deny knowledge and information sufficient to form a belief as to the

allegations in paragraph 22 of the Amended Complaint and refer the Court to the

referenced document, which speaks for itself, except admit that Audi, on several

occasions, suggested that the parties withdraw the Audi assets from the from the

APA.

23.      Deny knowledge and information sufficient to form a belief as to the

allegations in paragraph 23 of the Amended Complaint and refer the Court to the referenced document, which speaks for itself.

24.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 24 of the Amended Complaint.

25.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 25 of the Amended Complaint.

26.     Deny the allegations in paragraph 26 of the Amended Complaint and refer the Court to the referenced document, which speaks for itself.

27.     The allegations in paragraph 27 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

28.     The allegations in paragraph 28 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

29.     Deny the allegations in paragraph 29 of the Amended Complaint.

30.     The allegations in paragraph 30 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

31.     The allegations in paragraph 31 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent

that the allegations are directed to Intervenors, they are denied.

32.     Deny the allegations in paragraph 32 of the Amended Complaint except admit that Audi offered to accept Wyoming Valley's withdrawal of Audi from the APA and refer the Court to the referenced document, which speaks for itself.

33.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 33 of the Amended Complaint except admit that Wyoming Valley provided a good faith breakdown of the franchise value for Audi and refer the Court to the referenced document, which speaks for itself.

34.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 34 of the Amended Complaint.

35.     The allegations in paragraph 35 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

**E.     Wyoming Valley Has Improperly Attempted to Withdraw the Sale of Its Audi Business from the APA.**

36.     Deny the allegations in paragraph 36 of the Amended Complaint except admit that Audi commenced this litigation on December 13, 2016 (ECF #1) as one of many steps it has taken to thwart Napleton of the fruits of its bargain with Wyoming Valley.

37.     Deny knowledge and information sufficient to form a belief as to the allegations in paragraph 37 of the Amended Counterclaim except admit that, on

information and belief, Wyoming Valley provided Audi a copy of the fully executed First Addendum to Asset and Real Estate Purchase Agreement and refer the Court to the referenced document, which speaks for itself.

38.     The allegations in paragraph 38 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, Intervenors deny the allegations and refer the Court to the referenced document, which speaks for itself.

39.     Deny the allegations in paragraph 39 of the Amended Complaint and refer the Court to the referenced document, which speaks for itself.

40.     Deny the allegations in paragraph 40 of the Amended Complaint.

41.     Deny the allegations in paragraph 41 of the Amended Complaint as argumentative and calling for a legal conclusion, for which no response is required and refer the Court to the referenced agreement, which speaks for itself.

42.     The allegations in paragraph 42 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

43.     Deny the allegations in paragraph 43 of the Amended Complaint.

44.     The allegations in paragraph 44 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

45.     Deny the allegations in paragraph 45 of the Amended Complaint.

46.     The allegations in paragraph 46 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

**F.     Wyoming Valley Violated AoA's Right of First Refusal.**

47.     The allegations in paragraph 47 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

48.     The allegations in paragraph 48 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

49.     The allegations in paragraph 49 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied except that Intervenors admit AoA suggested that the parties, on numerous occasions, withdraw the Audi assets from the APA.

50.     The allegations in paragraph 50 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

51.     The allegations in paragraph 51 of the Amended Complaint are not

directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

52.     The allegations in paragraph 52 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

53.     Deny the allegations in paragraph 53 of the Amended Complaint as argumentative for which no response is required except admit that Audi has displayed a pattern of conduct designed to deny Napleton the fruits of its bargain with Wyoming Valley, and that Audi and Volkswagen were the only franchisors to reject Napleton's acquisition of Wyoming Valley's franchise assets.

## COUNT I
## BREACH OF CONTRACT

54.     Intervenors repeat and incorporate by reference their responses to paragraphs 1-53 herein.

55.     The allegations in paragraph 55 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

56.     The allegations in paragraph 56 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

57.     The allegations in paragraph 57 of the Amended Complaint are not

directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

58.     The allegations in paragraph 58 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

59.     The allegations in paragraph 59 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

60.     The allegations in paragraph 60 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

61.     The allegations in paragraph 61 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

62.     The allegations in paragraph 62 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

63.     The allegations in paragraph 63 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

64.     The allegations in paragraph 64 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

## COUNT II
## VIOLATION OF THE PENNSYLVANIA BOARD OF VEHICLES ACT

65.     Intervenors repeat and incorporate by reference their responses to paragraphs 1-53 herein.

66.     Deny the allegations in paragraph 66 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Act, which speaks for itself.

67.     Deny the allegations in paragraph 67 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Act, which speaks for itself.

68.     The allegations in paragraph 68 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

69.     The allegations in paragraph 69 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

70.     The allegations in paragraph 70 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent

that the allegations are directed to Intervenors, they are denied.

71.     The allegations in paragraph 71 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

72.     The allegations in paragraph 72 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

73.     Deny the allegations in paragraph 73 of the Amended Complaint as calling for a legal conclusion for which no response is required and refer the Court to the Act, which speaks for itself.

74.     The allegations in paragraph 74 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

## COUNT III
## DECLARATORY JUDGMENT

75.     Intervenors repeat and incorporate by reference their responses in paragraph 1-53 above.

76.     The allegations in paragraph 76 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

77.     The allegations in paragraph 77 of the Amended Complaint are not

directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

78.     The allegations in paragraph 78 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

79.     The allegations in paragraph 79 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

80.     The allegations in paragraph 80 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

81.     The allegations in paragraph 81 of the Amended Complaint are not directed to Intervenors, and thus no responsive pleading is required.  To the extent that the allegations are directed to Intervenors, they are denied.

## **DEFENSES**

Intervenors assert the following defenses based upon information presently available; they reserve the right to assert additional defenses or withdraw any of the following defenses as further information becomes available through discovery or otherwise.

## FIRST DEFENSE

Audi has failed to state a claim upon which relief may be granted.

## SECOND DEFENSE

Audi's claims are barred, in whole or in part, by the Act.

## THIRD DEFENSE

Audi's claims are barred by the doctrines of estoppel, release, waiver, forfeiture, and laches, or a combination of the foregoing doctrines.

## FOURTH DEFENSE

If Audi sustained any damages, which Intervenors deny, such damages were proximately caused by Audi's own negligence, acts and omissions.

## FIFTH DEFENSE

Audi's claims against Intervenors, if any, are barred in whole or in part because it failed to mitigate its damages.

## SIXTH DEFENSE

Audi's claims against Intervenors are barred because damages sustained by Audi, if any, were the result of actions of third-parties over which Intervenors exercise no control.

## SEVENTH DEFENSE

Audi was aware of the facts, circumstances and conditions existing at the time and place set forth in the Amended Complaint and voluntarily assumed all risk

arising therefrom.

## EIGHTH DEFENSE

Audi's claims are barred by the doctrine of unclean hands.

WHEREFORE, Intervenors request judgment in favor of the Defendants, dismissing the Amended Complaint, and for such other and further relief as the Court may deem just and proper.

## INTERVENORS' COUNTERCLAIMS

### Parties

1.     Intervenor-Defendant/Counterclaim-Plaintiff      North      American Automotive Services, Inc. is a corporation organized under the laws of the State of Illinois and with its principal place of business in Illinois.

2.     Intervenor-Defendant/Counterclaim-Plaintiff      Napleton      Wyoming Valley Imports, LLC is an Illinois limited liability company with its principal place of business in Illinois.

3.     Intervenor-Defendant/Counterclaim-Plaintiff      Napleton      Investment Partnership, LP is an Illinois limited partnership with its principal place of business in Illinois.

4.     Intervenor-Defendant/Counterclaim-Plaintiff EFN Wyoming Valley Properties, LLC is an Illinois limited liability company with its principal place of business in Illinois.

5.     Millennium Holdings, IV, LLC is a Pennsylvania Limited Liability Company with its principal place of business in Pennsylvania.

6.     Bronsberg & Hughes Pontiac, Inc., d/b/a Wyoming Valley Audi is a corporation organized under the laws of the Commonwealth of Pennsylvania and with its principal place of business in Larksville, Pennsylvania.

7.     Plaintiff/Counterclaim-Defendant Audi of America, Inc. is an

organizational unit of Volkswagen Group of America, Inc. Volkswagen Group of America, Inc. is a corporation organized under the laws of the State of New Jersey and with its principal place of business in Herndon, Virginia. Audi of America, Inc. shares its citizenship with Volkswagen Group of America, Inc.

## **Jurisdiction and Venue**

8.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a) as the Intervenors/Counterclaim-Plaintiffs are diverse from Plaintiff/Counterclaim-Defendant Audi. Additionally, the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      This Court has personal jurisdiction over the Audi by virtue of it commencing this action and thus submitting itself to personal jurisdiction in the Middle District of Pennsylvania.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Intervenor's claims occurred in the Middle District of Pennsylvania, and a substantial part of property that is the subject of this action is situated in this judicial district.

## **Introduction**

11.     Intervenors bring these Intervenor Counterclaims against Audi based upon Audi's willful, unlawful, and improper attempt to thwart Napleton's proposed

acquisition of seven retail automotive dealerships in violation of the Pennsylvania Board of Vehicles Act, 63 P.S. § 818.2, *et seq.* ("the Act"). Audi has not only unreasonably withheld consent to the sale of an authorized Audi dealership, Wyoming Valley Audi, but it has also tortiously interfered with the entire Asset Purchase Agreement between Napleton and Defendant Bronsberg & Hughes Pontiac, Inc. d/b/a Wyoming Valley Audi and its affiliated entities (collectively, "Wyoming Valley").

12.    Audi has, through its actions, sought to deprive Napleton of the prospective economic advantage that was to be obtained by Napleton upon consummation of the proposed sale.

13.    Such actions include, but are not limited to, the misuse of the discovery process in this action for the improper purpose of souring Napleton's relationships with the other manufacturers who have already approved the sale, in order to result in the sale's rejection and termination. Napleton seeks compensatory and punitive damages resulting from Audi's unlawful actions.

14.    Audi has engaged in this unlawful behavior in order to punish Napleton for, among other things, its affiliates' efforts to protect their legal rights in the unrelated diesel defeat device scandal (the "TDI Scandal").

15.    Affiliates of Napleton owned multiple Volkswagen dealerships when news broke of the years-long campaign of Volkswagen AG ("VW AG") and its

subsidiaries and affiliates, Audi AG, and Volkswagen Group of America ("VW Group," which includes its unincorporated business divisions, Audi of America, Inc. and Volkswagen of America, Inc.) to defraud the federal government (VW AG, Audi AG, and VW Group collectively referred to herein as "VW").

16.    VW's fraud is well documented, including being the subject of a popular new book.[3]

17.    After subsequent fallout from a tarnished brand and investigations by the DOJ, the EPA, and numerous state Attorneys General, VW Group's corporate parent, VW AG, recently pled guilty on behalf of itself, Audi AG, and VW Group to multiple federal crimes.

18.    Those charges relate to VW's coordinated strategy to fool emissions regulators into believing that VW's "clean diesel" vehicles, including vehicles sold under the Audi brand, were within regulations—when in fact such vehicles polluted the atmosphere at many times over the legal limit.

19.    A federal MDL judge in California recently approved a class action settlement of all potential claims held by Volkswagen dealers against VW Group related to the TDI Scandal (the "MDL Settlement").

---

[3] Bethany McLean, *Driven Off Course:  How Volkswagen Got On The Road To Scandal*, N.Y. Times, June 5, 2017, *available at*:
https://www.nytimes.com/2017/06/05/books/review/volkswagen-scandal-faster-higher-farther-jack-ewing.html?_r=0 (last visited June 9, 2017).

20.     The Napleton affiliates agreed to act as the class representatives when the action was filed, ironically, at the urging of VW Group itself.  However, on November 18, 2016, the Napleton affiliates ultimately elected to opt-out of the MDL Settlement, and their case against VW Group proceeds (the "Napleton Opt Out").

21.     Perceiving Napleton as a persistent thorn in the side of VW Group due to the Napleton affiliates' exercise of their legal rights, Audi seized upon the proposed sale of Wyoming Valley's franchises as the perfect opportunity to exact revenge.

22.     Napleton came to an agreement with Wyoming Valley to purchase all of Wyoming Valley's franchises and franchise-related assets in Luzerne County, Pennsylvania, including dealerships for Mazda, Porsche, BMW, Subaru, Kia, Volkswagen and Audi, as well as purchasing the real estate and committing to the construction of new buildings, for a total investment of approximately $51.5 million (the "Initial Proposed Transaction").

23.     As described more fully below, all of the manufacturers have conditionally approved the Initial Proposed Transaction except for VW Group's two brands, Audi and Volkswagen.

24.     From the very first time that it received notice of the Initial Proposed Transaction, Audi immediately raised objections to the transaction and insisted upon an apportionment of the price of the Audi assets from the rest of the franchises under

the APA.

25.      Napleton  and  Wyoming  Valley  complied  with  Audi's  request.
Nevertheless, Audi refused, despite Wyoming Valley's demands, to advise Wyoming
Valley whether it would honor its prior conditional approval for Wyoming Valley to
relocate the Audi franchise, only with a new operator.

26.      Under the circumstances, Napleton and Wyoming Valley complied with
Audi's request in the only way that they could: by providing Audi with a valuation
for the Audi franchise without the relocation factored in. (The parties' approach
would prove prescient. As described below, on May 22, 2017, Audi relied on
information obtained in this case under a protective order to form the basis of its
decision to revoke its prior approval to relocate the franchise.)

27.      Audi objected to this approach and suggested that, if the allocation
could not be revised, Napleton and Wyoming Valley remove the Audi dealership
from the deal.

28.      Looking  to  move  forward  with  the  remainder  of  the  transaction,
Napleton and Wyoming Valley removed Audi from the Initial Proposed Transaction
through a First Addendum to the APA in an effort to complete the sale for the
remainder of the franchises (the "Proposed Transaction").

29.      Yet for reasons that it has so far been unwilling to articulate to Wyoming
Valley or this Court, Audi still acted to block the consummation of the Proposed

Transaction.

30.     Audi continued to stand in the way and otherwise obstruct the Proposed Transaction until June 28, 2017. Audi's bad faith conduct was motivated by its desire to penalize Napleton for having availed itself of its legal rights.

31.     It is apparent from the timing of its actions and other indicators that Audi, either independently or in concert with VW Group, has taken particular umbrage over the Napleton affiliates' TDI Scandal class action lawsuit and for opting out of the MDL Settlement.

32.     Audi has, in effect, weaponized its right of first refusal in an attempt to effectuate a total separation of the parties and to chill any future acquisitions that Napleton may endeavor to consummate involving VW Group franchises, including Audi.

33.     Far from looking to protect Audi's right to choose its dealer partners, Audi has perverted its right of first refusal to advance its dark motives. It abused the processes of this Court in an attempt to kill the Proposed Transaction and punish Napleton.

34.     Aside from obtaining an injunction that blocks the sale of the non-Audi dealerships while refusing to pay for them, Audi has also issued numerous subpoenas to the other manufacturers in the Proposed Transaction, while failing, until several weeks after Napleton moved to intervene, to issue subpoenas to Napleton.

35.     If Audi was truly interested in discovery narrowly tailored to confirming the value of the Audi deal, Audi surely would have started with Napleton long ago.

36.     Instead, Audi has abused the discovery process in an effort to improperly coerce the other manufacturers into rejecting the deal.

37.     Indeed, the institution of these proceedings and the issuance of third-party subpoenas resulted in at least one manufacturer expressing concerns about the consummation of the Proposed Transaction. The other approvals were put at risk, given their conditional nature and their deadlines for closing.

38.     Fully aware of the tenuous nature of any transaction before it is closed, Audi has sought and obtained an injunction for the entire Proposed Transaction, knowingly putting Napleton in peril of losing its existing conditional manufacturer approvals and jeopardizing the entire deal.

39.     Moreover, Audi's objections are moot as the Proposed Transaction no longer includes the Audi dealership. Any action by Audi in this Court after the First Addendum served no purpose other than to punish Napleton and undermine its contractual and prospective business rights. Audi's actions compounded the damages that Napleton is entitled to recover in this Intervenor Complaint.

40.     Further, VW Group has instituted a separate, duplicative lawsuit regarding its exercise of the right of first refusal for the Volkswagen franchise in the

Proposed Transaction. *Volkswagen Group of America, Inc. v. Bronsberg & Hughes Pontiac, Inc. d/b/a Wyoming Valley Volkswagen*, 17-cv-00010-JEJ (the "Duplicate Action").

41.     The true motive behind Audi and VW Group's actions have been betrayed by its own writings. In its January 4, 2017 letter to the principals of Wyoming Valley, VW Group made it clear that it wishes to dissociate itself from Napleton as a result of, *inter alia*, Napleton's prior lawsuits against the VW Group to protect Napleton's rights as a result of VW Group's illegal conduct.

42.     VW Group unreasonably rejected Napleton's purchase of Wyoming Valley's Volkswagen franchise due to Napleton's purported "bad faith conduct and history of litigation" against VW Group, including initiating the class action lawsuit that recently led to a $1.2 billion settlement in favor of all Volkswagen dealers across the country.

43.     Upon information and belief, Napleton and its dealership entities have been blacklisted by Audi and VW Group.  Indeed, Audi's entire strategy in this action appears to have been in furtherance of VW Group's larger goal of punishing Napleton for asserting its lawful claims.

44.     Moreover, VW Group's January 4, 2017 letter is nothing short of a tacit admission on its part that it does not wish to have any further business relationships with Napleton, and that it will not rest until Napleton has ceased all of its litigation

efforts against VW Group and is no longer a Volkswagen dealer.

45.     As an organizational unit of VW Group, and through its own actions, it is clear that Audi does not want to have any further business relationships with Napleton, and that it will not rest until Napleton relinquishes its Volkswagen franchises and ceases its litigation against VW Group that resulted from the VW Group's illegal and intentionally deceptive conduct.

46.     Upon information and belief, Audi's actions are an attempt to make an example of Napleton to create a chilling effect in the dealership community.  Audi is aware that large groups like Napleton grow through acquisitions, and through its wrongful conduct in this instance, it has attempted to harm the reputation of Napleton and cause would-be sellers to avoid deals with Napleton that include VW Group brands.

47.     Audi has exerted unlawful leverage through abuse of process in this action to not only deprive Napleton of an Audi dealership, but to put the entire transaction at risk and to ham Napleton's reputation and jeopardize Napleton's standing in the dealer community.

48.     That VW Group and Audi would use their respective approvals of the Proposed Transaction to punish Napleton, which has affiliated dealerships that were victims of VW Group's federal crimes, for asserting their rights, demonstrates the very corrupt nature that VW has acknowledged permeates all levels of its

organization in its plea agreement with the federal government.

49.    Audi and VW Group are self-admitted criminal enterprises, and their thuggish tactics in this litigation should be rejected.

## Factual Background

50.    In April 2016, Rob Lee, a broker with the Tim Lamb Group auto dealership brokerage firm, contacted Napleton regarding Napleton's interest in purchasing substantially all of the assets of Wyoming Valley's seven retail automotive dealerships, including Mazda, Porsche, Volkswagen, BMW, Subaru, Kia, and Audi franchises.

51.    The Audi dealership, located at 126 Narrows Road, Route 11, Larksville, Pennsylvania 18651 ("Wyoming Valley Audi"), is owned and operated at the same location with Mazda, Porsche, and Volkswagen. The BMW, Subaru, and Kia franchises operate at nearby locations in Kingston, Pennsylvania.

52.    Wyoming Valley was and is in the process of a major relocation and construction plan for certain of its dealerships, including Wyoming Valley Audi, at a cost well exceeding $27,000,000.

53.    The discussions and negotiations between Napleton and Wyoming Valley were complex, as the relocation and construction project was already underway. Despite this hurdle, Wyoming Valley and Napleton were able to agree on an overall purchase price for the seven dealerships, the properties, and the

assumption of all liabilities, including the construction of new facilities.

54.     On or about July 11, 2016, Napleton, through its affiliated entities, entered into an Asset and Real Estate Purchase Agreement (the "APA") with Wyoming Valley for the Initial Proposed Transaction.

55.     Pursuant to the APA, in addition to Napleton's purchasing through its affiliated entities the seven automotive dealerships contemplated in the Initial Proposed Transaction, EFN Wyoming Valley (a Napleton affiliate), is to purchase the parcel of real property located at 1492 Highway 315, Plains Township, Luzerne County, Pennsylvania (the "Relocation Property").

56.     The Relocation Property was, and still is at the time of this filing, owned by MH4, a limited liability company organized and existing for the sole purpose of owning the Relocation Property.

57.     Upon the closing of the APA, MH4 will transfer the Relocation Property to EFN Wyoming Valley, as per the APA's terms.

58.     The Relocation Property was and is the site of a construction project to build new dealership facilities, including a brand-new, state of the art exclusive Audi facility meeting all of Audi's design standards.

59.     The Wyoming Valley Audi dealership is supposed to relocate to the Relocation Property once construction there is complete. In a letter to Wyoming Valley dated August 12, 2016, Audi conditionally approved this planned relocation.

The parties documented Audi's conditional approval in a Relocation Agreement having the same date.

60.    The Relocation Property site is currently under construction, and construction is scheduled to be completed within weeks.

61.    However, the completion of the construction project was once not so certain: in or about October 2016, the construction project was in danger of losing its funding, and the Napleton-Wyoming Valley deal was in danger of falling apart as a result.

62.    To preserve the deal, Napleton stepped in to provide the funding necessary to resuscitate the floundering construction project: NIP, a Napleton affiliate, agreed to fund the construction project in exchange for the membership interests of MH4, pending the closing of the APA.

63.    NIP and the members of MH4 entered into a Membership Purchase Agreement (the "MIPA") in or about December, 2016 to memorialize this exchange. As a result of the MIPA, NIP owns the membership interests in MH4, while MH4 still owns the Relocation Property itself. Upon the closing of the APA, MH4 will still transfer the Relocation Property to EFN Wyoming Valley, per its terms.

64.    Upon closing of the Initial Proposed Transaction, it was Napleton's intent to operate all seven dealerships contemplated therein.

65.    Closing on the APA was conditioned upon, *inter alia*, the approval of

the manufacturers pursuant to the terms of Wyoming Valley's respective franchise agreements.

66.    On September 14, 2016, in accordance with the terms of the APA and Wyoming Valleys' franchise dealer agreement with VW Group (the "Franchise Agreement"), Wyoming Valley submitted an executed copy of the APA to VW Group for approval.

67.    During the time period from September 14, 2016 to Audi's initiation of this action, Wyoming Valley communicated with VW Group on several occasions to discuss and request assistance in compiling, preparing, and submitting a formal application to obtain Audi's approval of Napleton's proposed acquisition of Wyoming Valley Audi pursuant to the terms of the APA (the "Application Process").

68.    Audi was uncooperative throughout the entire Application Process.

69.    First, Audi falsely accused Wyoming Valley of breaching the Franchise Agreement by virtue of packaging the transaction for the multiple dealerships (colloquially known as a "bundled" or "packaged" transaction).

70.    Audi's accusations came despite this being a common practice in the industry, and despite Audi's past approval of Wyoming Valley selling its Audi franchise as part of a "packaged deal" with other franchises.

71.    Audi piled on by further alleging that it was entitled to, and thus demanded, a "good faith" breakdown of the purchase price and the other terms

attributable to the Audi transfer so that Audi could "evaluate" the Audi transfer in regards to exercising its contractual right of first refusal.  Upon information and belief, Audi never intended to engage in any such "evaluation" as same would have been completely superfluous given that Audi's position—asserted just two weeks after the Napleton affiliates' Opt-Out—was that Wyoming Valley was in breach of its Franchise Agreement by the mere packaging of the transaction.

72.    Audi made this demand despite it having no such right under either the Dealer Agreement or provisions of the Act that govern a manufacturer's right of first refusal, Pennsylvania Board of Vehicles Act, 63 P.S. § 818.16.

73.    Understanding that Napleton would be under significant pressure to try to save the deal, Audi offered Wyoming Valley and Napleton the alternative of "withdrawing the APA," thus achieving through coercion that which Audi could not otherwise accomplish through legal means.

62.    Eager to obtain Audi's approval of the APA, Wyoming Valley and Napleton used good faith efforts to satisfy the requests of Audi as it related to the Audi transfer.

63.    Audi assured Napleton and Wyoming Valley that it "intends to perform a focused review with respect to, among other matters, the buyer's proposed facility and capitalization." But from Napleton's due diligence and the state of Wyoming Valley's financial statements, it is clear that Audi had never taken any steps to

apprise itself of Wyoming Valley's financial condition up until the point that Napleton became a candidate to purchase the same. Napleton is unaware of any facts which might give Audi legitimate cause for concern had the Initial Proposed Transaction been approved.

74.    On or about November 17, 2016, Wyoming Valley and Napleton provided a good faith breakdown of the blue sky purchase price ($8 million) for the Audi transfer as a stand-alone franchise.

75.    In its November 17, 2016 letter to Audi, Wyoming Valley explained the complexities and difficulties in accommodating Audi's request, since the parties to the APA priced it as a bundled transaction, not on a franchise-by-franchise basis.

76.    Napleton's Opt-Out occurred the following day.

77.    Just two weeks later, by letter dated December 2, 2016, counsel for Audi responded by indicating its disagreement with the blue sky allocation, accusing Wyoming Valley of breaching the Franchise Agreement and *again* offering to accept Wyoming Valley's withdrawal of Audi from the Transaction.

78.    Indeed, Audi had failed and refused to engage in any good faith meaningful discussion toward a resolution of parsing out the terms of the Audi transfer.

79.    Instead, on December 13, 2016, Audi sued Wyoming Valley for the improper purpose of enjoining the APA in its entirety. Audi concurrently filed a

motion for a temporary restraining order and preliminary injunction.

80.     Audi purposefully did not name Napleton in its action in an effort to further obstruct Napleton's abilities to protect its rights under the APA. Audi has made no secret of its motivations and ill-will toward Napleton, having alleged in its Amended Complaint, without explanation, that Napleton is simply not "among the organizations that … (Audi) would choose to succeed Wyoming Valley as an Audi dealer." *See* Amended Compl. ¶ 53.

81.     Upon information and belief, Audi's allegations in ¶ 53 of its Amended Complaint are facetious, as Audi has on numerous prior occasions "chosen" convicted felons and other individuals with criminal records to acquire Audi dealerships. *See* Edward A. Robinson, *The Fall Of A Mega Dealer Rick Hendrick's Legal Woes – And A Big Headache For Honda*, Fortune, Apr. 28, 1997;[4] Will Anderson, *Charlotte's Hendrick Automotive Snags Another Luxury Car Dealership,* Charlotte Business Journal, Dec. 29, 2015.[5]

82.     Upon information and belief, Audi's position is in fact based upon the TDI Scandal lawsuit and the Napleton affiliates' Opt-Out, discussed *supra*.

83.     Recognizing that Audi's consent to the transaction was not forthcoming

---

[4] *Available at*:
http://archive.fortune.com/magazines/fortune/fortune_archive/1997/04/28/225534/index.htm (last visited June 9, 2017).
[5] *Available at*: http://www.bizjournals.com/charlotte/news/2015/12/28/charlottes-hendrick-automotive-snags-another.html) (last visited June 9, 2017).

even though the parties had cooperated fully with Audi's unreasonable demands, Napleton and Wyoming Valley accepted Audi's offer and agreed to remove Audi from the Initial Proposed Transaction.

84.     Counsel for Wyoming Valley promptly informed counsel for Audi on December 19, 2016 that the parties to the APA had decided to remove the Audi assets from the transaction through an amendment thereto.  Wyoming Valley and Napleton entered into the First Addendum to the APA, which served to carve Audi entirely out of the Initial Proposed Transaction.

85.     The following day, counsel for Wyoming Valley *again* confirmed the intent to withdraw the Audi franchise from the Initial Proposed Transaction and requested that Audi withdraw the Motion for Temporary Restraining Order and Preliminary Injunction and dismiss the case. Incredibly, Audi refused.

86.     This Honorable Court held a telephonic conference on December 21, 2016, at which time the Court heard argument from the parties regarding Audi's request for a temporary restraining order.

87.     Audi requested that the entire transaction as to all the assets be temporarily enjoined, which included Napleton's acquisition of Wyoming Valley's non-Audi assets. This Honorable Court entered an order temporarily restraining Wyoming Valley from closing the APA and from otherwise transferring not only the Audi franchise assets, but also any of Wyoming Valley's other franchise assets,

including its Subaru, Kia, Mazda, Volkswagen, BMW and Porsche dealerships.

88.    Subsequent thereto, Audi moved to extend the temporary restraining order preventing closing of the Transaction even though it no longer included the sale of Wyoming Valley Audi.

89.    Despite all this, Audi has continued to interfere by seeking discovery from certain of the other manufacturers, all of which at this point, except Audi and Volkswagen, have already conditionally approved Napleton's acquisition of their respective franchises from Wyoming Valley.

90.    Audi's actions were an obvious attempt to upend the entire deal, which would have inflicted the greatest possible harm upon Napleton. Such intent is clearly evidenced by Audi's May 22, 2017 letter to Wyoming Valley revoking it's approval of Wyoming Valley's plan to relocate Wyoming Valley Audi dealership to the new Audi facility at the Relocation Property.

91.    In that May 22, 2017 letter, Audi states that it is "not absolutely withholding its consent to a relocation by Wyoming Valley of its Audi dealership," and that it is "willing to accept and consider a new request from Wyoming Valley to relocate its Audi dealership, including to the Relocation Property." Audi also states that such willingness is conditioned on the requirement that "the improper dealings and transactions between Wyoming Valley and Napleton be unwound."

92.    The "improper dealings" Audi references include both the APA itself,

under which MH4 will transfer the Relocation Property to EFN Wyoming Valley, as well as the MIPA, in which NIP purchased of the membership interests of MH4, both described *supra*.

93.     The contents of Audi's letter reveal that Audi's issue here is not the overall transaction itself, but rather that ***Napleton*** is a part of it.

94.     Audi has crossed the line into abusive, frivolous conduct in order to advance a false narrative that the parties conspired to thwart Audi's contractual right of first refusal.

95.     When Wyoming Valley attempted to accede to Audi's demands, Audi then proceeded to twist and mischaracterize this information and used its claims to a contractual right of first refusal to justify its rejection of Napleton, one of the largest and most successful privately-owned dealership groups in the country, which currently controls more than three dozen successful dealerships located throughout the United States and is an objectively qualified dealer principal for the Audi franchise under Pennsylvania law (and any other reasonable metric).

96.     Audi's actions put in jeopardy a multimillion dollar acquisition that the parties have spent considerable time and resources trying to bring to fruition.

97.     Audi's actions are clearly revenge for the Napleton affiliates' assertion of their legal rights in connection with the TDI Scandal. VW Group admitted as much in its January 4, 2017 letter rejecting Napleton's purchase of Wyoming Valley

Volkswagen.

98.    VW Group claimed in its January 4, 2017 letter that Napleton has "engaged in bad faith conduct" toward VW Group and "has had a history of litigation" against VW Group. The letter described at length the class action suit brought by the Napleton affiliates against VW Group for the TDI Scandal, including spurious descriptions of confidential settlement discussions of that suit.

99.    The letter then notes that, though the suit originally brought by the Napleton affiliates resulted in a $1.2 billion settlement with almost every Volkswagen dealer in the country, the Napleton affiliates exercised their legal right to opt out of the settlement and continue pursuit of their legal claims against VW Group.

100.    On January 11, 2017, VW AG, on behalf of itself and its wholly-owned subsidiary, VW Group, pled guilty to multiple federal crimes related to the TDI Scandal, including conspiracy to commit wire fraud, conspiracy to violate the Clean Air Act, and obstruction of justice.

101.    As part of the plea agreement, VW is foreclosed from disputing the fact of the guilty plea or the predicate facts in any court or proceeding. *See* Plea Agreement, at 1.E, 14, & Ex. 2 ¶¶ 3-4.[6]

---

[6] *Available at*: https://www.justice.gov/opa/press-release/file/924436/download (last visited June 9, 2017)

102.   But because the Napleton Volkswagen dealerships continue to assert their legal rights related to the federal crimes committed by VW, in its letter, VW Group has ironically deemed ***Napleton*** not to be "a desirable or good faith business partner." This from the company that spent years defrauding the federal government and the public.

103.   Upon information and belief, Audi has sought to kill the entire APA transaction.

104.   Upon information and belief, Audi has been secretly shopping the entire seven-franchise deal to other dealers, even though Audi only has rights related to the Wyoming Valley Audi franchise.

105.   Audi's unseemly tactics should not be sanctioned by this Court. Napleton has rights under the Act and the common law, and by this Intervenors' Complaint, the Napleton seeks to enforce those rights.

## FIRST CAUSE OF ACTION AGAINST AUDI

(Violation of Section 12(b)(3) of the Act)

106.   Napleton repeats and realleges the preceding allegations as if fully set forth herein.

107.   Section 12(b)(3) of the Act makes it unlawful for any manufacturer or distributor to unreasonably withhold consent to the sale of a franchise to a qualified buyer capable of being licensed in the Commonwealth of Pennsylvania, who meets

the reasonable requirements of the manufacturer or distributor. *See* 63 P.S. § 818.12(b)(3).

108.   At all times relevant to the instant Counterclaims, Napleton was a qualified buyer capable of being licensed as a new Volkswagen or Audi dealer in the Commonwealth of Pennsylvania.

109.   Napleton met all of Audi's reasonable requirements for owning and operating the Audi franchise at issue.

110.   By reason of Audi's improper and untimely response to Napleton's request for approval to be a successor Audi dealer, Audi has acted in violation of Section 12(b)(3) by unreasonably withholding consent to the sale of the Audi franchise to Napleton.

111.   By way of Audi's measures to deny Napleton's application to become a successor Audi dealer, premised, in part, on the fact that Napleton had validly exercised its legal rights, Audi has acted in violation of Section 12(b)(3) by unreasonably withholding consent to the sale of the Audi franchise to Napleton.

112.   Audi's unreasonableness is further demonstrated by the fact that, upon information and belief, Audi has failed to verify or otherwise conduct any due diligence as to whether Wyoming Valley even had the financial means to complete the very substantial, on-going construction and relocation project that Audi had approved.

113.   A purchaser willing to finance such a project is rare and generally difficult to locate. Napleton was one of the few, if not the only, groups willing to step into Wyoming Valley's shoes and fund the completion of the construction and relocation projects.

114.   Upon information and belief, another prospective buyer (prior to Napleton's being offered the Initial Proposed Transaction) elected not to proceed specifically because of the daunting nature of the pending construction and relocation projects.

115.   Section 29 of the Act (63 P.S. § 818.29) provides that any person who is injured by a violation of any provision of the Act may bring an action for damages and equitable relief in any court of competent jurisdiction.

116.   Napleton has suffered monetary damages in excess of $75,000, exclusive of interest and costs, as a result of Audi's unlawful acts and omissions.

117.   Accordingly, Napleton is entitled to recover damages from Audi in an amount to be proven and determined at trial.

## SECOND CAUSE OF ACTION AGAINST AUDI

(Violation of Section 16 of the Act)

118.   Napleton repeats and realleges the preceding allegations as if fully set forth herein.

119.   Audi's attempt to delay the exercise its right of first refusal by and

through their frivolous allegations and vexatious conduct—including Audi's unreasonable demands, the filing of the present action, and unnecessary third-party discovery—violates the procedures set forth in Section 16 of the Act. (63 P.S. § 818.16.)

120. By failing to actually issue a right of first refusal for Audi or otherwise reject Napleton in accordance with the Act, Audi has compounded and substantially increased the amount of reasonable attorneys' fees that Napleton has incurred "prior to the manufacturer's or distributors exercise of its right of first refusal." Accordingly, Napleton is entitled to recover from Audi all such attorneys' fees, including those incurred in this action, pursuant to 63 P.S. § 818.16(4).

121. Due to Audi's frivolous tactics and delays, and as a consequence of Audi's violation of Section 16 of the Act, Napleton has suffered monetary damages in excess of $75,000, exclusive of interest and costs.

122. Accordingly, and pursuant to Section 29 of the Act, Napleton is entitled to recover damages from Audi in an amount to be proven and determined at trial.

## THIRD CAUSE OF ACTION AGAINST AUDI

(Tortious Interference With Contract as to Napleton)

123. Napleton repeats and realleges the preceding allegations as if fully set forth herein.

124. The APA, as amended by the First Addendum thereto, between

Napleton and Wyoming Valley is a viable and legally enforceable agreement for the sale of substantially all of the assets of Wyoming Valley's six dealerships (with Audi excluded).

125.   Audi has and continues to intentionally and unlawfully interfere with Napleton's APA, as amended, for the Proposed Transaction even after the subject Audi franchise was withdrawn from the APA.

126.   Audi has and continues to intentionally and unlawfully interfere with the Proposed Transaction by, among other things, serving frivolous and abusive subpoenas on the non-Audi manufacturers involved in the transaction, purportedly in the name of discovery but in actuality for improper purposes, while serving no discovery subpoenas on Napleton until Napleton intervened in this action (which intervention Audi unsuccessfully opposed).

127.   Upon information and belief, Audi served those subpoenas with the sole goal of disrupting Napleton's relationship with the other manufacturers involved in the transaction in order to persuade those manufacturers to withhold or rescind their approval of the Proposed Transaction.

128.   Upon information and belief, Audi has intentionally and unlawfully interfered with the Proposed Transaction by seeking out and communicating with potential alternate buyers for not just the Audi and Volkswagen franchises, but for all seven franchises that are part of the Proposed Transaction.

129.   VW Group has similarly wrongfully and unlawfully interfered with the Proposed Transaction by filing the Duplicate Action and by unreasonably rejecting Napleton as a proposed purchaser of Wyoming Valley Volkswagen.

130.   Audi's acts and omissions were willful, malicious, and undertaken with reckless indifference to the rights of Napleton.

131.   Audi lacks any privilege or other justification for its conduct toward Napleton and Wyoming Valley. Any purported right of first refusal that Audi may have had would not under any circumstances justify Audi's efforts to prevent the closing of the APA in its entirety even after the subject Audi franchise was withdrawn from the APA.

132.   Napleton has suffered monetary damages in excess of $75,000, exclusive of interest and costs, as a consequence of Audi's improper interference with the APA, as amended.  These damages include, without limitation, lost revenue and profits from the six non-Audi franchises under the APA, as amended, since Audi's wrongful conduct has prevented these transactions from closing. These damages also include, without limitation, lost opportunities that Napleton could have pursued and benefitted from but for its extended investment of time, money and resources in the transactions under the APA by virtue of Audi's wrongful interference and efforts to thwart those transactions, without legal justification.

133.   In addition, Audi's acts and omissions are sufficient to warrant (indeed,

scream for) the imposition of exemplary and punitive damages.

134.   Accordingly, Napleton is entitled to recover both compensatory and punitive damages from Audi in an amount to be proven and determined at trial.

### FOURTH CAUSE OF ACTION AGAINST AUDI

(Tortious Interference With Prospective Contractual Relations as to Napleton)

135.   Napleton repeats and realleges the preceding allegations as if fully set forth herein.

136.   Pursuant to the terms of the APA, and upon the closing therein, Napleton intended to own and operate all seven retail automotive dealerships.

137.   Pursuant to the terms of the First Addendum, and upon the closing therein, Napleton intended to own and operate six of the retail automotive dealerships, with the Audi dealership excluded.

138.   Upon the closing of the APA as amended, Napleton intended to enter into dealer agreements with the six non-Audi manufacturers whose automotive dealerships Napleton intended to own and operate. Such dealer agreements are viable and legally enforceable agreements.

139.   It was Napleton's further intent to sell and service automobiles and related products from the dealerships to the consuming public in the Luzerne County area.

140.   Napleton estimated that offering sales and service to consumers in the

Luzerne County area was reasonably probable to result in profits exceeding $6 million in the first year alone. Audi accepted, and has never challenged, Napleton's pro forma projections reflecting those reasonably estimated profits.

141.   Audi's actions, as more particularly described herein, including but not limited to its efforts to unwind the deal and its abuse of process within this action, were undertaken with the willful intent to harm Napleton. Audi's statements in its January 4, 2017 letter are tantamount to an admission to such wrongful conduct.

142.   Audi lacks any privilege or other legal justification for its improper conduct toward Napleton.

143.   As a consequence of Audi's wrongful acts and omissions, Napleton has suffered substantial monetary damages in excess of $75,000, exclusive of interest and costs. These damages include, without limitation, lost revenue and profits from the six non-Audi franchises under the APA, as amended, as Audi's wrongful conduct has prevented these transactions from closing and thus has prevented Napleton from both entering into dealer agreements with the six non-Audi manufacturers and reaping the economic benefits of those agreements. These damages also include, without limitation, lost opportunities that Napleton could have pursued and benefitted from but for its extended investment of time, money and resources in the transactions under the APA by virtue of Audi's wrongful interference and efforts to thwart those transactions.

144. Thus, Audi has tortiously interfered with Napleton's prospective contractual relations.

145. Accordingly, Napleton is entitled to recover damages from Audi in an amount to be proven and determined at trial.

## FIFTH CAUSE OF ACTION AGAINST AUDI

(Tortious Interference With Contract as to the MIPA and the transfer of the

Relocation Property)

146. Intervenors repeat and reallege the preceding allegations as if fully set forth herein.

147. The APA, as amended by the First Addendum thereto, between Napleton and Wyoming Valley is a viable and legally enforceable agreement for the sale of substantially all of the assets of Wyoming Valley's six dealerships (with Audi excluded), including for the transfer of the Relocation Property from MH4 to EFN Wyoming Valley.

148. Audi has and continues to intentionally and unlawfully interfere with the APA, as amended, for the sale of the Relocation Property from MH4 to EFN Wyoming Valley even after the subject Audi franchise was withdrawn from the APA.

149. The MIPA between NIP and the former members of MH4 is a viable and legally enforceable agreement for the sale of the membership interests in MH4.

150. Audi has intentionally and unlawfully interfered with the MIPA, even

after the Wyoming Valley Audi franchise was removed from the overall transaction.

151.   Audi notified Wyoming Valley on May 22, 2017 that Audi has revoked its approval of Wyoming Valley's plan to relocate its Audi dealership to the brand-new, state of the art exclusive facility meeting all of Audi's design standards, currently under construction and scheduled to be completed within weeks, because Audi discovered through discovery in this litigation (under a protective order) that NIP acquired an ownership interest in Millennium Holdings IV, LLC, the owner of the Relocation Property. Audi stated that it is willing to reconsider the relocation request if the "dealings and transactions between Wyoming Valley and Napleton [are] unwound."

152.   One of the "dealings and transactions" contemplated in Audi's letter is the APA, including the provision thereof by which MH4 would transfer the Relocation Property to EFN Wyoming Valley.

153.   Another of the "dealings and transactions" contemplated in Audi's letter is the acquisition of the MH4 ownership interests by NIP, as memorialized by the MIPA.

154.   Audi's revocation of relocation approval is not a hollow threat. With that decision comes the revocation of valuable Exclusive Standards Bonus monies paid to Wyoming Valley Audi, as a percentage of every new car sold. Audi is using its substantial leverage over Wyoming Valley Audi to attempt to scuttle the valid

contracts between Wyoming Valley and its principals and affiliates, and Napleton and its principals and affiliates.

155.   In essence, Audi has admitted that it is intentionally interfering with the APA and the MIPA, and as a result is threatening the viability of on-going, multi-million dollar construction project by withholding approval unless those dealings are "unwound."

156.   Audi's acts and omissions were willful, malicious, and undertaken with the intent to harm Napleton.

157.   Audi lacks any privilege or other justification for its conduct. Audi has approved the relocation location and the design of the building (which costs millions of dollars and is compliant with all Audi image standards). Audi only takes issue with the landlord, for improper reasons. Under Pennsylvania law, Audi can make no objection to the landlord of a relocation property, only the location and building itself.

158.   Moreover, any time Audi had to reject the relocation has expired. Audi is acting unlawfully.

159.    Any purported right of first refusal that Audi may have had would not under any circumstances justify Audi's efforts to prevent the transfer of the Relocation property or unwind the MIPA.

160.   Napleton has suffered monetary damages in excess of $75,000,

exclusive of interest and costs, as a consequence of Audi's improper interference with the APA and the MIPA.

161.   In addition, Audi's acts and omissions are sufficient to warrant (indeed, scream for) the imposition of exemplary and punitive damages.

162.   Accordingly, Napleton is entitled to recover both compensatory and punitive damages from Audi in an amount to be proven and determined at trial.

## SIXTH CAUSE OF ACTION AGAINST AUDI

(Tortious Interference with Contract as to the Relocation Property Owners)

163.   Intervenors repeat and reallege the preceding allegations as if fully set forth herein.

164.   The Relocation Property Owner has entered into leases, and will enter into further leases, with certain dealerships subject to the APA whose facilities will occupy the Relocation Property. Extant leases are, and prospective leases will be, viable and legally enforceable agreements.

165.   As described above, Audi notified Wyoming Valley on May 22, 2017 that Audi has revoked its approval of Wyoming Valley's plan to relocate its Audi dealership to the Relocation Property, but further noted that Audi is willing to reconsider the relocation request if the "dealings and transactions between Wyoming Valley and Napleton [are] unwound."

166.   To unwind the "dealings and transactions between Wyoming Valley and

Napleton" would be to invalidate the extant leases to which the Relocation Property Owner is a party and to extinguish the Relocation Property Owner's expectation to enter into prospective leases.

167.   In essence, Audi has admitted that it is intentionally interfering with existing and prospective leases between the Relocation Property Owner and certain dealerships.

168.   Audi's acts and omissions are willful, malicious, and undertaken with the intent to harm Napleton.

169.   Audi lacks any privilege or other justification for its conduct. Any purported right of first refusal that Audi may have had would not under any circumstances justify Audi's efforts to upend valid leases entered into by the Relocation Property Owner.

170.   The Relocation Property Owner has suffered monetary damages in excess of $75,000, exclusive of interest and costs, as a consequence of Audi's improper interference with its leases.

171.   In addition, Audi's acts and omissions are sufficient to warrant (indeed, scream for) the imposition of exemplary and punitive damages.

172.   Accordingly, the Relocation Property Owner is entitled to recover both compensatory and punitive damages from Audi in an amount to be proven and determined at trial.

## <u>SEVENTH CAUSE OF ACTION AGAINST AUDI</u>

(Violation of Section 12(b)(5) of the Act)

173.   Napleton repeats and realleges the preceding allegations as if fully set forth herein.

174.   Section 12(b)(5) of the Act (63 P.S. § 818.12(b)(5)) makes it unlawful for any manufacturer or distributor to fail to respond in writing to any request for consent to the sale of a franchise within 60 days of receipt of a written request, on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required. *See* 63 P.S. § 818.12(b)(5).

175.   Although Section 12(b)(5) of the Act provides that this time period may be extended by an additional 15 days if supplemental information is requested in a timely manner, Section 12(b)(5) expressly states that the 60-day time period for approval shall run from receipt of any supplemental requested information. *See* 63 P.S. § 818.12(b)(5).

176.   Here, Napleton electronically submitted, and Audi received, the initial application for the approval of the proposed sale on October 4, 2016.

177.   Napleton electronically submitted, and Audi received, the requested supplemental information on November 2, 2016.

178.   Section 12(b)(5) of the Act expressly states: "**In no event** shall the total time period for approval exceed 75 days from the date of the receipt of the initial

forms." [Emphasis added]

179. In this regard, Section 16 of the Act (63 P.S. § 818.16), which provides a manufacturer or distributor with the right to elect to exercise a right of first refusal, specifically provides that the manufacturer or distributor must provide timely notice in accordance with the requirements of Section 12(b)(5). *See* 63 P.S. § 818.16(1).

180. Accordingly, Audi had no more than 75 days from October 4, 2016 to reject the proposed APA or exercise any existing right of first refusal.

181. Thus, Audi had until December 19, 2016 to reject the proposed APA or exercise its right of first refusal.

182. Through letters to and from counsel, the parties agreed that such deadline would be extended to December 29, 2016, even though such extensions were not authorized under the statute.

183. Audi did not reject the proposed APA or exercise its right of first refusal by December 29, 2016.

184. The actions of the parties cannot extend the time to reject or exercise a right of first refusal under the Act, as such time "in no event" shall exceed 75 days. Thus, if Audi had a right of first refusal, such right has long since expired.

185. Audi's failure to act in a timely, statutory fashion has damaged Napleton.

186. Accordingly, and pursuant to Section 29 of the Act (63 P.S. § 818.29),

Napleton is entitled to recover damages from Audi in amount to be proven and determined at trial.

## EIGHTH CAUSE OF ACTION AGAINST AUDI

(Abuse of Process)

187.   Napleton repeats and realleges the preceding allegations as if fully set forth herein.

188.   In this action, Audi has issued subpoenas to non-party manufacturers of the other brands involved in the Proposed Transaction, and certain lenders of the parties.

189.   Audi has also sought the injunction of the entire transaction, not just the Audi portion.

190.   Upon information and belief, Audi's goal with this continued litigation, injunction, and the discovery processes used within it is to effectively terminate the Proposed Transaction.

191.   Upon information and belief, Audi has taken these measures with the goal of attempting to coerce those other non-party manufacturers subject to its subpoenas into rejecting or revoking their approval of Napleton as the purchaser of the respective non-party manufacturer franchises owned by Wyoming Valley.

192.   Upon information and belief, Audi served subpoenas on certain actual or potential lenders of the parties to the APA in an effort to dissuade them from

providing financing for any of the transactions under the APA.

193.   Upon information and belief, after issuing its subpoenas, Audi used documents and information provided by those other non-party manufacturers in response to those subpoenas to coerce those other non-party manufacturers to reject or revoke their approval of Napleton as the purchaser of the respective non-party manufacturer franchises owned by Wyoming Valley.

194.   Upon information and belief, after issuing its subpoenas, Audi also used documents and information provided by those other non-party manufacturers in response to those subpoenas to shop not just the Audi and Volkswagen franchises—but rather all seven of the franchises in the Proposed Transaction—to prospective purchasers other than Napleton in an effort to replace Napleton as the Buyer under the APA with respect to the non-Audi franchises that are the subject of the APA.

195.   Upon information and belief, after issuing its subpoenas, Audi also used documents and information provided by certain lenders that Audi subpoenaed in this action to try to dissuade those lenders from financing the transactions in the APA in whole or in part.

196.   Upon information and belief, after issuing its subpoenas, Audi also used documents and information provided by certain lenders that Audi subpoenaed in this action to try to coerce other non-party manufacturers to reject or revoke their approval of Napleton as the purchaser of the respective non-party manufacturer

franchises owned by Wyoming Valley.

197.   Discovery subpoenas were not designed to serve such improper ends.

198.   Audi's attempt to terminate the Proposed Transaction as to the non-VW Group franchises is not a legitimate purpose of a discovery subpoena.

199.   In so issuing subpoenas with these illegitimate goals, Audi has improperly perverted the process as a tactical weapon in an effort to coerce its desired improper result.

200.   Audi's ill-intent is made clear by the fact that Napleton, the primary non-party in the transaction between Napleton and Wyoming Valley, was not subpoenaed until weeks after Napleton moved to intervene in this action.

201.   Audi has abused the normal process of this Court to serve its illegal goals.

202.   Audi's misuse of the legal process as described herein has resulted in harm to Napleton.

203.   Accordingly, Audi should be prevented and enjoined from any further abuse of process.

204.   Napleton is entitled to recover damages from Audi as a result of its abuse of process in amount to be proven and determined at trial.

## **Jury Trial Demand**

205.   Pursuant to Fed. R. Civ. P. 38, Napleton demands a trial by jury on all

causes of action so triable.

## **Prayer of Relief**

**WHEREFORE**, Napleton respectfully requests that this Court enter judgment on its Counter-claims against Audi as follows:

A.   on the First Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

B.   on the Second Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

C.   on the Third Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

D.   on the Fourth Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

E.   on the Fifth Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

F.   on the Sixth Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

G.   on the Seventh Cause of Action, awarding Napleton damages in an amount to be proven and determined at trial;

H.   on the Eighth Cause of Action, enjoining any further abuses of process and awarding Napleton damages in an amount to be proven and determined at trial;

I.   awarding Napleton prejudgment interest at the statutory annual rate;

J.   awarding Napleton the costs, disbursements, and attorneys' fees incurred in this action; and

K.   awarding Napleton such other and further relief as this Court deems just, proper, and equitable.

Dated: July 19, 2017                    Respectfully submitted,


By: _/s/ Russell P. McRory_____
    Russell P. McRory (*pro hac vice*)
    James M. Westerlind (*pro hac vice*)
    Michael P. McMahan (*pro hac vice*)
    Charles A. Gallaer (*pro hac vice*)
    **ARENT FOX LLP**
    1675 Broadway
    New York, NY 10019-5874
    Phone:  212.484.3900
    Fax:  212.484.3990
    Email:  Russell.McRory@arentfox.com
    Email:  James.Westerlind@arentfox.com
    Email:  Michael.McMahan@arentfox.com
    Email:  Charles.Gallaer@arentfox.com

    Kathryn L. Simpson, Esq.
    **METTE, EVANS & WOODSIDE**
    3401 North Front Street
    Harrisburg, PA 17110-0950
    Phone:  717.232.5000
    Fax: 717.236.1816
    Email:  ksimpson@mette.com

    **Attorneys for Intervenors**

## CERTIFICATE OF SERVICE

I hereby certify that on July 19, 2017, I caused the foregoing document to be sent to the following attorneys who have filed electronically through the Court's ECF system.

Thomas B. Schmidt, III, Esq.
*schmidtt@pepperlaw.com*
Tucker R. Hull, Esq.
*hullt@pepperlaw.com*

Attorneys for Plaintiff
VOLKSWAGEN GROUP OF
AMERICA, INC.

Randall L. Oyler, Esq.
*randall.oyler@bfkn.com*
Owen H. Smith, Esq.
*owen.smith@bfkn.com*
Brandon C. Prosansky, Esq.
*brandon.prosansky@bfkn.com*
Michael S. Elvin
*michael.elvin@bfkn.com*
Caroline H. Sear
*carrie.sear@bfkn.com*
Andrew M. Spangler
*andrew.spangler@bfkn.com*

Attorneys for Plaintiff
VOLKSWAGEN GROUP OF
AMERICA, INC.

Nicholas D. George, Esq.
*ngeorge@swartz-legal.com*
Dennis George, Esq.
*dgeorge@arangiogeorge.com*
Jeffrey M. Scarfaria, Esq.
*jeff@scarfarialaw.com*

Attorneys for Plaintiff
BRONSBERG & HUGHES PONTIAC
INC. d/b/a WYOMING VALLEY
AUDI

David C. Gustman, Esq.
*dgustman@freeborn.com*
Jill C. Anderson, Esq.
*janderson@freeborn.com*
Dylan Smith, Esq.
*dsmith@freeborn.com*
Charles O. Beckley, II, Esq.
*cbeckley@pa.net*
John G. Milakovic, Esq.
*johngm@pa.net*

Attorneys for Plaintiff
BRONSBERG & HUGHES
PONTIAC INC. d/b/a WYOMING
VALLEY AUDI

*/s/ Russell P. McRory*
Russell P. McRory (*pro hac vice*)
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019-5874
Phone: 212.484.3900
Fax: 212.484.3990
Email: Russell.McRory@arentfox.com
*Attorneys for Intervenors*