## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AUDI OF AMERICA, INC. An Organizational Unit of Volkswagen Group of America, Inc., A New Jersey Corporation, | |
| Plaintiff/Counterclaim-Defendant, | Case No. 3:16-cv-02470-JEJ-MCC |
| v. | |
| BRONSBERG & HUGHES PONTIAC, INC. d/b/a WYOMING VALLEY AUDI, a Pennsylvania Corporation, | |
| Defendant, | |
| and | |
| NORTH AMERICAN AUTOMOTIVE SERVICES, INC., an Illinois Corporation; NAPLETON WYOMING VALLEY IMPORTS, LLC, an Illinois Limited Liability Company; MILLENNIUM HOLDINGS, IV, LLC, a Pennsylvania Limited Liability Company; NAPLETON INVESTMENT PARTNERSHIP, LP, an Illinois Limited Partnership; and EFN WYOMING VALLEY PROPERTIES, LLC, an Illinois Limited Liability Company, | |
| Intervenor-Defendants/ Counterclaim-Plaintiffs. | |

**Napleton's Memorandum Of Law In Opposition
To Audi's Motion To Dismiss Napleton's Counterclaims And In Support Of
Napleton's Cross-Motion To Amend Its Intervenor Complaint**

# TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................1

Statement of Facts ..............................................................................................2

Argument.............................................................................................................9

I.    Napleton has sufficiently pled that Audi unreasonably withheld
      consent from approving Napleton, a qualified buyer, and that it failed
      to reject the APA or exercise its right of first refusal within 75 days........9

   A.   Napleton has sufficiently pled that Audi did not consider Napleton's
        qualifications when unreasonably withholding consent ...........................9

   B.   Napleton has sufficiently pled that Audi failed to reject the APA
        within 75 days......................................................................................11

   C.   Napleton has sufficiently pled that Audi failed to exercise its ROFR
        within 75 days......................................................................................14

II.   Napleton has sufficiently pled that Audi purposefully set out to upend
      Napleton's contracts and destroy Napleton's business opportunities......15

   A.   Napleton has sufficiently pled that Audi tortiously interfered with
        Napleton's existing and prospective relationships ...................................15

      i.    Third Cause of Action: Tortious Interference with Contract..............18

      ii.   Fourth Cause of Action: Tortious Interference with Prospective
            Contractual Relations .........................................................................19

      iii.  Fifth Cause of Action: Tortious Interference with Contract..............21

      iv.   Sixth Cause of Action: Tortious Interference with Contract .............22

   B.   Napleton has sufficiently pled that Audi perverted judicial process........23

III.  Audi's Noerr-Pennington defense does not apply to Napleton's
      private tort and statutory counterclaims ..................................................25

IV.   The Napleton Affiliates Are Proper Parties to this Action .....................29

Conclusion .......................................................................................................31

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
 263 F.3d 239 (3d Cir. 2001) ................................................................28

*Advanced Fluid Sys., Inc. v. Huber*,
 28 F. Supp. 3d 306 (M.D. Pa. 2014)....................................................16

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
 486 U.S. 492 (1988)..............................................................................28

*Barlow v. Brunswick Corp.*,
 311 F. Supp. 209 (E.D. Pa. 1970) ........................................................17

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
 404 U.S. 508 (1972)..............................................................................25

*Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*,
 515 F. Supp. 2d 565 (W.D. Pa. 2007).....................................................9

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
 168 F.3d 119 (3d Cir. 1999) .................................................................25

*Crivelli v. Gen. Motors Corp.*,
 215 F.3d 386 (3d Cir. 2000) .................................................................17

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
 365 U.S. 127 (1961)........................................................................25, 26

*Empire Trucking Co. v. Reading Anthracite Coal Co.*,
 71 A.3d 923 (Pa. Super. Ct. 2013).......................................................16

*Jordan v. Fox, Rothschild, O'Brien & Frankel*,
 20 F.3d 1250 (3d Cir. 1994) ...................................................................9

*Kelly-Springfield Tire Co. v. D'Ambro*,
 596 A.2d 867 (Pa. Super. Ct. 1991).........................................20, 21, 22

*Klatch-Maynard v. Sugarloaf Twp.,*
    No. 3:06-CV-845, 2010 WL 5789390 (M.D. Pa. Nov. 8, 2010),
    *report and recommendation adopted,* 2011 WL 532168 (M.D. Pa.
    Feb. 8, 2011) .......................................................................................................26

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.,*
    700 F.2d 785 (2d Cir. 1983) ..............................................................................26

*Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.,*
    No. CIV.A. 07-127-LPS, 2011 WL 678707 (D. Del. Feb. 18, 2011) ...............28

*McGee v. Feege,*
    535 A.2d 1020 (Pa. 1987)...................................................................................24

*Nami v. Fauver,*
    82 F.3d 63 (3d Cir. 1996) .....................................................................................9

*Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.,*
    579 F.3d 304 (3d Cir. 2009) .......................................................................2, 9, 16

*Peoples Mortg. Co. v. Fed. Nat'l Mortg. Ass'n,*
    856 F. Supp. 910 (E.D. Pa. 1994)......................................................................17

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993)..............................................................................................25

*S3 Graphics Co. v. ATI Techs., ULC,*
    No. CV 11-1298-LPS, 2015 WL 7307241 (D. Del. Oct. 21, 2015)...................26

*Schulman v. J.P. Morgan Inv. Mgmt., Inc.,*
    35 F.3d 799 (3d Cir. 1994) .................................................................................17

*T.B. Proprietary Corp. v. Sposato Builders, Inc.,*
    No. CIV. A. 94-6745, 1996 WL 257224 (E.D. Pa. May 14, 1996) .............23, 24

*U.S. Futures Exch., LLC v. Bd. of Trade of City of Chicago,*
    No. 04 C 6756, 2005 WL 2035652 (N.D. Ill. Aug. 22, 2005) ....................26, 27

*United Mine Workers of Am. v. Pennington,*
    381 U.S. 657 (1965)......................................................................................25, 26

*Volvo Grp. N. Am., LLC v. Truck Enters., Inc.,*
      No. 7:16-CV-00025-EKD, 2017 WL 1483431 (W.D. Va. Mar. 31,
      2017), *judgment entered*, 2017 WL 1613058 (W.D. Va. Apr. 28,
      2017), *app. filed* (4th Cir. May 18, 2017)..........................................13

*We, Inc. v. City of Philadelphia,*
      174 F.3d 322 (3d Cir. 1999) ...............................................................26

**Statutes and Rules**

Fed. R. Civ. P. 24 ..............................................................................2, 29

63 P.S. § 818.12(b)(3)........................................................................9, 10

63 P.S. § 818.12(b)(5)....................................................................11, 12, 14

63 P.S. § 818.16 ....................................................................................14

## Introduction

Intervenor-Defendants/Counterclaim-Plaintiffs North American Automotive Services, Inc. ("NAAS"), Napleton Wyoming Valley Imports, LLC ("NWVI"), Millennium Holdings IV, LLC ("MH4"), Napleton Investment Partnership, LP ("NIP"), and EFN Wyoming Valley Properties, LLC ("EFN Wyoming Valley") (collectively, "Napleton") hereby respond to Plaintiff/Counterclaim-Defendant Audi of America, Inc.'s ("Audi") Motion to Dismiss Napleton's Counterclaims.

The four issues for resolution on this motion and cross-motion are straightforward:

1.  The Pennsylvania Dealer Act prohibits manufacturers from unreasonably withholding consent to the sale of a franchise to a qualified buyer, or from waiting more than 75 days to reject a deal or to exercise a right of first refusal ("ROFR"). Audi withheld consent from Napleton, a qualified buyer, because of Audi's animosity toward Napleton over a California class action involving an emissions "defeat device," and Audi's 75 days to formally reject the deal or exercise its ROFR has long expired. Has Napleton properly stated claims under Pennsylvania law?

2.  Tortious interference claims must plead: (i) a contract, (ii) the defendant purposefully harmed the contract, (iii) absence of privilege or justification, and (iv) legal damage to plaintiff. Audi has improperly attempted to: (a) coerce other manufacturers to kill the Asset and Real Estate Purchase Agreement ("APA"), and (b) coerce Defendant Bronsberg & Hughes Pontiac, Inc. d/b/a Wyoming Valley Audi ("Wyoming Valley") to kill the Membership Interest Purchase Agreement ("MIPA"). As a result, Mazda has since rejected Napleton, the APA has yet to close, and Napleton has lost potential sales and profits. Has Napleton properly stated tortious interference claims?

3.  The *Noerr-Pennington* doctrine protects parties who petition the government for redress through governmental action, but does not

apply to private commercial activity. Napleton's counterclaims arise from Audi's private conduct toward Napleton, Wyoming Valley, the other manufacturers, and other buyers, as Audi has sought to upend the entire APA through tortious interference and violations of the Pennsylvania Dealer Act. Does the *Noerr-Pennington* doctrine bar Napleton's counterclaims?

4.   Under Rule 24, intervention is proper if the intervening parties have claims that share common questions of law or fact with the main action. "Napleton" has been involved with this action since March and has already been recognized to be a proper intervenor, but "Napleton" operates through multiple entities and affiliates who own the legal rights affected by this action, and their claims won't expand the action's scope. Should the Napleton-affiliates be permitted to be added to the action?

As discussed herein, Audi's motion to dismiss should be denied in its entirety and Napleton's cross-motion to intervene should be granted.

## Statement of Facts[1]

In July of 2016, Napleton and Wyoming Valley came to an agreement whereby Napleton, through its affiliated entities, agreed to purchase from Wyoming Valley seven automobile franchises and franchise-related assets located in Luzerne County, Pennsylvania, including Wyoming Valley's Audi, Volkswagen, Mazda, Porsche, BMW, Subaru, and Kia franchises (the "APA"). (Counterclaim ¶¶ 22, 54.) Closing of the APA is conditioned upon all manufacturers involved approving the deal. (Counterclaim ¶ 65.)

---

[1] Unless otherwise noted, all facts herein come from Napleton's Counterclaims, which must be taken as true on a motion to dismiss and given every favorable inference. *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.,* 579 F.3d 304, 307 (3d Cir. 2009).

Pursuant to the APA, Napleton, through its affiliate EFN Wyoming Valley, also committed to purchase a parcel of real estate located at 1492 Highway 315, Plains Township, Luzerne County, Pennsylvania (the "Relocation Property"). (Counterclaim ¶ 55.) The Relocation Property, owned by MH4, would transfer to EFN Wyoming Valley upon the APA's closing. (Counterclaim ¶¶ 56-57.)

The Relocation Property is the planned home of a brand-new, state of the art, exclusive Audi sales facility constructed according to all of Audi's design standards. As part of the deal, the Wyoming Valley Audi dealership would move to the Relocation Property upon completion of the facilities there. (Counterclaim ¶¶ 58-59.) Audi conditionally <u>approved</u> this planned relocation in a letter to Wyoming Valley and a Relocation Agreement dated August 12, 2016. (Counterclaim ¶ 59.)

In October 2016, Wyoming Valley determined that the Relocation Property construction project was in danger of losing its funding, which put the entire Napleton-Wyoming Valley deal at risk. (Counterclaim ¶ 61.) To save the transaction, Napleton affiliate NIP agreed to step in and fund construction in exchange for the membership interests of MH4. This was memorialized in the Membership Interest Purchase Agreement (the "MIPA"), executed in December, 2016. (Counterclaim ¶¶ 62-63.)

On September 14, 2016, Wyoming Valley had previously submitted for approval an executed copy of the APA to Volkswagen Group of America, Inc. ("VW

Group"), which includes Audi among its unincorporated business divisions. (Counterclaim ¶¶ 15, 66.) From then up until the time Audi initiated this action, Wyoming Valley communicated with VW Group on several occasions to discuss and request assistance in compiling, preparing, and submitting a formal application to obtain Audi's approval of Napleton's proposed acquisition of the Wyoming Valley Audi dealership. (Counterclaim ¶ 67.)

But Audi was not forthcoming with its approvals. Audi concocted reasons to withhold its approval and thereby block the APA from closing. First, Audi falsely accused Wyoming Valley of breaching its franchise agreement with Audi by offering to sell the Wyoming Valley Audi dealership as part of a packaged transaction, even though bundled transactions are commonplace in the industry, and even though Audi had approved the sale of the Wyoming Valley Audi dealership as part of a packaged transaction in the past. (Counterclaim ¶¶ 68-70.)

Next, Audi claimed that it was entitled to a breakdown of the purchase price and other terms of the APA attributable to the Audi dealership so that Audi could "evaluate" whether to exercise a right of first refusal on the Audi franchise, despite the fact that neither the franchise agreement between Wyoming Valley and Audi nor the Dealer Act afforded Audi such an entitlement. (Counterclaim ¶ 71-72.) Audi also suggested that Napleton and Wyoming Valley "withdraw[ ] the APA" in its entirety. (Counterclaim ¶ 73.)

4

It became manifest that Audi's refusal to approve was part of an effort to upend the entire transaction. Audi's conduct was revealed when Napleton affiliates opted out in the California class action involving the emissions defeat device. (Counterclaim ¶¶ 14, 22). Specifically, Napleton affiliates owned multiple Volkswagen dealerships when it became public that Volkswagen AG, along with its Audi subsidiaries and affiliates, engaged in a years-long effort to defraud the public and emissions regulators regarding the fact that "clean diesel" vehicles, including models sold under the Audi brand, actually emitted pollutants in amounts far exceeding legal limits (the "TDI Scandal") (Counterclaim ¶¶ 15-18.) The Napleton affiliates elected to opt-out of the class action settlement, and their TDI Scandal case proceeds. (Counterclaim ¶¶ 19-20.) As a result, Audi embarked on its wrongful conduct here in Pennsylvania and seized upon Napleton's proposed acquisition of Wyoming Valley's dealerships to get even.

In the face of Audi's retaliatory behavior, Napleton and Wyoming Valley sought to obtain Audi's approval for the proposed transaction. To that end, on November 17, 2016, Napleton and Wyoming Valley provided a good faith breakdown of the blue sky purchase price ($8 million) for Audi as a stand-alone franchise, when stripped of the obligations and liabilities attendant to the package deal. (Counterclaim ¶¶ 62, 74-75.) But two weeks later, Audi's counsel indicated that Audi disagreed with the $8 million allocation, again accused Wyoming Valley of

breaching its franchise agreement with Audi, and again insisted upon withdrawal of the APA. (Counterclaim ¶ 77.)

Rather than parse the terms of the Audi transfer, on December 13, 2016, Audi sued Wyoming Valley and concurrently moved for a temporary restraining order and preliminary injunction to kill the entire APA. (Counterclaim ¶¶ 78-79.) Even though Audi knew Napleton's contracts were affected and that Napleton thus had a significant interest in the litigation, Audi purposefully refrained from naming Napleton as a party, which had the intended effect of inhibiting Napleton's ability to protect its APA-related contract rights. (Counterclaim ¶ 80.) Audi has admitted its ill-will and contempt toward Napleton in its Amended Complaint, in which Audi alleges that Napleton is not "among the organizations that . . . (Audi) would chose to succeed Wyoming Valley as an Audi dealer." (*Id.* (citing Amended Compl. ¶ 53).)

It became apparent that Audi's approval would never be forthcoming. Accordingly, on December 22, 2016, Wyoming Valley and Napleton executed a First Addendum to the APA, which removed the Audi assets from the transaction entirely. (Counterclaim ¶¶ 83-84.) But despite the agreement to carve Audi out of the APA, Audi refused to withdraw its Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction or dismiss its case. (Counterclaim ¶¶ 83-85.) In effect, Audi continued on its path to interfere with the APA, harm Napleton, and frustrate Napleton's ability to engage in business in the Luzerne County area.

6

On December 22, 2016, this Court issued the requested TRO, which it later converted into a preliminary injunction that enjoined the closing of the entire APA—not just with respect to the Audi assets, but also with respect to all other of Wyoming Valley's dealership assets. (Dkt. Nos. 16, 22, 30, 28; Counterclaim ¶¶ 86-88.) On Audi's motion to extend the preliminary injunction, the Court later scheduled a hearing for June 28, 2017. (Dkt. No. 147.)

In the interim, Audi undertook further acts to harm Napleton and interfere with its contract with Wyoming Valley and its prospective business relationship. For instance, in an attempt to coerce other manufacturers to pull out of the APA, Audi pressured them to turn away from Napleton, even though all manufacturers (except for Audi and Volkswagen) had already conditionally approved Napleton's acquisition of their respective franchises from Wyoming Valley. (Counterclaim ¶¶ 89.) Audi's tactics worked: just weeks ago (during the pendency of this motion), on September 29, Mazda informed Napleton that it had rejected the proposed sale of Wyoming Valley Mazda to Napleton, noting that Napleton's "situation with Volkswagen and Audi" is "not fully resolved." *See* Declaration of David N. Wynn, Esq., dated October 25, 2017 ("Wynn Decl."), Exh. A.[2]

---

[2] Unknown at this time and to be the subject of discovery in this action is what communications and acts Audi undertook with other manufacturers to upend the deal. Furthermore, upon information and belief, Audi secretly shopped the entire seven-franchise transaction to other dealers, even though Audi's rights are limited to the Wyoming Valley Audi franchise. (Counterclaim ¶ 104.)

Audi also held the move of Wyoming Valley's Audi franchise to the Relocation Property hostage. In a May 22, 2017 letter, Audi revoked its prior approval of the relocation and stated that it would be "willing to consider and accept a new request from Wyoming Valley to relocate its Audi dealership . . . to the Relocation Property," conditional on the requirement that "the improper dealings and transactions between Wyoming Valley and Napleton be unwound." The "improper dealings" Audi references include the APA and the MIPA. (Counterclaim ¶¶ 91-92; Wynn Decl., Exh. B.)

The letter was designed to not only harm Napleton, but also to create a rift between Napleton and Wyoming Valley, cause a breach of the APA and the MIPA, and harm Napleton's investment in the Relocation Project. The letter, along with Audi's conduct as described therein, reveal that Audi's conduct is not motivated by the merits of the transactions, but by Napleton's part in them.

These facts underpin three statutory claims and five common law tort claims of contract interference, interference with prospective contractual relation, and abuse of process. Simply put, Audi has sought to impair the Wyoming Valley/Napleton relationship and Napleton's relationship with the other manufacturers, and Audi did so out of animus toward Napleton. Napleton's claims should have their day in court.

**Argument**

In reviewing a motion to dismiss, the Court must accept all factual allegations as true and must construe the complaint in plaintiffs' favor to determine whether, under any reasonable reading of the complaint, plaintiffs may be entitled to relief. *Nationwide Life Ins. Co. v. Commonwealth Land Title Ins. Co.*, 579 F.3d 304, 307 (3d Cir. 2009). "The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief." *Caldon, Inc. v. Advanced Measurement & Analysis Grp., Inc.*, 515 F. Supp. 2d 565, 572 (W.D. Pa. 2007) (citing *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994)). "Under this standard a complaint will be deemed sufficient if it adequately puts the defendant on notice of the essential elements of a cause of action." *Id.* at 572–73 (citing *Nami v. Fauver*, 82 F.3d 63, 66 (3d Cir. 1996)). Napleton's counterclaims certainly meet this standard.

**I.    Napleton has sufficiently pled that Audi unreasonably withheld consent from approving Napleton, a qualified buyer, and that it failed to reject the APA or exercise its right of first refusal within 75 days.**

    **A.    Napleton has sufficiently pled that Audi did not consider Napleton's qualifications when unreasonably withholding consent.**

Section 12(b)(3) of the Dealer Act makes it unlawful for any manufacturer or distributor to unreasonably withhold consent to the sale of a franchise to a qualified buyer who meets the manufacturer or distributor's reasonable requirements. *See* 63

9

P.S. § 818.12(b)(3). Napleton alleges in its first claim that Audi unreasonably withheld consent to the sale of the Wyoming Valley Audi dealership to Napleton. (Counterclaim ¶¶ 106-117.)  Napleton alleges that although it was a qualified buyer meeting all of Audi's requirements, Audi improperly and untimely responded to Napleton's request for approval to be a successor Audi dealer. (Counterclaim ¶¶ 108-110.)

Audi seeks dismissal of the 12(b)(3) claim on the grounds that because the Audi franchise was removed from the APA, "there was no proposed transaction for AoA to consent to by any statutory deadline." (Audi Br. at 10.) This argument is unavailing for three reasons. First, Audi improperly advances a factual argument in support of dismissal. Second, section 12(b)(3) has no statutory deadline. Third, Audi ignores the fact, as alleged, that Audi openly stated it would not do business with Napleton. This, on its face, this makes out a prima facie claim of unreasonable withholding of consent. Audi even compounded its statutory violation by suing Wyoming Valley for breach of its franchise agreement precisely because Wyoming Valley proposed to sell to Napleton. The essence of the 12(b)(3) claim is that Audi's withholding consent to Napleton's request for approval was retaliation for the valid exercise of legal rights against Audi's sister brand in the TDI Scandal lawsuit. (Counterclaim ¶¶ 15-20, 111.)

**B.     Napleton has sufficiently pled that Audi failed to reject the APA within 75 days.**

Section 12(b)(5) makes it unlawful for any manufacturer to fail to respond in writing to any request for consent to the sale of a franchise within 60 days of receipt of a written request. *See* 63 P.S. § 818.12(b)(5). (Counterclaim ¶¶ 173-186.) Section 12(b)(5) also provides that the 60 day time period may be extended by no more than an additional 15 days if supplemental information is requested in a timely manner. 63 P.S. § 818.12(b)(5). But *"(i)n no event* shall the total time period for approval exceed 75 days from the date of the receipt of the initial forms." *Id.* (emphasis added).

Here, Napleton alleges Audi clearly violated the statutory deadline. Napleton alleges that it electronically submitted, and Audi received, the initial application for approval of the proposed sale of the Wyoming Valley Audi franchise on October 4, 2016. (Counterclaim ¶ 176.) At most and by statute, Audi had 75 days—until December 19, 2016—to reject the proposed APA or exercise any existing ROFR, and its failure to do either violated the Dealer Act. (Counterclaim ¶¶ 180-181.) Audi did not meet the unambiguous statutory deadline and reject the APA or exercise any ROFR by December 19, 2016. Accordingly, this claim is stated. While Audi claims the statutory 75-day deadline was extended to December 29, 2016 on consent (a factual dispute), the deadline could not be extended by the parties. It is further

11

irrelevant because Audi to this day has not exercised its ROFR, well beyond even that later deadline.

Alternatively, Audi argues that this claim fails because the Audi component of the sale was removed from the APA. (Audi Br. at 10.) Hence, according to Audi, there was no "transaction for AoA to consent to by any statutory deadline." (Audi Br. at 10.) Audi argues that "Napleton cannot have it both ways," but Audi ignores the fact that Audi did not comply with the statutory deadline.[3] In effect, Audi attacks Napleton for proceeding with the sale of the non-Audi franchises even after the statutory violation occurred. But that does not defeat the claim. More to the point, if it is Audi's position that there was no proposed transaction for it to consent to, then Audi has no more ROFR to exercise and its litigation should have ceased. It is *Audi* that cannot "have it both ways."

Audi further contends that Napleton and Wyoming Valley's failure to "identify the terms" to which Audi's right of first refusal applied "negated" the approval notice deadlines articulated in Dealer Act section 12(b)(5). *Id.* Again, Audi offers a factual defense not appropriate for a motion to dismiss. In any event, Napleton and Wyoming Valley *did* provide a good faith breakdown of the blue sky purchase price of $8 million for Audi as a stand-alone franchise. (Counterclaim ¶¶ 62, 74-75.) Audi

---

[3] The Audi franchise was not removed from the APA until December 22, 2016—days after the December 19, 2016 statutory deadline had passed.

could have used this information to either exercise its ROFR or reject the APA. It did neither.

Moreover, the case cited is inapposite. *See Volvo Grp. N. Am., LLC v. Truck Enters., Inc.*, No. 7:16-CV-00025-EKD, 2017 WL 1483431, at *1 (W.D. Va. Mar. 31, 2017), *judgment entered*, 2017 WL 1613058 (W.D. Va. Apr. 28, 2017), *app. filed* (4th Cir. May 18, 2017). There, the scope of Volvo's ROFR was at issue—i.e., whether the ROFR encumbered the entire proposed sale of a package of dealerships, or whether it encumbered only the Volvo-related assets in that package. 2017 WL 1483431, at *1–2. After determining that Volvo's statutory right of first refusal encumbered only the Volvo-related portions of the deal, the court declared that the 45-day statutory deadline for exercise of that right would not commence until the seller provided a "completed proposal." *Id.* at *13. However, under the Virginia statute at issue, the receipt of a "completed proposal" was a necessary condition for a manufacturer's exercise of its right of first refusal and for the triggering of the statutory deadline for exercise. *See id.* at *9.

This is in stark contrast to here, where the deadline is triggered by the initial application, a request for further information only adds 15 days, and "in no event" shall the deadline be extended past the 75 days. Audi's brief essentially asks "what about this event?" No means no. No event. The time has passed.

Accordingly, Napleton's Seventh Cause of Action is stated.

13

### C.   Napleton has sufficiently pled that Audi failed to exercise its ROFR within 75 days.

Napleton's second claim alleges that Audi a section 16 violation, which

provides:

> A manufacturer or distributor shall be permitted to enact a right of first refusal to acquire the new vehicle dealer's assets or ownership in the event of a proposed change of all or substantially all ownership or transfer of all or substantially all dealership assets *if all of the following requirements are met*:
>
> (1) To exercise its right of first refusal, the manufacturer or distributor must notify the dealer in writing within the 60-day or 75-day time limitations established under section 12(b)(5).
>
> * * *
>
> (4) The manufacturer or distributor agrees to pay the reasonable expenses, including reasonable attorney fees which do not exceed the usual, customary and reasonable fees charged for similar work done for other clients, incurred by the proposed new owner and transferee prior to the manufacturer's or distributor's exercise of its right of first refusal in negotiating and implementing the contract for the proposed change of all or substantially all ownership or transfer of all or substantially all dealership assets. . . .

63 P.S. § 818.16. Section 16(1) incorporates section 12(b)(5)'s mandate that "*[i]n no event* shall the total time period for approval exceed 75 days from the date of the receipt of the initial forms." 63 P.S. § 818.12(b)(5) (emphasis added).

Here, Audi offers no new argument. As alleged above, Audi failed to exercise its purported ROFR or otherwise reject Napleton in accordance with the 12(b)(5)'s time limits. "In no event"—including any event raised by Audi—"shall the total time" exceed 75 days. This failure also violates Section 16(1).

14

\*         \*         \*

In summary, all three of Napleton's statutory claims are stated. Napleton alleges Audi failed to consider the transaction on the merits, which failure violated the Dealer Act and resulted in damages to Napleton.

## II. Napleton has sufficiently pled that Audi purposefully set out to upend Napleton's contracts and destroy Napleton's business opportunities.

Napleton also brings five common law tort claims: four for tortious interference and one for abuse of process.

### A. Napleton has sufficiently pled that Audi tortiously interfered with Napleton's existing and prospective relationships.

To prevail on a tortious interference claim under Pennsylvania law, a plaintiff must plead:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party;

> (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring;

> (3) the absence of privilege or justification on the part of the defendant;

> (4) legal damage to the plaintiff as a result of the defendant's conduct; and

> (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 336 (M.D. Pa. 2014) (citations omitted) (denying motion to dismiss tortious interference claim for failure to state a claim).

Audi attacks Napleton's tortious interference claims by justifying its conduct as being in furtherance of its "efforts to enforce its contractual ROFR" and thus privileged. (Audi Br. at 12.) This attack fails.

First, in each of its causes of action for tortious interference, Napleton has alleged that Audi lacked privilege or justification to interfere. (*See, e.g.,* Counterclaim ¶¶ 131, 142, 157, 169.) In considering this motion to dismiss, the Court must accept these allegations as true and must construe the complaint in Napleton's favor. *Nationwide Life Ins. Co.*, 579 F.3d at 307. Here again, Audi improperly argues facts. Whether conduct is privileged depends on whether conduct is the type that is "sanctioned by the rules of the game adopted by society and fall[s] within the area of socially acceptable conduct . . . ." *Advanced Fluid Sys., Inc.*, 28 F. Supp. 3d at 338 (M.D. Pa. 2014) (quoting *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 935–36 (Pa. Super. Ct. 2013)) (internal quotation marks omitted). Whether Audi's unlawful and outright malicious conduct, as alleged, is not within "the rules of the game" is a factual matter inappropriate for consideration at the pleading stage.

16

Second, the cases Audi cites for this position are inapposite, as those cases involve a party that *actually exercised* the defined contract right. *See, e.g., Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 395 (3d Cir. 2000) ("While GM's *exercise of its contractual right of first refusal* necessarily interfered with the purchase agreement between Crivelli and Scheidmantel, it does not subject GM to liability for interfering with their contract.") (emphasis added) (citation omitted); *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 810 (3d Cir. 1994) ("Widener acted in good faith pursuant to its own reserved, contractual right in the mortgage and loan documents between it and WALP to oversee the selection of the Widener Building tenants."); *Barlow v. Brunswick Corp.*, 311 F. Supp. 209 (E.D. Pa. 1970) (billiard equipment manufacturer was privileged to interfere with alleged oral contract between its promoter and other television producers where the manufacturer, pursuant to prior contract with the promoter, had paid and was paying the promoter for the right to use his public image and for the right to designate his public appearances toward that end); *Peoples Mortg. Co. v. Fed. Nat'l Mortg. Ass'n*, 856 F. Supp. 910, 934 (E.D. Pa. 1994) ("The Letter Agreement gave Fannie Mae the right to seek loan repurchases from Peoples. . . . Thus, *when Fannie Mae sought repurchases*, and by so doing allegedly interfered with Peoples' prospective contract with Fidelity, it was seeking to enforce a right specifically granted to it by the Letter Agreement.") (emphasis added). In stark contrast here, Audi never exercised its

17

ROFR, but instead weaponized the ROFR to try to drive a wedge into between Napleton and Wyoming Valley and other manufacturers with the goal of killing the entire seven-dealership transaction and harming Napleton.

Scrutiny of Napleton's counterclaims demonstrates that Napleton has pled its causes of action for tortious interference, as follows.

### i.    *Third Cause of Action: Tortious Interference with Contract*

Napleton pleads all the elements of a claim for tortious interference with contract as to the APA. With respect to element one, Napleton alleges that the APA is a viable and legally enforceable contract with Wyoming Valley. (Counterclaim ¶ 124.) For element two, Napleton alleges that Audi has purposefully and maliciously interfered with the APA (even after the Audi franchise was withdrawn from it) with the intent to harm Napleton by disrupting the entire transaction, including by coercing other manufacturers to withdraw from the deal and by shopping the entire transaction to prospective purchasers other than Napleton (even though any rights Audi has are limited to the Audi franchise). (Counterclaim ¶¶ 125-130.) For element three, Napleton further alleges that Audi lacked any privilege or justification to engage in such conduct. (Counterclaim ¶ 131.) Finally, Napleton alleges that it has suffered money damages as a result of Audi's interference, including damages for lost revenue and profits, as well as for lost opportunities that Napleton could have pursued and benefitted from but for its extended investment of time, money, and

resources in the transactions under the APA. (Counterclaim ¶ 132.) Accordingly, Napleton pleads all essential elements for its Third Cause of Action.

Audi contends that this claim should be dismissed because there has been "no interference and no damage." (Audi Br. at 14). This position is factual. Regardless, the evidence suggests there was actual interference, as we now know that Mazda rejected the proposed sale of Wyoming Valley's Mazda dealership to Napleton on the basis of the unresolved "situation with Volkswagen and Audi." Wynn Decl., Exh. A.

### ii.   Fourth Cause of Action: Tortious Interference with Prospective Contractual Relations

Napleton states a claim for tortious interference with prospective contracts with the five non-Audi manufacturers subject to the APA. With respect to element one, Napleton alleges that it intended to enter prospective dealer agreements with those five non-Audi manufacturers, which would be valid and legally enforceable agreements. (Counterclaim ¶ 138.) Napleton also alleges that as a party to those dealer agreements, it intended to sell and service automobiles and related products to prospective customers in the Luzerne County area. (Counterclaim ¶ 139.)

For element two, Napleton alleges that Audi's conduct was undertaken with the intent to harm Napleton, including by preventing Napleton from consummating the transaction with *any* manufacturer involved. (Counterclaim ¶ 141.) For element

three, Napleton further alleges that Audi lacked any privilege or justification to engage in such conduct. (Counterclaim ¶ 142.)

For element four, Napleton alleges that it has suffered money damages as a result of Audi's interference, including damages for lost revenue and profits, as well as for lost opportunities that Napleton could have pursued and benefitted from but for its extended investment of time, money, and resources in the transactions under the APA. (Counterclaim ¶ 132.)

For the fifth element, Napleton alleges that upon the closing of the APA subject to the First Addendum, Napleton would enter into dealer agreements with the non-Audi franchises to sell and service those manufacturers' products, and that Napleton has been prevented from reaping the economic benefits of those agreements because of Audi's conduct preventing the APA from closing. (Counterclaim ¶¶ 137-140, 143.) Accordingly, Napleton pleads all essential elements for its Fourth Cause of Action.

Audi argues that this claim fails because Napleton "has not been prevented from closing its purchases of the remaining dealerships" and thus has suffered "no damage." (Audi Br. at 13-14). This is unavailing, as the fact that the APA may close is not fatal to the claim. *See Kelly-Springfield Tire Co. v. D'Ambro*, 596 A.2d 867, 871 (Pa. Super. Ct. 1991) ("It also was not fatal to appellant's cause of action [for tortious interference] that an agreement for the sale of the warehouse property was

20

ultimately reached . . . ."). Further, the claim seeks damages for lost profits and opportunities resulting from the delays caused by Audi's conduct. (Counterclaim ¶ 132) *See Kelly-Springfield Tire Co.*, 596 A.2d at 871 ("The complaint contains averments that a resale was unnecessarily delayed by the interference . . . and that actual damage was caused thereby. This was sufficient.").

Finally, Audi argues that the claim fails because Napleton has "failed to allege the identity of a single future customer" lost as a result of Audi's conduct. (Audi Br. at 15). This argument misses the mark. Napleton specifically alleges prospective contracts with the five non-Audi franchises with whom Napleton intended to enter dealer agreements upon the closing of the APA, (Counterclaim ¶ 132), and that Audi's conduct has prevented Napleton from entering those agreements. (Counterclaim ¶ 143.)

### iii.    *Fifth Cause of Action: Tortious Interference with Contract*

Napleton states a claim for tortious interference with two additional agreements: (1) the APA, with respect to its provision that upon closing, the Relocation Property will transfer from MH4 to EFN Wyoming Valley, and (2) the MIPA. (Counterclaim ¶¶ 146-162.) With respect to the first element, Napleton alleges that both the APA and the MIPA are viable and legally enforceable agreements (Counterclaim ¶¶ 147, 149), and that Audi purposefully and intentionally interfered with the APA and the MIPA to harm Napleton, including by requiring that

21

the APA and the MIPA be unwound as a condition for re-approval of the relocation of Wyoming Valley Audi to the Relocation Property. (Counterclaim ¶¶ 148-156.) Napleton further alleges that Audi lacks any privilege or justification for this conduct. (Counterclaim ¶¶ 157-159.) Finally, Napleton alleges that it has suffered money damages as a result of Audi's interference. (Counterclaim ¶ 150.)

Audi's predicate for dismissal is that the MIPA has not been unwound, and because Napleton still intends to complete the MH4-to-EFN Wyoming Valley transaction when the APA closes, there is no interference and no damages. (Audi Br. at 16-17). This argument is unavailing because Audi's efforts to unwind these agreements resulted in delays, which is a recognized damage. *See Kelly-Springfield Tire Co.*, 596 A.2d at 871.

With respect to Audi's argument that this claim fails because it is brought by nonparties NIP, MH4, and EFN Wyoming Valley, Napleton respectfully refers the Court to Napleton's Cross-motion to Amend its Intervenor Complaint.

### iv.   *Sixth Cause of Action: Tortious Interference with Contract*

Napleton states a claim for tortious interference with contract as to the existing and prospective leases between the Relocation Property Owner[4] and dealerships that

---

[4] Presently, MH4 owns the Relocation Property. As described herein, upon the closing of the APA, MH4 will transfer ownership of the Relocation Property to EFN Wyoming Valley. Therefore, depending on whether the APA has closed or not, either MH4 or EFN Wyoming Valley is entitled to assert the claims and defenses alleged in Napleton's Answer and Counterclaims. *See* Answer at 2.

will occupy the Relocation Property subject to the APA. (Counterclaim ¶¶ 163-172.)

Napleton alleges that both the extant leases and the further leases the Relocation

Property Owner would enter are and will be viable and legally enforceable

agreements. (Counterclaim ¶ 164.) Napleton also alleges that Audi's conduct—

namely, its request that the "dealings and transactions between Wyoming Valley and

Napleton" be unwound—was a purposeful effort to harm Napleton by invalidating

the extant leases and extinguishing the Relocation Property Owner's expectation to

enter into further leases with the other dealerships to occupy the Relocation Property.

(Counterclaim ¶¶ 165-168.) Napleton further alleges that Audi lacked any privilege

or justification for its conduct, and that Audi's efforts to upend existing valid leases

and prevent the entering of further leases have caused Napleton monetary harm.

Audi's argument here fails for the same reasons described above. *See also*

Napleton's Cross-motion to Amend its Intervenor Complaint.

### B.     Napleton has sufficiently pled that Audi perverted judicial process.

Napleton's states its eighth claim that Audi has abused judicial process with

the improper intent of killing the dealings between Napleton and Wyoming Valley.

Under Pennsylvania common law, "[t]he gist of an action for abuse of process is the

improper use of process after it has been issued, that is, a perversion of it" toward a

result that is not a legitimate objective of that process. *T.B. Proprietary Corp. v.*

*Sposato Builders, Inc.*, No. CIV. A. 94-6745, 1996 WL 257224, at *1 (E.D. Pa. May

14, 1996) (quoting *McGee v. Feege*, 535 A.2d 1020, 1023 (Pa. 1987)) (internal quotation marks omitted).

Here, Napleton alleges that Audi has issued subpoenas to non-party manufacturers of other brands involved in the transaction, as well as to actual and potential lenders of parties to the APA, for the illegitimate purpose of coercing those manufacturers into revoking their approval of Napleton and Wyoming Valley's transaction and dissuading those lenders from providing financing for transactions related to the APA. (Counterclaim ¶¶ 188-192.) The essence of Napleton's claim is twofold: (1) that Audi used documents and information obtained pursuant to those subpoenas to effectuate coercive ends to harm Napleton, (Counterclaim ¶¶ 193-196), and (2) through process such as subpoenas, Audi improperly perverted judicial process to harm Napleton. (Counterclaim ¶¶ 199-202). These tactics support an abuse of process claim. *See T.B. Proprietary Corp.*, 1996 WL 257224, at *3 (denying summary judgment on abuse of process counterclaim where evidence that counterclaim-defendant's "conducting depositions to intimidate and coerce litigation opponents and others, rather than for goodfaith discovery, . . . could demonstrate perversion of the discovery process").

In response, Audi contends that its abusive behavior was directed at third parties instead of Napleton, and argues that Napleton is therefore not entitled to bring an abuse of process claim. However, Audi used process toward parties other than

Napleton with the express intent of injuring Napleton. Audi's efforts were in fact successful, as evidenced by Mazda's recent revocation of approval. A claim is stated because Audi has endeavored to cast Napleton as a pariah and to send a message to other prospective dealership owners that Napleton is not a party be dealt with. Audi should not be permitted to skate away from this malicious conduct, and its motion to dismiss Napleton's Eighth Cause of Action should be denied.

### III.   Audi's *Noerr-Pennington* defense does not apply to Napleton's private tort and statutory counterclaims.

The *Noerr-Pennington* doctrine is not an "absolute bar" to Napleton's counterclaims, as Audi contends. (Audi Br. at 1.) To be blunt, it is not even relevant to this case. As alleged, the operative conduct underlying Napleton's counterclaims has nothing to do with Audi's protected "petitioning" activity.

The *Noerr-Pennington* doctrine protects parties who petition the government for redress from claims that arise in response to that activity. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965)). Government petitioning includes seeking relief through the courts. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, (1972); *see also Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–57 (1993). Although *Noerr-Pennington* immunity arose in the antitrust context, the Third Circuit Court of Appeals has

"extended the *Noerr-Pennington* doctrine to offer protection to . . . petitioning activities in contexts outside the antitrust area . . . ." *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 326–27 (3d Cir. 1999).

However, *Noerr-Pennington* immunity is narrow and applies to efforts "directed toward obtaining ***governmental*** action." *Noerr*, 365 U.S. at 140 (emphasis added); *see also Pennington*, 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted ***effort to influence public officials*** regardless of intent of purpose.") (emphasis added); *Klatch-Maynard v. Sugarloaf Twp.*, No. 3:06-CV-845, 2010 WL 5789390, at *5 (M.D. Pa. Nov. 8, 2010) ("[A]n individual is immune from liability for exercising his or her First Amendment right to ***petition the government***.") (emphasis added) (citation and internal quotation marks omitted), *report and recommendation adopted*, 2011 WL 532168 (M.D. Pa. Feb. 8, 2011).

In contrast, private commercial activity does not qualify for *Noerr-Pennington* protection. *See S3 Graphics Co. v. ATI Techs., ULC*, No. CV 11-1298-LPS, 2015 WL 7307241, at *15 (D. Del. Oct. 21, 2015) (citing *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 807 (2d Cir. 1983)) (*Noerr-Pennington* did not shield conduct that was not "petitioning the government" but was instead "private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws.") (internal quotation marks omitted); *see also U.S. Futures Exch., LLC v. Bd. of Trade of City of Chicago*, No. 04 C 6756, 2005 WL 2035652, at *1 (N.D. Ill.

26

Aug. 22, 2005) (defendants' conduct, which included efforts to interfere with Plaintiffs' regulatory services agreement with the National Futures Association, had "nothing to do with Defendants' petitioning activities and [was] not subject to *Noerr-Pennington*.").

Napleton's counterclaims do not derive from Audi's "petitioning" of the government for redress. Rather, the counterclaims have their genesis in Audi's private, commercial conduct directed towards Napleton as private actor who sought to acquire valuable private contract rights, with which Audi obstructed and interfered. Three of Napleton's counterclaims allege Dealer Act violations. These claims arise out of Audi's failure to consider and approve a private transaction within the framework of the Dealer Act. Audi's conduct in this regard has nothing to do with petitioning or other activity remotely relevant to *Noerr-Pennington*. Audi cannot claim its ROFR shields it from statutory challenge.

As to the business torts counterclaims, those involve conduct towards Napleton, Wyoming Valley, and additional private entities, as evidenced by, for example, letters to the parties demanding that their transactions be unwound. Audi's tortious acts have nothing to do with petitioning the government, but rather amount to interference with existing agreements and prospective commercial relationships. *See U.S. Futures Exch., LLC*, 2005 WL 2035652, at *1.

Nor can Audi argue its conduct is "incidental" to litigation so as to shield it from liability, because it is not Audi's litigation that gives rise to Napleton's claims. The only relationship to a litigation is to Napleton's: Audi sought revenge because Napleton availed itself of a class action opt out. In any event, incidental conduct "varies with the context and nature" of that conduct. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499, 505 (1988) (incidental activity is not protected by *Noerr-Pennington* if its "context and nature . . . make it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves"). The two Third Circuit cases Audi cites to support *Noerr-Pennington*'s application to incidental conduct involve conduct vastly different from that alleged here. *See, e.g., A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 252 (3d Cir. 2001) (affirming the district court's grant of *Noerr-Pennington* immunity, concluding that cigarette manufacturers' settlement with state attorneys general was "akin to petitioning the government."); *accord Magnetar Techs. Corp. v. Six Flags Theme Parks Inc.*, No. CIV.A. 07-127-LPS, 2011 WL 678707, at *2, n.1 (D. Del. Feb. 18, 2011) (applying *Noerr-Pennington* to bar a claim alleging conduct in bringing the lawsuit, as well as pre-litigation letters advising other entities that they potentially infringe the patents-in-suit, in and of itself amounted to an effort to control the market for the patent at issue).

28

*Noerr-Pennington* simply does not apply here. There is no petitioning activity and no governmental interest relevant here. Napleton's counterclaims invoke private party activity that violates statutory obligations and Pennsylvania common law.

## IV.    The Napleton Affiliates Are Proper Parties to this Action.

In support of dismissal, Audi argues that the Intervenor pleading seeks relief on behalf of certain Napleton Affiliates—Napleton Wyoming Valley Imports, LLC; Millennium Holdings IV, LLC; Napleton Investment Partnership, LP; and EFN Wyoming Valley Properties, LLC—who are not parties to this action. Napleton submits that this Court should grant leave to amend *nunc pro tunc* to allow these additional Napleton Affiliates so that this Intervenor pleading can render complete relief as to all parties. Under Rule 24, the parties are properly joined if their claims share a common issue of law or fact with the main action; here, the Napleton affiliates' counterclaims are fully entwined with the issues raised by the claims in Audi's complaint and Wyoming Valley's counterclaims. There would be no prejudice to Audi in granting leave, since Audi has been on notice of these claims. And main-case discovery, while on-going, has already encompassed these claims. Indeed, the scope of these proceedings would not be expanded at all by this intervention; this is simply to add the proper parties. As this Court itself has recognized, "Napleton *explicitly* revealed its intention to file counterclaims… and the general substantive nature of those claims. They were well within the

29

contemplation of all parties as we discussed logistics and scheduling of this matter moving forward." (Dkt. No. 275 at 8.)

Should the amendment not be granted, it would subject the Court and the parties to additional proceeding at further expense, as the Napleton affiliates would be required to commence a second duplicative action, thereby consuming additional unnecessary judicial resources. Accordingly, the motion for leave to amend should be granted.

## Conclusion

Napleton's eight counterclaims are sufficiently pled. Audi is alleged to have violated clear statutory provisions of the Pennsylvania Dealer Act according to its terms, and is alleged to have attempted to interfere (and with respect to Mazda, has succeeded in interfering) with Napleton's APA, MIPA, and the prospective contracts with the non-VW Group manufacturers. This is more than enough to survive a motion to dismiss; Audi's factual disputes to the contrary are inapposite and ignored at this stage. Nor does the *Noerr-Pennington* doctrine apply to bar state law claims; if it did, any defendant could escape liability by beating the plaintiff to court. Audi's motion to dismiss should be denied in its entirety.

Finally, Napleton's intervention motion should be granted, as the affiliates hold the rights and interests in the APA and the MIPA at issue here, and their presence completes "Napleton's" intervention, granted several months ago.

Dated: October 25, 2017

Respectfully submitted,


By: */s/ Kathryn L. Simpson*
Kathryn L. Simpson, Esq.
**METTE, EVANS & WOODSIDE**
3401 North Front Street
Harrisburg, PA 17110-0950
Phone: 717.232.5000
Fax: 717.236.1816
Email:  ksimpson@mette.com

James M. Westerlind (*pro hac vice*)
Michael P. McMahan (*pro hac vice*)
David N. Wynn (*pro hac vice* motion to be filed)
**ARENT FOX LLP**
1675 Broadway
New York, NY 10019-5874
Phone: 212.484.3900
Fax: 212.484.3990
Email:  james.westerlind@arentfox.com
Email:  michael.mcmahan@arentfox.com
Email:  david.wynn@arentfox.com


*Attorneys for Intervenors*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.8

Pursuant to Local Rule 7.8(b), the undersigned hereby certifies that

Napleton's Memorandum Of Law In Opposition To Audi's Motion To Dismiss

Napleton's Counterclaims And In Support Of Napleton's Cross-Motion To Amend

Its Intervenor Complaint was prepared in Microsoft Word 2013 using 14-point

font.

On October 20, 2017, Napleton moved to extend its word limit under Rule

7.8 to 8,000 words, (Dkt. No. 295), and on October 23, 2017, the Court granted

that motion. (Dkt. No. 296.) The undersigned certifies that the above-referenced

Memorandum contains 7,179 words, according to Microsoft Word 2013's word

count, including headings, footnotes, and quotations.

/s/ Kathryn L. Simpson
Kathryn L. Simpson, Esquire

33

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2017, I caused the foregoing document to be sent to the following attorneys who have filed electronically through the Court's ECF system.

Thomas B. Schmidt, III, Esq.
*schmidtt@pepperlaw.com*
Tucker R. Hull, Esq.
*hullt@pepperlaw.com*

Attorneys for Plaintiff
VOLKSWAGEN GROUP OF
AMERICA, INC.

Randall L. Oyler, Esq.
*randall.oyler@bfkn.com*
Owen H. Smith, Esq.
*owen.smith@bfkn.com*
Brandon C. Prosansky, Esq.
*brandon.prosansky@bfkn.com*
Michael S. Elvin
*michael.elvin@bfkn.com*
Caroline H. Sear
*carrie.sear@bfkn.com*
Andrew M. Spangler
*andrew.spangler@bfkn.com*

Attorneys for Plaintiff
VOLKSWAGEN GROUP OF
AMERICA, INC.

Nicholas D. George, Esq.
*ngeorge@swartz-legal.com*
Dennis George, Esq.
*dgeorge@arangiogeorge.com*
Jeffrey M. Scarfaria, Esq.
*jeff@scarfarialaw.com*

Attorneys for Plaintiff
BRONSBERG & HUGHES PONTIAC
INC. d/b/a WYOMING VALLEY
AUDI

David C. Gustman, Esq.
*dgustman@freeborn.com*
Jill C. Anderson, Esq.
*janderson@freeborn.com*
Dylan Smith, Esq.
*dsmith@freeborn.com*
Charles O. Beckley, II, Esq.
*cbeckley@pa.net*
John G. Milakovic, Esq.
*johngm@pa.net*

Attorneys for Plaintiff
BRONSBERG & HUGHES
PONTIAC INC. d/b/a WYOMING
VALLEY AUDI

By: */s/ Kathryn L. Simpson*
Kathryn L. Simpson, Esq.
**METTE, EVANS & WOODSIDE**
3401 North Front Street
Harrisburg, PA 17110-0950
Phone: 717.232.5000
Fax: 717.236.1816
Email: ksimpson@mette.com
*Attorneys for Intervenors*

34