# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AUDI OF AMERICA, INC.,                    )
An Organizational Unit of Volkswagen Group )
of America, Inc.,                          )
A New Jersey Corporation,                  )
                                           )
    Plaintiff/Counter-Defendant,         ) Case No.  3:16-cv-02470
                                           )
        v.                            ) Judge John E.  Jones III
                                           )
BRONSBERG & HUGHES PONTIAC, INC.,          )
d/b/a WYOMING VALLEY AUDI,                 )
A Pennsylvania Corporation,                )
                                           )
          Defendant/Counter-        )
          Plaintiff,                 )
                                           )
    -and-                                )
                                           )
NORTH AMERICAN AUTOMOTIVE                   )
SERVICES, INC.,                            )
an Illinois Corporation;  *et al.,*        )
                                           )
          Defendants/Counter-       )
          Plaintiffs.                )

## AUDI OF AMERICA, INC.'S BRIEF IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
## REGARDING NAPLETON'S COUNTERCLAIMS

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 3

I.   STANDARD OF REVIEW ......................................................................... 3

II.  THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF
     LAW ON ALL OF NAPLETON'S CLAIMS BASED ON THE
     SECOND ADDENDUM ............................................................................. 5

III. THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF
     LAW ON NAPLETON'S TORTIOUS INTERFERENCE CLAIMS
     (COUNTS III-VI) ...................................................................................... 8

     A.   NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER
          OF LAW BECAUSE THEY ARE NOT COGNIZABLE UNDER
          PENNSYLVANIA LAW ................................................................................ 10

     B.   NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER
          OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT
          AOA'S ACTIONS WERE JUSTIFIED. ............................................................. 15

          1.   Napleton Cannot Demonstrate that AoA Lacked Justification to
               Demand a Breakdown of the APA. .......................................................... 18

               a.   AoA's Actions to Enforce Its ROFR Were Per Se Justified. ............. 18

               b.   AoA's Demand Was an Appropriate Means of Pursuing its
                    Legally Protected Interest in the ROFR. ............................................. 20

          2.   Napleton Cannot Demonstrate that AoA Lacked Justification to
               Rescind the Conditional Relocation Agreement. ................................... 23

     C.   NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER
          OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT
          AOA'S NON-LITIGATION CONDUCT CAUSED NO ACTUAL
          INTERFERENCE OR LEGAL DAMAGES. ........................................................ 28

          1.   Napleton Cannot Show that AoA's Non-Litigation Conduct
               Interfered with the APA (Counts III & IV) ............................................. 29

          2.   Napleton Cannot Show that AoA's Rescission of the Relocation
               Agreement Interfered with the MIPA, the Transfer of the
               Relocation Property, or the New Audi Lease at the Relocation
               Property (Counts V & VI) ....................................................................... 33

3.  Napleton Cannot Show that AoA's Communications with Potential Purchasers or Other Manufacturers Interfered with Any Agreement or Expectation. .......................................................... 36

IV.  THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON NAPLETON'S STATUTORY CLAIMS (COUNTS I, II & VII). ................................................................................................... 37

A.  NAPLETON'S CLAIM FOR VIOLATION OF SECTION 12(B)(3) OF THE ACT (COUNT I) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA DID NOT "UNREASONABLY WITHHOLD CONSENT." ....................................................... 38

1.  AoA Did Not Unreasonably Withhold Consent Because AoA Was Acting to Enforce Its ROFR. .................................................. 39

2.  AoA Did Not Unreasonably Withhold Consent Because It Had Legitimate Business Reasons to Reject Wyoming Valley's Request for Consent to the APA. ............................................................. 41

3.  AoA Did Not Unreasonably Withhold Consent Because It Did Not Reject Wyoming Valley's Request for Consent, and Wyoming Valley Withdrew Its Request Before AoA's Deadline to Respond. ........ 44

B.  NAPLETON'S CLAIM FOR VIOLATION OF SECTION 16 OF THE ACT (COUNT II) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA DID NOT UNREASONABLY DELAY EXERCISING ITS ROFR. .................................................................... 46

C.  NAPLETON'S CLAIM FOR VIOLATION OF SECTIONS 12(B)(5) OF THE ACT (COUNT VII) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS SHOW THAT AOA DID NOT FAIL TO TIMELY RESPOND TO WYOMING VALLEY'S REQUEST FOR CONSENT. ....................... 49

CONCLUSION .......................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acumed LLC v. Advanced Surgical Servs., Inc.,*
561 F.3d 199 (3d Cir. 2009) .............................................................. 8, 16

*Adler, Barish, Daniels, Levin & Creskoff v. Epstein,*
482 Pa. 416 (1978) .............................................................................. 10

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................................... 4

*Arbour v. Pittsburgh Produce Trade Ass'n,*
1907 WL 2988 (Pa. Com. Pl. 1907) ..................................................... 21

*Arkansas Valley Smelting Co. v. Belden Mining Co.,*
127 U.S. 379 (1888) ............................................................................. 21

*Barefoot Architect, Inc. v. Bunge,*
632 F.3d 822 (3d Cir. 2011) ................................................................. 15

*Bishop v. GNC Franchising LLC,*
403 F. Supp. 2d 411 (W.D. Pa. 2005) .................................................. 19

*Bortz v. Noon,*
556 Pa. 489 (1999) .............................................................................. 24

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................... 4

*CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.,*
357 F.3d 375 (3d Cir. 2004) ................................................................. 28

*Clark Distribution Sys., Inc. v. ALG Direct, Inc.,*
12 F. Supp. 3d 702 (M.D. Pa. 2014) .................................................... 12

*Cloverleaf Dev., Inc. v. Horizon Fin. F.A.,*
500 A.2d 163 (Pa. Super. Ct. 1985) .................................................... 18

*Com. v. Berryman,*
437 Pa. Super. 258 (1994) ................................................................... 45

*Com. v. Bigelow*,
 484 Pa. 476 (1979) ................................................................ 45

*Corr. U.S.A. v. McNany*,
 892 F. Supp. 2d 626 (M.D. Pa. 2012) ................................... passim

*Crivelli v. Gen. Motors Corp.*,
 215 F.3d 386 (3d Cir. 2000) ................................................. passim

*Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc.*,
 519 A.2d 997 (Pa. Super. 1987) ................................................ 34

*Darius Int'l, Inc. v. Young*,
 2008 WL 1820945 (E.D. Pa. Apr. 23, 2008) ...................... 18, 20

*DePace v. Jefferson Health Sys., Inc.*,
 2004 WL 2850067 (E.D. Pa. Dec. 7, 2004) ............................. 19

*Dunkin Donuts Franchising LLC v. Claudia III, LLC*,
 2014 WL 12618097 (E.D. Pa. Dec. 5, 2014) ........................... 11

*Eigen v. Textron Lycoming Reciprocating Engine Div.*,
 874 A.2d 1179 (Pa. Super. Ct. 2005) ....................................... 27

*Gabe Staino Motors, Inc. v. Volkswagen of Am., Inc.*,
 2005 WL 1041196 (E.D. Pa. Apr. 29, 2005) ...................... 22, 41

*Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 40 F.3d 63 (3d Cir. 1994) .................................................. 12, 15

*Geofreeze Corp. v. C. Hannah Const. Co.*,
 588 F. Supp. 1341 (E.D. Pa. 1984) .................................... 19, 23

*Glenn v. Point Park Coll.*,
 441 Pa. 474 (1971) .......................................................... 16, 34

*In re Bridgeport Fire Litig.*,
 8 A.3d 1270, 1282 (Pa. Super. Ct. 2010) ........................ 24, 25, 26

*Leopold Graphics, Inc. v. CIT Grp./Equip. Fin., Inc.*,
 2002 WL 1397449 (E.D. Pa. June 26, 2002) ..................... 11, 14

*LJL Transp., Inc. v. Pilot Air Freight Corp.*,
 599 Pa. 546 (2009) ................................................................ 24

*McIntire v. Wm. Penn Broad. Co. of Philadelphia,*
151 F.2d 597 (3d Cir. 1945) .................................................................. 21

*Metro. Prop. & Liab. Ins. Co. v. Ins. Com'r of Com. of Pa.,*
525 Pa. 306 (1990) .............................................................................. 27

*Mission Funding Alpha v. Com.,*
173 A.3d 748, 757 (Pa. 2017) .............................................................. 45

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984) .............................................................................. 21

*Myers v. Jani-King of Philadelphia, Inc.,*
2012 WL 6058146 (E.D. Pa. Dec. 5, 2012) .......................................... 19

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC,*
923 F. Supp. 2d 745 (D. Md. 2013) ..............................................42, 43, 44

*Peoples Mortg. Co. v. Fed. Nat. Mortg. Ass'n,*
856 F. Supp. 910 (E.D. Pa. 1994) ..................................................23, 27

*Phillips v. Selig,*
959 A.2d 420 (Pa. Super. Ct. 2008) ..............................................11, 16, 17

*Post v. Mendel,*
510 Pa. 213 (1986) .............................................................................. 27

*re Bus., Inc. v. Buckingham Ridgeview, LP,*
991 A.2d 956 (Pa. Super. Ct. 2010) ...................................................... 23

*Rosado v. Ford Motor Co.,*
337 F. 3d 291 (3d Cir. 2003)......................................... 19, 20, 39, 47

*Ruder v. Pequea Valley Sch. Dist.,*
790 F. Supp. 2d 377 (E.D. Pa. 2011) .................................................... 15

*Safa v. City of Philadelphia,*
2014 WL 2011487 (E.D. Pa. May 16, 2014) .......................................... 11

*Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.,*
150 A.3d 957 (Pa. Super. Ct. 2016) ...................................................... 22

*Schulman v. J.P. Morgan Inv. Mgmt., Inc.,*
35 F.3d 799 (3d Cir. 1994) ................................................................5, 18

*Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187*,
  339 Pa. 353 (1940) ........................................................................................ 21

*Siegel Transfer, Inc. v. Carrier Exp., Inc.*,
  54 F.3d 1125 (3d Cir. 1995) ........................................................................ 21

*Solomon v. Soc'y of Auto. Engineers*,
  41 F. App'x 585 (3d Cir. 2002) ..................................................................... 4

*Wagner v. Tuscarora School Dist.*,
  2006 WL 167731 (M.D. Pa. Jan. 20, 2006 ..................................... 34, 35, 37

*Waterfront Renaissance Assoc. v. City of Philadelphia*,
  2008 WL 862705 (E.D. Pa. Mar. 31, 2008) ................................................ 11

*Windsor Sec., Inc. v. Hartford Life Ins. Co.*,
  986 F.2d 655 (3d Cir. 1993) ................................................................ passim

*Witmer v. Exxon Corp.*,
  495 Pa. 540 (1981) ...................................................................................... 19

## STATUTES

1 P.S. § 1921(a) ............................................................................................ 45

63 P.S. § 818.12 .............................................................................. 38, 45, 49

63 P.S. § 818.16 .............................................................................. 39, 46, 48

## OTHER AUTHORITIES

F.R.C.P. 56 ................................................................................................ 3, 4

Restatement (Second) of Contracts Section §773 .............................. 16, 23, 27

Restatement (Second) of Torts § 766 .............................................. 10, 11, 16

## **INTRODUCTION**

This case began with Audi of America, Inc.'s ("AoA") narrowly drawn complaint against one of its dealers, Bronsberg & Hughes Pontiac, Inc. d/b/a Wyoming Valley Audi ("Wyoming Valley"), in which AoA sought the Court's intervention to protect and enforce its right of first refusal over Wyoming Valley's proposed sale of its Audi franchise and related assets ("Audi Assets") to the Ed Napleton Automotive Group and affiliated entities (collectively, "Napleton").[1] Wyoming Valley timely answered AoA's complaint and asserted a two-count counterclaim against AoA.

In the midst of this dispute between AoA and its dealer, Napleton sought leave to intervene in the litigation and, after obtaining leave, filed a wide-ranging counterclaim against AoA containing eight separate causes of action.  In these claims, Napleton asserts that AoA tortiously interfered with various aspects of its business plans relating to the transaction; that AoA's efforts to enforce its right of first refusal violated multiple provisions of the Pennsylvania Board of Vehicles Act, 63 P.S. § 818.1 *et seq.* ("Act"), including those which *protect* AoA's right of first refusal; and that AoA's efforts to obtain discovery in this case constituted an "abuse of process."  For the most part, Napleton's claims against AoA are based on the litigation itself—AoA's

---

[1] Napleton includes each of the intervenors in this action:  North American Automotive Services, Inc. d/b/a Napleton Automotive Group ("NAAS"), Napleton Wyoming Valley Imports, LLC ("NWVI"), EFN Wyoming Valley Properties, LLC ("EFN Wyoming Valley"), Millennium Holdings, IV, LLC ("MH4"), and Napleton Investment Partnership, LP ("NIP").

filing of the action, its request for injunctive relief, its efforts to obtain discovery, and the Court's various orders.

On November 20, 2016, the Court granted in part AoA's motion to dismiss Napleton's counterclaims, applying the *Noerr-Pennington* Doctrine to dismiss all claims to the extent they are based on the litigation, and dismissing Napleton's "abuse of process" counterclaim in its entirety ("November 20 Order"). Describing AoA's other arguments as "premised on factual issues," however, the Court allowed Napleton's claims to survive "at the motion to dismiss stage," noting "the liberal pleading standards we must consider." (Doc. 321, at 21.)

AoA now moves for summary judgment on what remains of Napleton's counterclaims. After extensive discovery conducted by all parties, the bottom line is this: there is nothing for a trier-of-fact to decide before the Court can enter judgment on Napleton's remaining counterclaims. The undisputed facts establish that Napleton's causes of action, as a matter of law, cannot be sustained.

*First*, if the Court were to grant AoA's separate motion for summary judgment on its affirmative claims and find that, in light of the Second Addendum, the Audi dealership remains a part of the APA, that determination alone would warrant judgment on Napleton's counterclaims in their entirety. In that event, Napleton's claims regarding AoA's efforts to enforce its right of first refusal cannot be squared with Napleton's own ongoing efforts to assert ownership over the franchise. Likewise, in that event, Napleton's claims regarding AoA's rescission of the

2

Relocation Agreement cannot proceed because Wyoming Valley cannot meet conditions precedent for AoA's approval of the relocation, precluding any finding of causation or damages.

*Second*, summary judgment should be granted on each of Napleton's claims for many other reasons as well. Ultimately, as the Court has observed, "the theory of Napleton's entire counter complaint [is] that AoA acted to thwart all business relationships with Napleton due to an improper motive," which Napleton claims to be "animus … for refusing to take part in a previous settlement." (Doc. 321, at 17.) Discovery has demonstrated that this theory and Napleton's claims have no basis. As to each claim, there is no disputed issue of fact, and AoA is entitled to judgment as a matter of law.

For these reasons, as set forth in detail below, the Court should grant summary judgment on Napleton's counterclaims in their entirety.

## ARGUMENT

### I.    STANDARD OF REVIEW

Rule 56 provides that a motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.C.P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Justice White further held

in *Liberty Lobby*:

> As to materiality, the substantive law will identify which facts are
> material. Only disputes over facts that might affect the outcome
> of the suit under the governing law will properly preclude the
> entry of summary judgment. Factual disputes that are irrelevant
> or unnecessary will not be counted.

*Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477

U.S. at 248. Moreover, a party "cannot rely on unsupported assertions, speculation,

or conclusory allegations to avoid a motion for summary judgment." *Solomon v. Soc'y of

Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002).

The moving party bears the burden of establishing that no genuine issue of

material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith

respect to an issue on which the nonmoving party bears the burden of proof . . . the

burden on the moving party may be discharged by 'showing'—that is, pointing out to

the district court—that there is an absence of evidence to support the nonmoving

party's case." *Id.* at 325. If the moving party meets its threshold burden, the

opposing party must present actual evidence that creates a genuine issue as to a

material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed.R.Civ.P. 56(c) (setting

forth types of evidence on which nonmoving party must rely to support its assertion

that genuine issues of material fact exist).

## II. THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON ALL OF NAPLETON'S CLAIMS BASED ON THE SECOND ADDENDUM

As AoA set forth in its separate Motion for Summary Judgment Regarding its Affirmative Claims ("AoA Affir. MSJ"), as a result of the Second Addendum, the Court can and should declare as a matter of law that, among other things, (i) Wyoming Valley has not removed the Audi Assets from the APA, and (ii) the APA still transfers an ownership interest in the Audi franchise to Napleton. In the event the Court grants this relief, Napleton's counterclaims will be foreclosed in their entirety, warranting judgment on the claims as a matter of law.

*First*, Napleton's tortious interference claims (Counts III-VI) primarily contest AoA's conduct relating to its right of first refusal ("ROFR"). If the Court determines based on the Second Addendum that the Audi Assets remain in the APA, then—without considering any other undisputed facts—the Court may determine that every action that AoA has taken with respect to its ROFR would be fully justified. *See generally Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 396 (3d Cir. 2000) (concluding that "as a matter of law, the exercise of a right of first refusal by GM did not constitute an improper action within Pennsylvania's tort of intentional interference with a contractual relationship"); *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 810 (3d Cir. 1994) (refusing tortious interference liability to a party who "acted in good faith pursuant to its own reserved, contractual right").

*Second*, Napleton also asserts tortious interference counterclaims based on AoA's rescission of the Relocation Agreement.  These claims likewise fail as a matter of law based on the Second Addendum.

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

*Third*, a ruling in AoA's favor on its Motion for Summary Judgment Regarding its Affirmative Claims would also necessitate the entry of judgment on Napleton's statutory counterclaims (Counts I, II, and VII).   These counterclaims contest the reasonableness and timeliness of AoA's response to Wyoming Valley's proposed transfer of its Audi dealership assets, as to both AoA's ROFR and its right to consent to or reject the proposed transaction.  (*See* Doc. 321, at 10–13.)  But if the Court holds as a matter of law that AoA's rights with respect to the Audi Assets remain intact, Napleton's statutory claims regarding the reasonableness and timeliness of AoA's actions fall away.  *See Crivelli*, 215 F.3d at 392–94 (holding "that the Act [does] not limit a motor vehicle manufacturer's exercise of its contractual right of first refusal").

Accordingly, in the event the Court grants AoA's motion for summary judgment on its affirmative claims, and as a result of the Second Addendum, the

Court should also grant summary judgment in AoA's favor on all of Napleton's counterclaims.

## III. THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON NAPLETON'S TORTIOUS INTERFERENCE CLAIMS (COUNTS III-VI)

Under Pennsylvania law, a party claiming tortious interference must establish four elements:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Crivelli*, 215 F.3d at 394 (internal quotations omitted); *see also Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009) (recognizing a fifth requirement "for prospective contracts, [of] a reasonable likelihood that the relationship would have occurred but for the defendant's interference") (citation omitted).

Napleton asserts four tortious interference claims against VWGoA.

- In Count III, Napleton claims that AoA tortiously interfered with the APA. (Counterclaim ¶¶ 123–134.)

- In Count IV, Napleton claims that, by interfering with the APA, AoA tortiously interfered with its prospective contractual relationships with the non-Audi, non-Volkswagen franchisors and unidentified future customers. (*Id.* ¶¶ 135–145.)

- In Count V, Napleton claims that AoA tortiously interfered with the APA, to the extent the APA contemplates that the Relocation

Property will transfer to EFN Wyoming Valley upon closing.  (*Id.* ¶¶ 146–162.)

- In Count VI, Napleton claims that AoA tortiously interfered with the MIPA and with the new lease for Wyoming Valley's Audi dealership at the Relocation Property.  (*Id.* ¶¶ 163–172.)[2]

Napleton's theories in support of these tortious interference claims are largely premised on AoA's filing and pursuit of this litigation, and the effect of the Court's orders on the APA transaction, including those in which the Court enjoined the APA from closing up until June 29, 2017.  The Court, in its November 20 Order, applied the *Noerr-Pennington* Doctrine to dismiss Napleton's tortious interference counts to the extent they rely upon the litigation.

In light of the Court's November 20 Order dismissing Napleton's claims based on the litigation, Napleton's remaining tortious interference claims are based on two core allegations:

- AoA demanded that Wyoming Valley provide a good faith apportionment of the APA identifying the terms by which it was proposing to transfer its the Audi dealership assets; and

- AoA rescinded its conditional approval of Wyoming Valley's request to relocate its Audi dealership to the Relocation Property.

(*See* Counterclaims ¶¶ 71, 90–93; Doc. 321, at 17–20.)  For three independent reasons, as discussed below, the Court should now grant judgment as a matter of law in favor of AoA on Napleton's claims based on such allegations.

_____

████████████████████████████████████████████████████
██████████

### A.   NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW BECAUSE THEY ARE NOT COGNIZABLE UNDER PENNSYLVANIA LAW.

This Court should grant summary judgment to AoA on Napleton's remaining tortious interference claims because they advance a theory of tortious interference not recognized by Pennsylvania law.  Napleton's tortious interference claims boil down to a single, basic assertion: AoA took actions that delayed or otherwise hindered Napleton's agreements and business plans with regard to Wyoming Valley and the Relocation Property.  These claims must fail because such actions cannot establish tortious interference under Pennsylvania law.[3]

The paradigmatic tortious interference claim is an "inducement" tort: an outsider convinces a contracting party to abandon or breach its contract, and the other party to that contract sues the outsider.  *Windsor Sec., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 660 (3d Cir. 1993).  Such "inducement" claims are governed by the Restatement (Second) of Torts § 766, which Pennsylvania courts have expressly incorporated into the Commonwealth's common law.  *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 429 (1978).

In contrast to the paradigmatic "inducement" tort, there exists an alternate "hindrance" theory of tortious interference: an outsider takes actions that prevent a contracting party's performance or make that performance more burdensome or

---

[3] The Court has not previously had an opportunity to consider this argument because AoA did not raise it when AoA moved to dismiss Napleton's counterclaims under Rule 12(b)(6).

costly. *Windsor Sec.*, 986 F.2d at 661-62. These "hindrance" claims are governed by Restatement (Second) of Torts § 766A.

Contrasting the two separate theories of tortious interference, the Third Circuit has explained that "Section 766A speaks of the defendant's 'preventing' performance, whereas § 766 speaks of the defendant's 'inducing' nonperformance." *Id.* at 662 n.11. In the related context of tortious interference with prospective contractual relations, Sections 766B(a) and 766B(b) of the Restatement directly echo the distinction between § 766 "inducement" and § 766A "hindrance." *Leopold Graphics, Inc. v. CIT Grp./Equip. Fin., Inc.*, 2002 WL 1397449, at *5 (E.D. Pa. June 26, 2002).

Crucially, unlike Section 766, Pennsylvania courts have not adopted Section 766A or the "hindrance" theory of tortious interference. *Windsor Sec.*, 986 F.2d at 660; *Safa v. City of Philadelphia*, 2014 WL 2011487, at *6 (E.D. Pa. May 16, 2014) ("Pennsylvania has not recognized a cause of action against a defendant that has prevented or impeded a plaintiffs' [*sic*] own performance."); *Dunkin Donuts Franchising LLC v. Claudia III, LLC*, 2014 WL 12618097, at *1 (E.D. Pa. Dec. 5, 2014) (same); *Leopold Graphics*, 2002 WL 1397449, at *4 (same); *Phillips v. Selig*, 959 A.2d 420, 436 n.13 (Pa. Super. Ct. 2008) (same). And courts in the Third Circuit "have been equally unwilling to interpret Pennsylvania law as recognizing a cause of action under § 766B(b)" for hindrance of prospective contractual relations. *Leopold Graphics*, 2002 WL 1397449, at *5; *Waterfront Renaissance Assoc. v. City of Philadelphia*, 2008 WL 862705, at *9 (E.D. Pa. Mar. 31, 2008).

The Third Circuit, moreover, has expressly predicted that the Pennsylvania Supreme Court is unlikely to follow Section 766A. *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 66 (3d Cir. 1994). Thus, "[u]ntil the Supreme Court of Pennsylvania issues a contrary decision, [a district court] is bound by the Third Circuit's decision in *Gemini* predicting that Pennsylvania will not recognize the cause of action for tortious interference set forth in § 766A." *Clark Distribution Sys., Inc. v. ALG Direct, Inc.*, 12 F. Supp. 3d 702, 725 (M.D. Pa. 2014), *order vacated in part on reconsideration* (May 29, 2014). Tortious interference claims based on attempts to burden, hinder, or prevent a party's performance, therefore, do not state a viable cause of action under Pennsylvania law.[4]

Here, Napleton's tortious interference claims fall under Section 766A because they assert not that AoA induced Wyoming Valley or any other person to breach a contract with Napleton, but rather that AoA's actions burdened, hindered, or prevented the performance of such contracts. As a result, the Court should enter judgment in AoA's favor on Napleton's tort claims.

In its third cause of action, for tortious interference with the APA itself, Napleton alleges that AoA's conduct hindered the performance of the APA. This is

---

[4] The Third Circuit has explained at length the strong policy justifications behind this conclusion. Because Section 766A extends actionable conduct beyond attempts to solicit or entice a breach, it is "much more difficult to apply and conducive to disputes." *Gemini Physical Therapy*, 40 F.3d at 66. It also "risks chilling socially valuable conduct and creates new liability of uncertain dimensions," without furthering the "bargain-forcing" purpose that underlies § 766 liability. *Windsor Sec.*, 986 F.2d at 661–62.

not a cognizable claim.  The Third Circuit's decision in *Windsor Securities* is decisive on this point.  In *Windsor Securities*, the defendant insurance company entered into an insurance contract with a broker, who in turn entered into separate contracts for dozens of sub-accounts dependent on its original contract with the defendant. *Windsor Sec.*, 986 F.2d at 658.  The defendant subsequently adopted a policy that imposed new restrictions on these sub-accounts, which the broker refused to sign.  *Id.* A sub-account holder sued the defendant insurance company for tortiously interfering with its contract with the broker.[5]  *Id.*  The Third Circuit recognized that these allegations fell under the ambit of § 766A, not § 766, because the conditions imposed by the insurer did not induce the broker to breach his contract, but rather had the effect of burdening or preventing the sub-account contract's performance.  *Id.* at 659–60.  Here, Napleton likewise claims that an "outsider" (AoA) insisted on certain improper conditions in a separate contract (the alleged "unreasonable demands" in relation to AoA's right of first refusal, and the various alleged attempts to enforce those demands (Counterclaims ¶ 119)), the imposition of which burdened Napleton's own arrangements with that same third party (the APA with Wyoming Valley) when the third party refused to comply with the conditions.  This is note-for-note what the sub-account holder plaintiff in *Windsor Securities* argued.

---

[5] There were other plaintiffs in *Windsor Securities* whose lost on summary judgment, including the broker himself, but those parties are not discussed because their position is not directly analogous to Napleton's.

Napleton's fourth cause of action restates the same allegations as its third cause of action, but at an even greater degree of attenuation.  Specifically, it argues that AoA's interference with the APA also, by ripple effect, interfered with its prospective contractual relations with other non-Audi and non-Volkswagen franchisors, and with hypothetical future customers.  But Napleton does not contend—nor could it—that AoA took any action to *induce* other non-Audi and non-Volkswagen franchisors to decline to enter into a future relationship with Napleton; rather, Napleton alleges only that AoA's actions with respect to the APA have burdened, hindered, or prevented Napleton's prospective future relationships with other franchisors.   Pennsylvania courts do not recognize interference with prospective business relations claims "in the absence of any alleged act directed toward a third party." *Leopold Graphics*, 2002 WL 1397449, at *5.  Likewise, there is no viable cause of action for a party who alleges "that it was hindered in its ability to engage prospective customers, not that prospective customers were influenced not to enter into contracts with it." *Id.*

Napleton's fifth and sixth causes of action both assert that AoA has wielded its right to approve Wyoming Valley's relocation as a sword against Napleton's business interests.  As with its "APA interference" claim, Napleton's "relocation interference" claims argue only that AoA hindered and delayed its completion of the Relocation Property transfer and the operation of the Audi lease there, and are therefore not cognizable under Pennsylvania law.  Napleton does not and cannot allege, moreover, that Wyoming Valley (or any other party) breached or "fail[ed] entirely to perform" a

14

contract with Napleton, as required for a tortious interference with contract claim. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834 (3d Cir. 2011); *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 396 (E.D. Pa. 2011) ("One interferes with a contract only where he causes a party not to perform under it.") (internal quotation and alteration omitted).[6]

In sum, as the Third Circuit has explained, "hindrance" claims such as Napleton's are based on allegations that are "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Gemini Physical Therapy*, 40 F.3d at 66 (internal quotation omitted).  Accordingly, AoA is entitled to judgment as a matter of law on Counts III through VI of Napleton's counterclaim.

### B.   NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA'S ACTIONS WERE JUSTIFIED.

This Court also should also grant summary judgment to AoA on Napleton's remaining tortious interference claims because the undisputed facts establish as a matter of law that the two primary actions that Napleton claims were wrongful—*i.e.*, demanding a breakdown of the APA and rescinding the Relocation Agreement—were justified.   In light of the Court's November 20 Order dismissing Napleton's claims based on the litigation, Napleton's remaining tortious interference claims are based on two core allegations:

15

- AoA demanded that Wyoming Valley provide a good faith apportionment of the APA identifying the terms by which it was proposing to transfer its Audi dealership assets; and

- AoA rescinded its conditional approval of Wyoming Valley's request to relocate its Audi dealership to the Relocation Property.

(*See* Counterclaims ¶¶ 71, 90–93; Doc. 321, at 17–20.)

Under Pennsylvania law, the party claiming tortious interference bears the burden to establish that the defendant lacked justification to act in the manner it did. *Acumed*, 561 F.3d at 212, 214. Thus, to maintain its tortious interference claims, Napleton bears the burden of establishing that AoA lacked justification to demand a breakdown of the APA and to rescind the Conditional Relocation Agreement.

In determining whether a defendant's actions were justified, Pennsylvania follows Section 766 of the Restatement (Second) of Torts, imposing liability only for "*improper* conduct by the alleged tortfeasor." *Crivelli*, 215 F.3d at 394 (emphasis added) (citations omitted).[7] The bar for what constitutes "improper" conduct is high. A party does *not* act improperly by "asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means … if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction." Restatement (Second) of Torts § 773.

---

[7] Napleton also cannot raise a genuine question of fact regarding the second element of a tortious interference claim, as it has no evidence suggesting that AoA "acted for the specific purpose of causing harm to the plaintiff." *Selig*, 959 A.2d at 429 (internal quotation omitted). "The absence of privilege or justification in the tort under discussion is closely related to the element of intent." *Glenn v. Point Park Coll.*, 441 Pa. 474, 482 (1971).

Rather, there must be an *absence* of any "legitimate business interest" behind the challenged conduct, and the conduct must run afoul of "the 'rules of the game' which society has adopted." *Selig,* 959 A.2d at 435-36 (internal quotation omitted); *Corr. U.S.A. v. McNany*, 892 F. Supp. 2d 626, 644–45 (M.D. Pa. 2012) ("Even if Defendants' conduct was specifically intended to harm [Plaintiff], we find that their actions were proper under the circumstances because they fall within the rules of the game. Each of the actions at issue were committed for the purpose of protecting Defendants' legitimate rights or interests that happened to conflict with those of [Plaintiff].") (internal citation and quotation omitted). For this reason, a plaintiff cannot avoid summary judgment by claiming merely that the defendant acted in part out of "malice" or "personal animus" toward it. *Selig*, 959 A.2d at 436 (affirming summary judgment against tortious interference claimants and rejecting their argument that otherwise legal conduct "may nevertheless be improper for purposes of a tortious interference claim if they can prove that it was undertaken with a motive of personal animus").

Here, Napleton cannot marshal facts to meet its burden. Indeed, Napleton cannot merely assert that AoA disliked it or hoped that its various business endeavors would fail, and argue that it has therefore raised a state-of-mind question best suited for the fact-finder. "Improper" conduct requires more than that. It requires Napleton to establish that AoA lacked any legitimate business interest and engaged in conduct that clearly violated the "rules of the game." *Selig*, 959 A.2d at 429, 436. The

undisputed facts show that, in demanding a breakdown of the APA and rescinding the Relocation Agreement, AoA was pursuing its legitimate business interests by appropriate means. The Court should therefore enter judgment as a matter of law on Napleton's tortious interference claims.

### 1. Napleton Cannot Demonstrate that AoA Lacked Justification to Demand a Breakdown of the APA.

For two reasons, Napleton cannot raise a genuine question of fact regarding the propriety of AoA's demand for a breakdown of the APA. *First*, AoA's conduct was *per se* justified because it was acting to enforce its contractual and statutory rights. *Second*, in any event, AoA's conduct was justified because its demand was an appropriate means of pursuing its legally protected interest in the ROFR, and was therefore justified.

#### a. *AoA's Actions to Enforce Its ROFR Were Per Se Justified.*

Under Pennsylvania law, a party's efforts to enforce its valid contractual rights are *per se* justified, and therefore cannot support a tortious interference claim. In such circumstances, courts need not and do not scrutinize motives. *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 810 (3d Cir. 1994) (affirming summary judgment to a party that "acted in good faith pursuant to its own reserved, contractual right," therefore satisfying Section 773); *Darius Int'l, Inc. v. Young*, 2008 WL 1820945, at *48 (E.D. Pa. Apr. 23, 2008) (holding that a party's actions were justified where it "merely enforced a[n] . . . agreement that it believed in good faith was valid"); *Cloverleaf Dev.,*

*Inc. v. Horizon Fin. F.A.*, 500 A.2d 163, 168 (Pa. Super. Ct. 1985) (affirming dismissal of a tortious interference claim for failure to allege improper conduct, *despite allegation of bad faith*, where the defendant acted in accordance with a "legitimate contractual stipulation"); *DePace v. Jefferson Health Sys., Inc.*, 2004 WL 2850067, at *3 (E.D. Pa. Dec. 7, 2004) ("Where a party acts in accordance with a contractual agreement with the plaintiff, there can be no impropriety or injury to the plaintiff sufficient to ground liability.") (citation omitted); *Geofreeze Corp. v. C. Hannah Const. Co.*, 588 F. Supp. 1341, 1344 (E.D. Pa. 1984) (refusing to apply tortious interference liability to a party who acted "according to pertinent contractual provisions").

This principle applies with particular force in the ROFR context. Indeed, the Third Circuit has held that a franchisor's ROFR is a wholly discretionary right, subject neither to the implied duty of good faith and fair dealing,[8] nor (as explained below) to the Pennsylvania Board of Vehicles Act provision prohibiting "[u]nreasonably withhold[ing] consent to the sale, transfer or exchange of the franchise." *Crivelli*, 215 F.3d at 390 (quoting 63 P.S. § 818.12(b)(3)). A manufacturer thus is not "required … to justify its decision to the jury to enforce its contractual right of first refusal" in defending against a tortious interference claim. *Id.* at 394, 396; *see Rosado v. Ford Motor Co.*, 337 F. 3d 291, 296 (3d Cir. 2003).

---

[8] In the franchise context, this heightened contractual duty only applies to a franchisor's decision to terminate a franchise. *See, e.g., Witmer v. Exxon Corp.*, 495 Pa. 540, 549 (1981); *Bishop v. GNC Franchising LLC*, 403 F. Supp. 2d 411, 419 (W.D. Pa. 2005), *aff'd*, 248 F. App'x 298 (3d Cir. 2007); *Myers v. Jani-King of Philadelphia, Inc.*, 2012 WL 6058146, at *7 (E.D. Pa. Dec. 5, 2012).

This is not a question of interest-weighing or "totality of the circumstances" tests. The Third Circuit has held *as a matter of law* that a franchisor has the right to free exercise of its ROFR: *Crivelli* overturned a jury verdict that found a manufacturer's ROFR exercise improper for purposes of a tortious interference claim, while *Rosado* held that summary judgment should have been granted against the franchisee on a nearly identical claim. *See Crivelli*, 215 F.3d at 394–95 (defining the franchisor's justification as an "interest in its franchise"); *Rosado*, 337 F.3d at 296.

Here, there is no dispute that AoA (i) has a ROFR over Wyoming Valley's Audi Assets; and (ii) demanded a good-faith breakdown of the APA in seeking to enforce its ROFR. Thus, AoA did not, and indeed could not, have acted "improperly" under Pennsylvania law.

> b.  *AoA's Demand Was an Appropriate Means of Pursuing its Legally Protected Interest in the ROFR.*

In addition, AoA has a legitimate, legally protected interest in protecting its contractual and statutory ROFR, and pursued that interest by appropriate means.

There can be no dispute that AoA's ROFR constitutes a "legally protected interest" under Restatement (Second) § 773. *Crivelli*, 215 F.3d at 395 (discussing a franchisor's legally protected interests in its ROFR); *Darius Int'l*, 2008 WL 1820945, at *48 (rejecting claim of no legally protected interest where the allegedly interfering party "merely enforced a[n] . . . agreement that it believed in good faith was valid"). AoA also had a legitimate business interest in seeking to enforce its ROFR. As the

Third Circuit has explained, "[a]ny franchisor has an interest in the identity of its franchisees." *Crivelli*, 215 F.3d at 395 (internal quotation omitted). The Third Circuit's holding in *Crivelli* reflects, in the ROFR context, the long-standing fundamental contractual right to do business with partners *of one's choosing*. *See, e.g.*, *Arkansas Valley Smelting Co. v. Belden Mining Co.*, 127 U.S. 379, 387 (1888) ("[E]very one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent."); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) (recognizing that a "manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes"); *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1137-38 (3d Cir. 1995) (same).

Thus, absent illegal discrimination, restraint of trade, or similar illegal conduct, Pennsylvania courts do not entangle themselves in a party's choice of contracting partners. *See, e.g.*, *Crivelli*, 215 F.3d at 388 (finding a ROFR exercise inherently proper where the manufacturer stated its subjective assessment that a "superior candidate" existed); *McIntire v. Wm. Penn Broad. Co. of Philadelphia*, 151 F.2d 597, 600 (3d Cir. 1945) ([T]here is no reason . . . why the defendant may not sell [its services] to whomever it pleases."); *Schwartz v. Laundry & Linen Supply Drivers' Union, Local 187*, 339 Pa. 353, 385 (1940) (recognizing that generally a "person may do business with whomsoever he pleases upon terms mutually agreed upon"); *Arbour v. Pittsburgh Produce Trade Ass'n*, 1907 WL 2988, at *4 (Pa. Com. Pl. 1907) (recognizing that "any individual can engage in a lawful business and deal with whomsoever he pleases on any terms; he may sell or

refuse to sell, actuated by any motive, whim or caprice"), *aff'd sub nom. Arbour v. Pittsburg Produce Trade Ass'n*, 44 Pa. Super. 240 (1910).

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████

Furthermore, even if the reasonableness of AoA's preferences were at issue, the undisputed facts establish that AoA had ample and legitimate reasons for preferring not to go into business with Napleton, as discussed in Section IV.A.2 below.   In particular, based on a series of events, AoA believed that Napleton presented unique and exceptional litigation risk to the company.   Even under a statutory reasonableness standard—which *Crivelli* expressly states does <u>*not*</u> apply to a ROFR—courts hold that "decisions motivated by sound and legitimate business purposes, absent illegal bias, are not subject to liability."   *Gabe Staino Motors, Inc. v. Volkswagen of Am., Inc.*, 2005 WL 1041196, at *14, 19 (E.D. Pa. Apr. 29, 2005).

Moreover, for the reasons discussed above, AoA's demand for a good-faith breakdown of the APA was an appropriate means of protecting its ROFR.   AoA therefore did not violate "the 'rules of the game' which society has adopted," and judgment as a matter of law should be entered against Napleton. *Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.*, 150 A.3d 957, 968 (Pa. Super. Ct. 2016) (quoting

*Glenn*, 272 A.2d at 899); *see also Geofreeze*, 588 F. Supp. at 1346 ("Because it acted as

both its contract and … business norms provided, it follows that the [party] acted in a

good faith manner and by appropriate means.").

### 2. Napleton Cannot Demonstrate that AoA Lacked Justification to Rescind the Conditional Relocation Agreement.

---

[9] Even an affirmative finding that the Relocation Agreement was not fraudulently induced—and that AoA's rescission was in fact a breach—would not revive Napleton's claim.   AoA still pursued legitimate interests in good faith.  *Windsor Sec.*, 986 F.2d at 666 (3d Cir. 1993) (holding that an attempt to modify a contract was still "proper," even though the court ultimately deemed that conduct a breach).

████████████████████████████████████████████████

██████████████████████████

Under Restatement Section 773A, a franchisor indisputably has a "legally protected interest" in terminating or voiding a contract based on the franchisee's fraud. *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 552, 567-68 (2009) (holding that a franchisor's right against "dishonest and improper conduct" is sufficiently strong to warrant immediate termination despite a contractual cure provision); *In re Bridgeport Fire Litig.*, 8 A.3d 1270, 1282 (Pa. Super. Ct. 2010) ("A contract can … be avoided if it was procured by fraud or misrepresentation that has been relied upon by the party seeking to rescind the instrument.") (citation omitted).

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████ ██ ███████████████████████

████████████████████

█    On July 14, 2016, Wyoming Valley sent a formal request to AoA seeking approval to relocate its Audi dealership to the Relocation

---

[10] Under Pennsylvania law, fraudulent inducement involves six elements: (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 556 Pa. 489, 499 (1999). "The tort of intentional non-disclosure has the same elements as intentional misrepresentation except in the case of intentional non-disclosure, the party intentionally conceals a material fact rather than making an affirmative misrepresentation." *Id.* (internal quotation omitted)

███████████████████████████████████

███████████████████████████████████

███████████

- On July 19, 2016, Wyoming Valley's President, Charles Phillips, instructed Wyoming Valley's counsel not to submit the APA to the manufacturers because "we are very close to securing the Audi facility approval so we are going to wait 1 maybe 2 more days to secure it." (*Id.* ¶ 30.)

- On July 19, 2016, Napleton's attorney directed Wyoming Valley's attorney: "They are waiting on Audi – don't send [the APA]." (*Id.* ¶ 31.)

- On July 21, 2016, Wyoming Valley learned that it would take additional time to obtain Audi's approval of the proposed relocation. Wyoming Valley's dealer principal, Steve Ubaldini, asked Napleton's COO, Bruce Etheridge: "Do you still want to hold off on sending the APA to the manufacturers?" Etheridge responded: "I would hold off if I were you. I really think Audi will require additional things on the new building … if they know there is a buy sell." (*Id.* ¶¶ 31–32.)

- On August 12, 2016, AoA first sent a draft of the Relocation Agreement to Wyoming Valley. The first sentence of the Relocation Agreement notified Wyoming Valley that AoA was providing conditional approval "[i]n reliance upon the representations, disclosures, and commitments made by you … in submitting your request for relocation." (*Id.* ¶¶ 34–35.)

- The proposed terms of the Relocation Agreement included, among other things, that Wyoming Valley "shall retain its current organization and ownership structure," and that there shall be no change in Wyoming Valley's "beneficial shareholders" without AoA's prior written consent. (*Id.* ¶ 36.)

- On August 13, 2016, after reviewing the proposed Relocation Agreement, Mr. Phillips asked Mr. Ubaldini: "Do we need to wait for it to be signed in order to proceed?" Mr. Phillips also acknowledged even before signing it that Wyoming Valley was in violation of the terms: "Looks like we give up the bonus monies

[that AoA agreed to pay under the agreement] when we give them the APA. Oh well." (*Id.* ¶ 40.)

- On August 15, 2016, Etheridge forwarded the proposed Relocation Agreement to Ed Napleton. Ed Napleton responded, "Time to sign and wait to get the document back countersigned and then send out the APA." (*Id.* ¶ 41.)

- On August 15, 2016, Etheridge responded to Ed Napleton, stating that the conditional relocation approval "COULD be disapproved if a buy sell is sent." Ed Napleton responded: "I read it, No choice so we need to be sure that we have our rights to stand in the sellers shoes and take them to the PA motor board if they fuck with us. Right up my alley." Etheridge responded: "Will do." (*Id.* ¶ 42.)

- The next day, on August 16, 2016, Wyoming Valley executed the proposed Relocation Agreement and returned it to AoA. Wyoming Valley never attempted to negotiate any of the terms and did not disclose the existence of the APA or its intent to sell its Audi dealership before executing the agreement. (*Id.* ¶ 43.)

- On September 12, 2016, AoA countersigned the Relocation Agreement and delivered a fully executed copy to Wyoming Valley. (*Id.* ¶ 45.)

- By letter dated September 14, 2016, two months after executing the APA, Wyoming Valley disclosed the APA to AoA and the other manufacturers. (*Id.* ¶ 49.)

- Despite the condition that Wyoming Valley "shall retain its current organization and ownership structure," Wyoming Valley has admitted that from July 2016 through the present, it has always intended to sell its Audi franchise. (*Id.* ¶ 44.)

These undisputed facts, most of which AoA did not discover until March 2017 or later, demonstrate that Wyoming Valley and Napleton worked in concert to induce AoA to enter into the Relocation Agreement by intentionally concealing the APA. Upon discovering this evidence and considering its options, AoA chose to rescind the

agreement.   The propriety of this decision under Restatement (Second) of Contracts

Section 773 is self-evident—regardless of whether AoA could hypothetically prevail in

a lawsuit for fraudulent inducement.   Indeed, under Pennsylvania law, rescission is the

"appropriate means" for addressing fraudulent inducement.   *See, e.g., Metro. Prop. &*

*Liab. Ins. Co. v. Ins. Com'r of Com. of Pa.*, 525 Pa. 306, 312 (1990) ("Under basic contract

principles, these fraudulent statements would certainly justify the rescission . . . after

discovery of the misrepresentations.").   AoA's rescission did not violate "the 'rules of

the game' which society has adopted," and therefore cannot be deemed improper as a

matter of law.   *Peoples Mortg.*, 856 F. Supp. 910, 941–42 (quoting *Glenn*, 272 A.2d at

899); Restatement (Second) of Contracts § 773 (1979) (requiring only a "good faith"

interest asserted by "appropriate means").

Notably, had AoA sought judicial rescission of the Relocation Agreement

based on the foregoing grounds, AoA's conduct indisputably would have been

privileged under the *Noerr–Pennington* doctrine (*see* Doc. 321)*,* Pennsylvania common

law,[11] and Restatement (Second) of Contracts Section 773.[12]   *See generally Eigen v.*

*Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1184 (Pa. Super. Ct. 2005)

(discussing the right to equitable rescission).   Napleton cannot show that AoA's

furtherance of the very same interests (its legal rights) by the same means (rescission)

---

[11] In Pennsylvania, judicial privilege extends to, *inter alia*, pleadings and communications "pertinent
and material to the redress sought and . . . issued in the regular course of the proceedings."   *Post v.
Mendel*, 510 Pa. 213, 223 (1986).

[12] Initiating a lawsuit for good faith reasons is not improper under Section 773.   *See Peoples Mortg.*,
856 F. Supp. at 942.

became not merely unprivileged, but *improper*, solely because AoA exercised its rescission right outside of the court system.

Thus, on this basis alone, the Court should enter judgment as a matter of law on Napleton's tortious interference claims relating to the rescission.

### C. NAPLETON'S TORTIOUS INTERFERENCE CLAIMS FAIL AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA'S NON-LITIGATION CONDUCT CAUSED NO ACTUAL INTERFERENCE OR LEGAL DAMAGES.

Finally, this Court should grant summary judgment to AoA on Napleton's remaining tortious interference claims because the undisputed evidence establishes that none of AoA's *non-litigation* conduct actually interfered with Napleton's agreements or prospective contractual relations.

To prove that a defendant's conduct actually interfered with a contract or a prospective contract, resulting in legal damages, a plaintiff must establish that the defendant's conduct *caused* the nonperformance. *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 385-88 (3d Cir. 2004) (reversing jury verdict on tortious interference claim on several grounds, including "most important[ly]" the lack of evidence that the relevant conduct caused the damages alleged); *McNany*, 892 F. Supp. 2d at 644 (granting summary judgment on tortious interference claim where the evidence failed to demonstrate causation).

Here, Napleton's tortious interference claims fail because the Court has already dismissed Napleton's claims to the extent they rely on the litigation, and the

undisputed material facts establish that AoA's *non-litigation conduct* did not cause any actual interference.  Specifically, Napleton cannot show (i) that AoA's non-litigation conduct interfered with the APA; (ii) that AoA's non-litigation conduct interfered with any agreements relating to the Relocation Property; or (iii) that AoA's communications with other potential purchasers or any other manufacturer interfered with any agreements.

For these reasons, the Court should enter judgment as a matter of law against Napleton on its tortious interference counterclaims.

### 1. Napleton Cannot Show that AoA's Non-Litigation Conduct Interfered with the APA (Counts III & IV).

The undisputed material facts demonstrate that AoA's non-litigation conduct did not cause any nonperformance of the APA.  Because Counts III and IV are based on Napleton's claim that AoA interfered with the APA, the Court should grant judgment as a matter of law on these claims.



██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

Crucially, several days _before_ the Court issued its June 29, 2017 Order in this action, Napleton and Wyoming Valley settled in principle their pending dispute with BMW. Napleton informed the Court that, _as a result of this settlement with BMW_, the

parties were now ready to close the APA transaction (without Audi and Volkswagen)

within approximately 60 days.  (Doc. 199 at 1.)  As Napleton itself explained:

> Napleton, Wyoming Valley, and BMW have come to a settlement
> in principle regarding their pending dispute, and BMW will
> approve Napleton to purchase Wyoming Valley BMW as part of
> that settlement.  *Napleton and Wyoming Valley thus are now ready to
> proceed to the closing of the non-VW Group dealerships* in the APA
> (namely, BMW, Porsche, Subaru, Mazda, and Kia).  *The parties
> intend to close on the transfer of those franchises on or before August 28,
> 2017.*

(*Id.* at 1 (emphasis added))  And, in a follow-up letter to the Court, Napleton and

Wyoming Valley jointly explained that, while the Court's injunction was in place,

"there had been ongoing negotiations among the attorneys to close on the five non-

VW Group dealerships and that the only open issue was money."  (Doc. 202, at 1-2

(quoting Wyoming Valley's 30(b)(6) deposition testimony).)

Thus, by Napleton and Wyoming Valley's own admissions, any non-closing or

delay in closing of the APA prior to June 29, 2017, when the Court lifted the

injunction and allowed their transaction to proceed, resulted from litigation-specific

events:  AoA's filing and prosecution of this action, the Court's preceding injunction

orders in this action, and BMW's separate action.

*Third*, AoA's non-litigation conduct has neither prevented nor delayed the

closing of the APA since the Court issued its June 29, 2017 Order.  Indeed, as noted

above, Napleton and Wyoming Valley informed the Court at the end of June that they

had reached agreement on all issues regarding their transaction for the five non-VW

Group dealerships except for price, and that they intended to close within 60 days. The undisputed facts establish that for many reasons *other than* AoA's non-litigation conduct, however, Napleton and Wyoming Valley have not been able to close their transaction according to their intended schedule.

The various causes of delay in the closing of the APA since June 29, 2017 include, among other things, the following events:

- The injunction prohibiting the sale of the BMW dealership remained in place until July 10, 2017.  (Doc. 215.)

- 

- Napleton did not produce a first draft of the parties' written agreement to close on the non-Audi and non-Volkswagen dealerships, entitled the "Second Addendum to the APA," until late August 2017.  (*Id.* ¶ 152.)

- The next draft of the Second Addendum was not circulated among the parties until several weeks later, on September 20, 2017.  (*Id.* ¶ 156.)

- 

- In October, Napleton had to re-submit forms to Pennsylvania regulatory agencies (including the Pennsylvania Board of Motor Vehicles) because its earlier submissions/approvals had expired due to the lapse of time. (*Id.* ¶ 157.)

- In addition, in October 2017, Napleton learned that it was unable to obtain a dealer license for the Subaru dealership because Subaru of America, Inc. had inadvertently allowed its distributor license in the Commonwealth to expire.  (*Id.* ¶ 158.)

- As of January 4, 2018, Subaru of America, Inc. still had not notified Napleton that its distributor license had been renewed.  (*Id.* ¶ 160.)

- As of January 4, 2018, Napleton had not even attempted to close the APA transaction without the Subaru dealership because Napleton preferred to wait.  (*Id.* ¶ 161.)

In light of these undisputed facts, Napleton cannot establish that AoA's non-litigation conduct either caused the APA not to close, or delayed any such closing, (i) before the Court enjoined the transaction, (ii) while the transaction was enjoined, or (iii) since June 29, 2017, when the Court permitted the non-Audi and Volkswagen portions of the transaction to proceed to closing.  The Court should therefore grant AoA judgment as a matter of law on Counts III and IV of Napleton's counterclaims.

### 2. Napleton Cannot Show that AoA's Rescission of the Relocation Agreement Interfered with the MIPA, the Transfer of the Relocation Property, or the New Audi Lease at the Relocation Property (Counts V & VI).

The undisputed material facts establish that AoA's May 22 Letter rescinding the Relocation Agreement did not cause any nonperformance or delayed performance of (i) the MIPA, (ii) the transfer of the Relocation Property from NIP to EFN Wyoming Valley Properties, or (iii) the new Audi lease at the Relocation Property.  Because Counts V and VI are based on Napleton's assertion that the May 22 Letter interfered

with those transactions, the Court should enter judgment as a matter of law in AoA's favor on both claims.

*First*, in light of the undisputed facts, Napleton's claim regarding the MIPA fails as a matter of law.  Napleton is not even a party to the MIPA, and thus does not have standing to assert this claim.  *See Glenn*, 441 Pa. at 479 (requiring "a contract or of a prospective contractual relation between the third person and the plaintiff"); *Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc.*, 519 A.2d 997, 1000 (Pa. Super. 1987) ("Essential to a right of recovery under this section is the existence of a contractual relationship between the plaintiff and a 'third person' other than the defendant.") (citations omitted); *see also Wagner v. Tuscarora School Dist.*, 2006 WL 167731, at *12–13 (M.D. Pa. Jan. 20, 2006), *aff'd*, 225 F. App'x 68 (3d Cir. 2007) (same).

*Third*, in light of the undisputed facts, Napleton's claim that the May 22 Letter has caused the nonperformance or delayed performance of the new Audi lease at the Relocation Property fails as a matter of law.  As discussed in Section I above, as a result of the Second Addendum and the MIPA, among other things, Wyoming Valley cannot satisfy the conditions precedent to AoA's performance under the Relocation Agreement.  In addition, pursuant to the June 29 Order, Wyoming Valley is prohibited from altering the *status quo* by relocating the Audi dealership to the Relocation Property, at least until this litigation is concluded.  (*See* Docs. 239 at 8, 251 at 8-9.)  AoA cannot be liable for a delay in the relocation that resulted from the Court's June 29 Order.

Accordingly, Napleton cannot establish that AoA's rescission of the Relocation Agreement caused actual interference or legal damages as a matter of law.  For this reason, the Court should grant judgment as a matter of law on Counts V and VI.

### 3.    Napleton Cannot Show that AoA's Communications with Potential Purchasers or Other Manufacturers Interfered with Any Agreement or Expectation.

Finally, the undisputed facts demonstrate that AoA's communications with other potential purchasers and/or other manufacturers did not interfere with any of Napleton's agreements or prospective relations.  To the extent any of Napleton's claims are based on these allegations, therefore, judgment against Napleton should be entered as a matter of law.

36

*First*, the record contains evidence that AoA communicated with potential purchasers (*i.e.*, other than Napleton) on multiple occasions regarding Wyoming Valley's Audi dealership. AoA was privileged to have these conversations; but even if it were not, there is not a scintilla of evidence to support Napleton's claim that such communications actually interfered with the APA in any way.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████

## IV. THE COURT SHOULD ENTER JUDGMENT AS A MATTER OF LAW ON NAPLETON'S STATUTORY CLAIMS (COUNTS I, II & VII).

Napleton asserts three statutory claims against AoA based on three provisions of the Pennsylvania Board of Vehicles Act.

- In Count I, Napleton claims that AoA violated Section 12(b)(3) by "unreasonably withholding consent to the sale" of Wyoming Valley's Audi franchise. (Doc. 219 ¶ 110.)

- In Count II, Napleton claims that AoA violated Section 16 of the Act by "attempt[ing] to delay the exercise [of] its right of first refusal by and through their frivolous allegations and vexatious conduct—including Audi's unreasonable demands, the filing of the present action, and unnecessary third-party discovery." (*Id.* ¶ 119.)

- In Count VII, Napleton claims that AoA violated Section 12(b)(5) of the Act by failing to "respond in writing" to Wyoming Valley's request to

sell its Audi franchise to Napleton within "75 days from the date of the receipt of the initial forms."  (Counterclaim ¶¶ 174-84.)

Based on the undisputed material facts, the Court should enter judgment as a matter of law in AoA's favor on each of these claims.

**A. NAPLETON'S CLAIM FOR VIOLATION OF SECTION 12(B)(3) OF THE ACT (COUNT I) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA DID NOT "UNREASONABLY WITHHOLD CONSENT."**

This Court should grant summary judgment on Napleton's claim that AoA violated Section 12(b)(3) of the Act because AoA did not unreasonably withhold consent to Wyoming Valley's request to transfer its Audi Assets to Napleton.

Under Section 12(b)(3), it is unlawful for a manufacturer or distributor to "[u]nreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer … who meets the manufacturer's or distributor's reasonable requirements for appointment as a dealer."  63 P.S. § 818.12(b)(3) (emphasis added). The undisputed material facts demonstrate that AoA did not violate Section 12(b)(3) for three reasons.  *First*, at all relevant times, AoA was acting to enforce its ROFR. *Second*, AoA had legitimate business reasons not to consent to the proposed transfer. *Third*, in any event, Wyoming Valley withdrew its request for AoA's consent before AoA's time to respond to the request had expired.  Therefore, the Court should enter judgment as a matter of law in AoA's favor on Count I.

### 1.   AoA Did Not Unreasonably Withhold Consent Because AoA Was Acting to Enforce Its ROFR.

AoA did not violate Section 12(b)(3) because the undisputed material facts establish that, at all relevant times, AoA was acting to enforce its contractual and statutory ROFR.

Under the Audi Dealer Agreement, AoA has a contractual ROFR over Wyoming Valley's proposed transfer of its Audi dealership assets to a third party. (AoA Affirm. MSJ, at 16–18.)   Section 16 of the Act, in turn, protects contractual ROFRs, providing that "[a] manufacturer or distributor *shall be permitted to enact a right of first refusal* to acquire the new vehicle dealer's assets" in the event of a proposed sale, so long as the manufacturer or distributor, in exercising its ROFR, satisfies certain requirements.   63 P.S. § 818.16 (emphasis added).

Crucially, the Third Circuit has held that "the manufacturer's right of first refusal should not be subject to the [Act]'s ban on unreasonable denial of consent" in Section 12(b)(3).   *Rosado*, 337 F.3d at 295 (discussing *Crivelli*, 215 F.3d 386)).   The Third Circuit has specifically held both that a manufacturer's use of its contractual right of first refusal does not constitute the unreasonable withholding of consent under Section 12(b)(3), and that, in enacting Section 16 of the Act, the "Pennsylvania legislature did not intend" for Section 12(b)(3) "to govern rights of first refusal." *Crivelli*, 215 F.3d at 393-94.

Here, the undisputed material facts establish that, at all relevant times, AoA was acting to enforce its ROFR with respect to the proposed transfer of Wyoming Valley's Audi dealership assets. These undisputed material facts include the following:

- 

- Wyoming Valley and Napleton asked AoA to give them time to provide the requested apportionment. (*Id.* ¶¶ 52–58.)

- On November 17, 2016, Wyoming Valley sent a letter to AoA in which it purported to respond to AoA's request for an apportionment of the APA, and set forth what it called a "good faith breakdown," agreed to with Napleton, of $8 million for the intangible assets of the Audi franchise only. (*Id.* ¶¶ 59–60.)

- On November 22, 2016, AoA, Wyoming Valley, and Napleton agreed in writing that AoA's statutory and contractual time period to consider and respond to the request for consent or to exercise its ROFR "began to run on October 14, 2016, and will expire on December 28, 2016." (*Id.* ¶ 62.)

- On December 2, 2016, AoA responded to the November 17 letter, setting forth various reasons why it believed Wyoming Valley had failed to provide a good faith apportionment of the Audi dealership assets, and that AoA was therefore still unable to evaluate and, if desired, exercise its ROFR. (*Id.* ¶¶ 63–62.)

- On December 9, 2016, Wyoming Valley responded to AoA's December 2 letter by, among other things, (i) admitting that the $8 million price for Audi intangible assets identified in its November 17 letter was not an apportionment of the APA intangible price, but rather a purported "stand-alone" valuation; and (ii) declining to provide an apportionment of the APA intangible price. (*Id.* ¶¶ 66–71.)

- On December 13, 2016, AoA initiated this litigation alleging that Wyoming Valley had attempted to thwart its ROFR.  (*Id.* ¶ 92.)

- On multiple occasions between December 19 and 27, 2016—before AoA's time period to exercise its rights (including its ROFR) under the Act had expired—Wyoming Valley informed AoA that it was withdrawing its request for AoA's consent. (*Id.* ¶¶ 100, 108–112.)

Because these undisputed facts establish that, at all relevant times, AoA was seeking to enforce its contractual and statutory ROFR, AoA's conduct cannot be deemed "unreasonable withholding of consent" as a matter of law.

### 2. AoA Did Not Unreasonably Withhold Consent Because It Had Legitimate Business Reasons to Reject Wyoming Valley's Request for Consent to the APA.

In addition, AoA did not unreasonably withhold consent under Section 12(b)(3) because the undisputed material facts establish that AoA had legitimate business reasons—in addition to enforcing its ROFR—for not providing its consent.

Under Pennsylvania law, it is not unreasonable to "withhold consent" to a "qualified buyer" if the manufacturer has valid and legitimate business reasons for doing so.  *See, e.g.*, *Gabe Staino Motors*, 2005 WL 1041196, at *13 (manufacturer's actions, intended to avoid entering into a franchise arrangement involving a particular third party, "cannot be found to have been unreasonable, as there was credible evidence that [the manufacturer] had legitimate business reasons for rejecting the transfer. . . ").

A manufacturer-franchisor legitimately may seek to avoid "a business relationship with a franchisee who it believes may not represent it in the manner it

desires, may not expend sufficient effort to promote its products, [or] may not have the loyalty to it and its business that it believes necessary to be an integral part of its operation." *Crivelli*, 215 F.3d at 391.  The decision in *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745 (D. Md. 2013), is illustrative.  In that case, the court held on summary judgment that a manufacturer's refusal to consent to a proposed transfer was reasonable where the proposed franchisee had sued it in the past:

> [T]he nature of this litigation, and the distrust that it represents, is a reasonable, sufficient bases for denial of transfer of the franchise . . . .  Absent evidence that this dispute and resultant litigation was manufactured and/or frivolous, it would be manifestly unreasonable to require a manufacturer to enter into a franchise agreement with a party with which it has ongoing business disputes, including matters of business integrity. [The manufacturer] was well within its right to deny a transfer to an entity with which it was already engaged in a lawsuit. . . .

*Id.* at 764.



AoA reached these conclusions based on the following undisputed material facts:

<u>Threat of TDI-Related Litigation Against the Audi Brand</u>

- 

- Napleton was not an Audi dealer at the time AoA received the APA. (*Id.* ¶ 73.)

- The APA includes a provision by which Wyoming Valley would assign its litigation rights pertaining to TDI diesel emissions issues—against <u>*both*</u> the Volkswagen *and* Audi brands—to Napleton. (*Id.* ¶ 23.)

- At the time Wyoming Valley disclosed the APA in mid-September, no Audi dealer had initiated litigation regarding the TDI diesel emissions issue (whether individually or on behalf of a class of Audi dealers), and AoA had a strong interest in resolving any disputes relating to the TDI diesel emissions issue and to avoid any litigation. (*Id.* ¶ 74.)

- At the same time, VWGoA was working to complete a class action settlement of the putative class action that Napleton had filed on behalf of all Volkswagen dealers in the United States. (*Id.* ¶ 75.)

- By mid-September, when the APA was disclosed, it was VWGoA's understanding that Napleton planned for all three of its Volkswagen dealerships to opt-out of the class action settlement and continue to pursue their claims against VWGoA, among others, in an individual action. (*Id.* ¶ 76.)

- After receiving the APA in mid-September, AoA became concerned that if Napleton acquired Wyoming Valley's litigation rights against the Audi brand relating to the TDI diesel emissions issue, Napleton would then attempt to initiate a class action on behalf of all Audi dealers in the United States and thereby interfere with and jeopardize AoA's ability to

amicably resolve diesel emissions issues with its dealers and avoid such litigation.  (*Id.* ¶ 77.)

Other Litigation

- Napleton had previously sued AoA in federal court in Florida in 2010. (*Id.* ¶ 78.)

- At or around the same time that Napleton and VWGoA were in discussions regarding Napleton's threat to file a class action on behalf of U.S. Volkswagen dealers regarding TDI diesel emissions issues, among other things, Napleton filed a lawsuit against FCA US, LLC.  (*Id.* ¶ 79.)

- Among other things, these other lawsuits heightened AoA's concern that Napleton would initiate TDI diesel emissions litigation relating to the Audi brand.  (*Id.* ¶ 80.)

In light of these undisputed facts, it was not "unreasonable" as a matter of law for AoA to withhold its consent to a transfer of the Audi franchise to Napleton. *Crivelli*, 215 F.3d at 391; *Paccar*, 923 F. Supp. 2d at 764.

> **3.      AoA Did Not Unreasonably Withhold Consent Because It Did Not Reject Wyoming Valley's Request for Consent, and Wyoming Valley Withdrew Its Request Before AoA's Deadline to Respond.**

Finally, AoA did not "unreasonably withhold consent" to Wyoming Valley's request to transfer its Audi dealership to Napleton as a matter of law because (i) AoA did not reject Wyoming Valley's request for consent, and (ii) Wyoming Valley purported to remove the Audi Assets from the APA transaction and formally withdrew its request for consent before AoA's time to respond to the request had expired.

Sections 12(b)(3) operates in conjunction with 12(b)(5) of the Act. While Section 12(b)(3) prohibits a manufacturer from unreasonably withholding consent to a proposed transfer or sale, Section 12(b)(5) makes it a violation for a manufacturer to "[f]ail to respond in writing to a request for consent *as specified in paragraph 3*"—*i.e.*, Section 12(b)(3)—within a defined period of time. 63 P.S. § 818.12(b)(5) (emphasis added). If a manufacturer fails to respond within the applicable time period, Section 12(b)(5) also dictates the result: "*[t]he failure to respond* within the time period … shall be deemed to be approval of the request … " *Id.* (emphasis added)

Therefore, reading these provisions together,[13] a manufacturer's "withholding of consent" under Section 12(b)(3) necessarily entails something more than a mere "failure to respond." Section 12(b)(3) kicks in only if a manufacturer *does respond* before the end of the defined time period and *rejects the request* for consent: the rejection violates the Act if, in doing so, the manufacturer is "unreasonably withholding consent" to the sale or transfer. 63 P.S. § 818.12(b)(3).[14]

---

[13] *See* 1 P.S. § 1921(a) ("Every statute shall be construed, if possible, to give effect to all its provisions."); *Mission Funding Alpha v. Com.*, 173 A.3d 748, 757 (Pa. 2017) ("Provisions of a statute are to be construed in the context in which they appear and with reference to other pertinent provisions.") (citations omitted)

[14] Were it otherwise, Sections 12(b)(5) and 12(b)(3) would be redundant—a result which the Pennsylvania legislature has instructed courts to avoid. *See* 1 P.S. § 1921(a); *Com. v. Bigelow*, 484 Pa. 476, 484 (1979) ("Where a section of a statute contains a given provision, the omission of such provision from a similar (section) is significant to show a different intention existed.") (quotation omitted); *Com. v. Berryman*, 437 Pa. Super. 258, 267 (1994) ("Where a legislature includes specific language in one section of a statute and excludes it from another, that language should not be implied where excluded."); *see also Crivelli*, 215 F.3d at 393–94 (citing 1 P.S. § 1921(a) in interpreting the scope of Section 12(b)(3)).



**B.  NAPLETON'S CLAIM FOR VIOLATION OF SECTION 16 OF THE ACT (COUNT II) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT AOA DID NOT UNREASONABLY DELAY EXERCISING ITS ROFR.**

This Court should grant summary judgment of Napleton's claim that AoA violated Section 16 of the Act because AoA did not unreasonably delay the exercise of its ROFR, and because Wyoming Valley purported to remove the Audi Assets from the APA transaction before AoA's time to exercise its ROFR had expired.

Section 16 protects a manufacturer's contractual right of first refusal, providing that "[a] manufacturer or distributor shall be permitted to enact a right of first refusal to acquire the new vehicle dealer's assets," so long as the manufacturer or distributor, in exercising its ROFR, satisfies certain requirements.  63 P.S. § 818.16 (emphasis added).  *See also Rosado*, 377 F.3d at 293; *Crivelli*, 215 F.3d at 393-94.  In Count II,

Napleton alleges that AoA violated Section 16 by improperly delaying the exercise of its ROFR, in particular through "Audi's unreasonable demands, the filing of the present action, and unnecessary third-party discovery."   (Doc 219, Counterclaims ¶ 119.)

The Court, in its November 20, 2017 Order, dismissed Count II to the extent it seeks to hold AoA liable for "its filing of the lawsuit and third-party discovery." (Doc. 312, at 11.)   What remains of Napleton's claim under Section 16, therefore, is merely its assertion that AoA "unreasonable delay[ed] [ ] the exercise of its right of first refusal," due to its "demand that Wyoming Valley and Napleton provide a price breakdown of the APA as a condition precedent to its decision on its right of first refusal."   (*Id.*)   The undisputed material facts establish that AoA did not improperly "delay" the exercise of its ROFR.   The Court should therefore enter judgment against Napleton on Count II of its counterclaims.

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

        █████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

    Accordingly, the Court should enter judgment as a matter on Count II in AoA's favor.

**C.    NAPLETON'S CLAIM FOR VIOLATION OF SECTIONS 12(B)(5) OF THE ACT (COUNT VII) FAILS AS A MATTER OF LAW BECAUSE THE UNDISPUTED FACTS SHOW THAT AOA DID NOT FAIL TO TIMELY RESPOND TO WYOMING VALLEY'S REQUEST FOR CONSENT.**

This Court should grant summary judgment on Napleton's claim that AoA violated Section 12(b)(5) of the Act because AoA did not fail to timely respond to Wyoming Valley's request for consent to the proposed transfer to Napleton.

---

[15] Section 12(b)(5) provides that once a manufacturer receives a written request for consent to sell or transfer the franchise "on the forms … generally utilized by the manufacturer … for such purposes and containing the information required," the manufacturer has either 60 or 75 days to respond to the request.   If, upon receiving the initial forms, the manufacturer does *not* seek additional information within 15 days, then the manufacturer must respond to the request for consent within 60 days of its receipt of the initial forms.   On the other hand, if the manufacturer *does* seek additional information within 15 days of receipt of the initial forms, then the manufacturer must respond to the request for consent by the earlier of 60 days following "receipt of the supplemental requested information," or 75 days from "the date of the receipt of the initial forms."   63 P.S. § 818.12(b)(5).

███████████████████████████████████████████████

██████████████████████████████████████

Accordingly, in light of these undisputed facts, AoA did not fail to timely respond to Wyoming Valley's request for consent. The Court should therefore grant AoA judgment as a matter of law on Count VII.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to AoA on each of Napleton's counterclaims—Counts I through VII—in their entirety. Court also should grant AoA such other and further relief as the Court determines to be just and equitable.

Dated: January 24, 2018                Respectfully submitted,


 /s/ Randall L. Oyler

Thomas B. Schmidt, III (PA 19196)
PEPPER HAMILTON LLP
100 Market Street, Ste. 200
Harrisburg, Pennsylvania 17108
Ph: 717.255.1155
Email: schmidtt@pepperlaw.com

Randall L. Oyler (IL 6209675)
Owen H. Smith (IL 6307554 / NY 693627)
Brandon C. Prosansky (IL 6293582)
BARACK FERRAZZANO
    KIRSCHBAUM & NAGELBERG LLP
200 West Madison, Ste. 3900
Chicago, Illinois 60606
Ph: 312.984.3100
Email: randall.oyler@bfkn.com
Email: owen.smith@bfkn.com
Email: brandon.prosansky@bfkn.com
        *Admitted Pro Hac Vice*

*Attorneys for Audi of America, Inc., an operating unit of Volkswagen Group of America, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on January 24, 2018, he caused the foregoing to be on all counsel of record via ECF.:


/s/ Randall L. Oyler

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 7.8</u>

I hereby certify, pursuant to Local Rule 7.8, that the actual number of words in Plaintiff Audi of America, Inc.'s Brief in Support of its Motion for Summary Judgment on Napleton's Counterclaims, excluding table of contents, table of authorities, cover page, signature block, and certificate of service, is 14,272 words,.


/s/ Randall L. Oyler