**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AUDI OF AMERICA, INC.,<br>An Organizational Unit of Volkswagen Group<br>of America, Inc.,<br>A New Jersey Corporation, | |
| Plaintiff/Counter-Defendant, | Case No.  3:16-cv-02470 |
| v.<br>BRONSBERG & HUGHES PONTIAC, INC.,<br>d/b/a WYOMING VALLEY AUDI,<br>A Pennsylvania Corporation, | Hon. John E. Jones III |
| Defendant/Counter-Plaintiff, | |
| -and-<br>NORTH AMERICAN AUTOMOTIVE<br>SERVICES, INC., an Illinois Corporation;  *et al.,* | |
| Defendants/Counter-Plaintiffs. | |

**AUDI OF AMERICA, INC.'S**
**STATEMENT OF UNDISPUTED FACTS**
**IN SUPPORT OF ITS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Audi of America, Inc. ("AoA"), an organizational unit of Volkswagen

Group of America, Inc. ("VWGoA"), by its attorneys, submits its Local Rule 56.1

Statement of Undisputed Facts.

**The Parties' Relationships**

1.      AoA is the U.S. importer and distributor of Audi-brand vehicles, parts

and accessories.  (Doc. 186, ¶ 6.)

2.     AoA distributes Audi-brand vehicles, parts and accessories through a network of independent, authorized Audi dealers.  (Doc. 186, ¶ 6.)

3.     Bronsberg & Hughes Pontiac, Inc. ("Wyoming Valley") is a new motor vehicle dealer authorized under an Audi Dealer Agreement with AoA, dated January 1, 1997 ("Dealer Agreement"), to sell and service Audi-brand vehicles, parts and accessories.   (Doc. 186, ¶ 7.)

4.     The Dealer Agreement incorporates the Audi Dealer Agreement Standard Provisions ("Standard Provisions").  (Doc. 186, ¶ 7.) The Dealer Agreement and the Audi Dealer Agreement Standard Provisions are attached as Exhibits 1 and 2.

5.     Wyoming Valley operates Audi, Volkswagen, Mazda, and Porsche dealerships, and certain separate entities under common ownership operate Kia, Subaru, and/or BMW dealerships (collectively, "Wyoming Valley's dealerships"). (Doc. 186, ¶ 8.)

**The Parties' Rights Regarding the Transfer of Dealership Assets**

6.     Under the Dealer Agreement, Wyoming Valley's right to transfer its Audi assets is subject to AoA's consent.  (Doc. 186, ¶¶ 9–10.)

7.     Article 12(1) of the Standard Provisions provides that:

> If the Dealer chooses to transfer its principal assets or change owners, AoA has the right to approve the proposed transferees, the new owners and executives and, if different from Dealer's, their premises.  (Doc. 35-2.)

8.      Wyoming Valley's right to transfer its Audi assets is also subject to AoA's contractual right of first refusal ("ROFR").  (Doc. 186, ¶ 11.)

9.      Article 12(3) provides:

(3)     Whenever Dealer proposes to transfer its principal assets or change owners of a majority interest, AoA shall have the right to purchase such assets or ownership interest, as follows:

(a) AoA may elect to exercise its purchase right by written notice to Dealer within 30 calendar days after Dealer has furnished to AoA all applications and information reasonably requested by AoA to evaluate Dealer's proposal.

(b) if Dealer's proposed sale or transfer was to a successor approved in advance by AoA, to any of Dealer's Owners, to Dealer's employees as a group or to Dealer's spouse, children or heirs, then Dealer may withdraw its proposal within 30 calendar days following receipt of AoA's notice of election of its purchase right.

(c) AoA's right under this Article 12(3) shall be a right of first refusal, permitting AoA to:

(i)  assume the proposed transferee's rights and obligations under its agreement with Dealer; and

(ii) cancel this Agreement and all rights granted Dealer hereunder.

Except to the extent specifically inconsistent with the terms of this Agreement, the price and all other terms of AoA's purchase shall be as set forth in any bona fide written purchase and sale agreement between Dealer and its proposed transferee and in any related documents.

(d) Dealer shall furnish to AoA copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses or

> other documents affecting any of the property to be transferred, and shall assign to AoA any permits or licenses necessary for the continued conduct of Dealer's Operations.
>
> (e) AoA may assign its right of first refusal to any party it chooses, but in that event AoA will remain primarily liable for payment of the purchase price to Dealer.
>
> (f) If AoA exercises its purchase right, AoA will reimburse Dealer's proposed transferee for reasonable documented actual expenses which such proposed transferee incurred through the date of such exercise which are directly and solely attributable to the transaction Dealer proposed.
>
> (g) Nothing contained in this Article 12(3) shall require AoA to exercise its right of first refusal in any case, nor restrict any right AoA may have to refuse to approve Dealer's proposed transfer.

(Ex. 2.)

## The Asset and Real Estate Purchase Agreement

10.     On or about July 11, 2016, Wyoming Valley, together with certain affiliated entities and individuals, entered into an Asset and Real Estate Purchase Agreement ("APA") with entities affiliated with the Napleton Automotive Group ("Napleton").  A copy of the APA is attached as Exhibit 3. (Doc. 186, ¶ 17–18; Doc. 219 ¶ 17; Doc. 360 ¶ 7.)

11.     Section 17.3 states:

> "This Agreement, including the Background of Agreement which is incorporated into this Agreement and an integral part hereof, along with the schedules and exhibits attached hereto and to be attached hereto at Closing or sooner, sets forth all of the promises, covenants, agreements, conditions and understandings between and among Asset Sellers, Property Owners and Interest

Holders and Buyer with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements or conditions, express or implied, oral or written, with respect hereto, except as contained herein."

12.     Under the APA, Wyoming Valley proposed to transfer its Audi franchise-related assets ("Audi Assets") to Napleton.  (Ex. 3.)

13.     In addition, under the APA, Wyoming Valley proposed to transfer various other assets and real property to Napleton, including the assets of each of the separate Volkswagen, BMW, Kia, Mazda, Porsche, and Subaru businesses. (Ex. 3.)

14.     The APA packaged the sale of all seven dealerships' assets into a single transaction. (Doc. 360 ¶ 9.)

15.     The APA does not separately price the assets of any of Wyoming Valley's dealerships, including its Audi dealership.  (Doc. 360 ¶ 9.)

16.     The APA does not apportion or separately identify the portion of the total purchase price that is attributable to the Audi Assets.  (Doc. 360 ¶ 9.)

17.     The APA does not separately identify the other terms of the APA that are attributable to the Audi Assets. (*See* Ex. 3.)

18.     The APA provides that:

[t]he purchase price for the Acquired Assets, the Motor Vehicle Contracts (as hereinafter defined) and the Assigned Contracts (collectively, the "Acquired Assets Purchase Price" ) shall be as described in subsections 2.1.1 through 2.1.7 inclusive of the sum of Seventeen Million and 00/100ths ($17,000,000.00) Dollars for Asset Sellers' Intangibles [blue sky]. (Ex. 3. § 2.1; § 1.1.9.)

19.     The APA also provided for the transfer of certain real estate assets, including (i) the Larksville real estate and facility where Wyoming Valley currently operates its Audi dealership, and (ii) "the Relocation Property", defined as "1492 Highway 315, Wilke Barre, PA, 18704" (Ex. 3 at 2), where, under the APA, the Audi dealership would be relocated (the "Relocation Property"). (Ex. 3, § 3.1.)

20.     In addition, the APA states:

> "Asset Sellers and Property Owners acknowledge and agree that Buyer has allocated (and will continue to allocate) substantial resources and has incurred (and will continue to incur) substantial costs and expenses in connection with structuring this Agreement including, but not limited to, the conducting of due diligence, negotiations with manufacturers, review of development plans, negotiations with contractors and materialmen, reviewing construction and development plans and reviewing estimates for construction costs. In consideration hereof, each of the Asset Sellers, jointly and severally, hereby agree to pay to NIP a structuring fee of Two-Million and 00/100ths ($2,000,000.00) Dollars ("Structuring Fee"). It is expressly understood that Asset Sellers shall be liable to pay NIP the Structuring Fee should (i) the closing contemplated by the Agreement actually occur between the Asset Sellers and Buyer, or (ii) alternatively, if there is an exercise of any right of first refusal, preemptive right or other similar right ("ROFR") with respect to any of the assets described in the Agreement and the closing upon the exercise of the ROFR actually occurs. Should the Sellers be obligated to pay the Structuring Fee to NIP but fail to do so and the transactions contemplated in the Agreement close between Sellers and Buyer, then NIP shall assign its rights to the 13 Structuring Fee to the Buyer and Buyer shall be entitled to deduct the Structuring Fee from the purchase price payable to Asset Sellers at the Closing. If any person (including, without limitation, either Manufacturer or any other person claiming by, through or under Manufacturer(s)) exercise a ROFR or any right of first refusal, preemptive right or other similar right with respect to any of the Acquired Assets and the closing upon same actually occurs between the Asset Sellers

and the party exercising such preemptive rights then Asset Sellers will promptly pay (or cause to be paid) to NIP the Structuring Fee in cash upon the closing for the purchase of any of the Acquired Assets. Without limiting the generality of the foregoing, NIP, and the Buyer (should NIP's rights be assigned to Buyer) jointly and severally, agree to hold harmless and indemnify Asset Sellers, their successors and assigns, and their successors and assigns' shareholders, directors, employees, affiliates, partners, officers, successors and assigns, from and against any claim, action, loss, liability, damage, or cost and expense, including, without limitation, reasonable expert and attorneys' costs and fees, and the costs of defense, enforcement or collection resulting from or arising from Asset Sellers entry into the agreement with NIP to pay the Structuring Fee to NIP, or Buyer, as NIP's assignee." (Ex. 3, § 2.2.)



























































[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Dated: January 24, 2018                Respectfully submitted,

                                        /s/ Randall L. Oyler

                                       Thomas B. Schmidt, III (PA 19196)
                                       PEPPER HAMILTON LLP
                                       100 Market Street, Ste. 200
                                       Harrisburg, Pennsylvania 17108
                                       Ph: 717.255.1155
                                       Email: schmidtt@pepperlaw.com

                                       Randall L. Oyler (IL 6209675)
                                       Owen H. Smith (IL 6307554 / NY 693627)
                                       Brandon C. Prosansky (IL 6293582)
                                       BARACK FERRAZZANO
                                           KIRSCHBAUM & NAGELBERG LLP
                                       200 West Madison, Ste. 3900
                                       Chicago, Illinois 60606
                                       Ph: 312.984.3100
                                       Email: randall.oyler@bfkn.com
                                       Email: owen.smith@bfkn.com
                                       Email: brandon.prosansky@bfkn.com
                                           *Admitted Pro Hac Vice*

                                       *Attorneys for Audi of America, Inc., an operating unit of
                                       Volkswagen Group of America, Inc.*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on January 24, 2018, he caused the foregoing to be sent to all counsel of record via ECF.


/s/ Randall Oyler