## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Audi of America, Inc., an organizational unit of Volkswagen Group of America, Inc., | Case No. 3:16-cv-02470 |
| Plaintiff / Counter-Defendant, | Judge John E. Jones III |
| v. | |
| Bronsberg & Hughes Pontiac, Inc., d/b/a Wyoming Valley Audi, | |
| Defendant / Counter-Plaintiff, | |
| and | |
| North American Automotive Services, Inc., et al. | |
| Intervenor-Defendants / Counter-Plaintiffs. | |

## JOINT RESPONSE OF WYOMING VALLEY AND INTERVENORS TO VWGoA'S LOCAL RULE 56.1 STATEMENT AND JOINT STATEMENT OF ADDITIONAL FACTS

Pursuant to Local Rule 56.1, Defendant and Counter-Plaintiff Bronsberg & Hughes Pontiac, Inc. ("Wyoming Valley") and Intervenor-Defendants and Counter-Plaintiffs North American Automotive Services, Inc., Napleton Wyoming Valley Imports, LLC, EFN Wyoming Valley Properties, LLC, Millennium Holdings, IV, LLC, and Napleton Investment Partnership, LP (collectively, "Napleton" or "Intervenors") submit their joint response to Audi of America, Inc.'s Statement of Undisputed Facts in Support of its Motions for Summary Judgment,

as well as a joint statement of additional material facts that require denial of Audi's motions for summary judgment.

The response to Audi's statement of facts is set forth below, followed immediately by the joint statement of additional facts.

## <u>RESPONSE TO AUDI'S STATEMENT OF FACTS</u>

1.      AoA is the U.S. importer and distributor of Audi-brand vehicles, parts and accessories. (Doc. 186, ¶ 6.)

**Response:   Undisputed** to the extent that "AoA" is defined as Volkswagen Group of America, Inc. doing business under the statutorily registered fictitious name of one of its operating units, Audi of America, Inc. This paragraph is **disputed** to the extent it implies that Audi of America is a separately-incorporated legal entity.

2.      AoA distributes Audi-brand vehicles, parts and accessories through a network of independent, authorized Audi dealers. (Doc. 186, ¶ 6.)

**Response:   Undisputed.**

3.      Bronsberg & Hughes Pontiac, Inc. ("Wyoming Valley") is a new motor vehicle dealer authorized under an Audi Dealer Agreement with AoA, dated January 1, 1997 ("Dealer Agreement"), to sell and service Audi-brand vehicles, parts and accessories. (Doc. 186, ¶ 7.)

**Response:   Undisputed.**

4.      The Dealer Agreement incorporates the Audi Dealer Agreement Standard Provisions ("Standard Provisions"). (Doc. 186, ¶ 7.) The Dealer

Agreement and the Audi Dealer Agreement Standard Provisions are attached as Exhibits 1 and 2.

**Response:   Undisputed.**

5.     Wyoming Valley operates Audi, Volkswagen, Mazda, and Porsche dealerships, and certain separate entities under common ownership operate Kia, Subaru, and/or BMW dealerships (collectively, "Wyoming Valley's dealerships"). (Doc. 186, ¶ 8.)

**Response:   Undisputed** that, as of the filing Doc. 186, and as of the filing of the parties' summary judgment motions, Wyoming Valley operated Audi, Volkswagen, Mazda, and Porsche dealerships, and that certain separate entities under common ownership also operated Kia, Subaru, and BMW dealerships. As Audi and the Court are aware, however, the BMW, Porsche, and Subaru dealerships, however, are subject to transfer by Wyoming Valley and its affiliates to the Napleton Auto Group, which transfer may have occurred as of this writing.

6.     Under the Dealer Agreement, Wyoming Valley's right to transfer its Audi assets is subject to AoA's consent. (Doc. 186, ¶¶ 9–10.)

**Response:   Undisputed** that Article 12(1) of the Standard Provisions of the Dealer Agreement provides that, "[i]f Dealer chooses to transfer its principal assets or change owners, Audi has the right to approve the proposed transferees, the new owners and executives and, if different from Dealer's, their premises." (Audi Ex. 2 at Art. 12(1))

Accordingly, it is **disputed** that paragraph 6 accurately or completely describes the consent requirement under the Dealer Agreement or Pennsylvania law. For example, in the Standard Provisions, Audi promises to consider any such proposal "in good faith." Further, the Pennsylvania Board of Vehicles Act makes it a "violation" for a manufacturer to "[u]nreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer…who meets the manufacturer's or distributor's reasonable requirements for appointment as a dealer," 63 P.S. § 818.12(b)(3). Wyoming Valley and Napleton refer the Court to the entire Dealer Agreement and Standard Provisions, as well as Pennsylvania law, for the actual meaning and effect of the consent requirement referenced in paragraph 6.

7.     Article 12(1) of the Standard Provisions provides that:

> If the Dealer chooses to transfer its principal assets or change owners, AoA has the right to approve the proposed transferees, the new owners and executives and, if different from Dealer's, their premises. (Doc. 35-2.)

**Response**: **Undisputed** that Article 12(1) of the Standard Provisions refers to Audi's right to approve proposed transferees if Dealer chooses to transfer its principal assets or change owners. **Disputed** that paragraph 7 is an accurate or complete statement of Audi's right to approve transferees under either the Dealer Agreement or Pennsylvania law. First, the Standard Provisions use the terms "Audi," not "AoA," and "Dealer," not "the Dealer." (*See* Audi Ex. 2 at Art. 12(1))

Second, Audi promises to consider any such proposal "in good faith." (*See id.*) Third, the Pennsylvania Board of Vehicles Act makes it a "violation" for a manufacturer to "[u]nreasonably withhold consent to the sale, transfer or exchange of the franchise to a qualified buyer capable of being licensed as a new vehicle dealer…who meets the manufacturer's or distributor's reasonable requirements for appointment as a dealer," 63 P.S. § 818.12(b)(3). Wyoming Valley and Napleton respectfully refer the Court to the entire Dealer Agreement and Standard Provisions, as well as Pennsylvania law, for the actual meaning and effect of the referenced contractual language.

8.      Wyoming Valley's right to transfer its Audi assets is also subject to AoA's contractual right of first refusal ("ROFR"). (Doc. 186, ¶ 11.)

**Response:  Undisputed** that the Standard Provisions of the Dealer Agreement include a right of first refusal. **Disputed** that Audi's right of first refusal relates to all Audi-related asset transfers or ownership changes as paragraph 8 erroneously implies. The right applies only when "Dealer proposes to transfer its principal assets or change owners of a majority interest." (Audi Ex. 2 at Art. 12(3)) Wyoming Valley and Napleton respectfully refer the Court to the entire Dealer Agreement and Standard Provisions, as well as Pennsylvania law, for the actual meaning and effect of the right of first refusal.

5

9.     Article 12(3) provides:

(3)     Whenever Dealer proposes to transfer its principal assets or change owners of a majority interest, AoA shall have the right to purchase such assets or ownership interest, as follows:

(a)     AoA may elect to exercise its purchase right by written notice to Dealer within 30 calendar days after Dealer has furnished to AoA all applications and information reasonably requested by AoA to evaluate Dealer's proposal.

(b)     if Dealer's proposed sale or transfer was to a successor approved in advance by AoA, to any of Dealer's Owners, to Dealer's employees as a group or to Dealer's spouse, children or heirs, then Dealer may withdraw its proposal within 30 calendar days following receipt of AoA's notice of election of its purchase right.

(c)     AoA's right under this Article 12(3) shall be a right of first refusal, permitting AoA to

(i)     assume the proposed transferee's rights and obligations under its agreement with Dealer and

(ii)     cancel this Agreement and all rights granted Dealer hereunder.

Except to the extent specifically inconsistent with the terms of this Agreement, the price and all other terms of AoA's purchase shall be as set forth in any bona fide written purchase and sale agreement between Dealer and its proposed transferee and in any related documents.

(d)     Dealer shall furnish to AoA copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses or other documents affecting any of the property to be transferred, and shall

assign to AoA any permits or licenses necessary for the continued conduct of Dealer's Operations.

(e)     AoA may assign its right of first refusal to any party it chooses, but in that event AoA will remain primarily liable for payment of the purchase price to Dealer.

(f)     If AoA exercises its purchase right, AoA will reimburse Dealer's proposed transferee for reasonable documented actual expenses which such proposed transferee incurred through the date of such exercise which are directly and solely attributable to the transaction Dealer proposed.

(g)     Nothing contained in this Article 12(3) shall require AoA to exercise its right of first refusal in any case, nor restrict any right AoA may have to refuse to approve Dealer's proposed transfer.

(Ex. 2.)

**Response:   Undisputed** that paragraph 9 sets forth language from Article 12(3) of the Standard Provisions of the Dealer agreement, with the exception that Standard Provisions use the term "Audi," not "AoA." (*See* Audi Ex. 2 at Art. 12(3).) Wyoming Valley and Napleton respectfully refer the Court to the entire Dealer Agreement and Standard Provisions, as well as Pennsylvania law, for the actual meaning and effect of the referenced language.

10.     On or about July 11, 2016, Wyoming Valley, together with certain affiliated entities and individuals, entered into an Asset and Real Estate Purchase Agreement ("APA") with entities affiliated with the Napleton Automotive Group ("Napleton"). A copy of the APA is attached as Exhibit 3. (Doc. 186, ¶¶ 17–18; Doc. 219 ¶ 17; Doc. 360 ¶ 7.)

**Response:   Undisputed.**

11.   Section 17.3 states:

> "This Agreement, including the Background of Agreement
> which is incorporated into this Agreement and an integral part
> hereof, along with the schedules and exhibits attached hereto
> and to be attached hereto at Closing or sooner, sets forth all of
> the promises, covenants, agreements, conditions and
> understandings between and among Asset Sellers, Property
> Owners and Interest Holders and Buyer with respect to the
> subject matter hereof, and supersedes all prior and
> contemporaneous agreements and understandings, inducements
> or conditions, express or implied, oral or written, with respect
> hereto, except as contained herein."

**Response:  Undisputed** that paragraph 11 accurately recites an isolated excerpt from the APA, to which the Court is respectfully referred. **Disputed** to the extent that this paragraph implies that the APA has not been since amended by the parties. (*See* First Addendum, Audi Ex. 54; Second Addendum, Audi Ex. 79) Wyoming Valley and Napleton respectfully refer the Court to the entire APA, as amended, for the actual meaning and effect of that contract.

12.   Under the APA, Wyoming Valley proposed to transfer its Audi franchise-related assets ("Audi Assets") to Napleton. (Ex. 3.)

**Response:  Undisputed** that Wyoming Valley originally proposed to transfer its Audi franchise-related assets to Napleton under the APA (to the extent that the phrase "Audi Assets" is limited to the Acquired Assets of the Audi Business and that the term "Napleton," as used in this paragraph, is limited to

North American Automotive Services, Inc.).[1] **Disputed** however, that paragraph 12 is a complete statement of what Wyoming Valley and its affiliates proposed to transfer under the APA. As originally negotiated, the APA contemplated the sale of all seven dealership franchises owned by Wyoming Valley and its affiliates, as well as the real estate upon which those franchises were meant to be operated, in a single, integrated transaction. (*See* Audi Ex. 3) The parties did not separately price the intangible assets of any of Wyoming Valley's dealerships. (*See id.*) Instead, they agreed on a single, undifferentiated price for the intangibles associated with all seven dealerships. (*See id.*)

13.   In addition, under the APA, Wyoming Valley proposed to transfer various other assets and real property to Napleton, including the assets of each of the separate Volkswagen, BMW, Kia, Mazda, Porsche, and Subaru businesses. (Ex. 3.)

**Response: Disputed** in that Wyoming Valley neither owns nor has proposed to transfer under the APA any assets related to the BMW Business or the Kia/Subaru Business, or any real property. (Audi Ex. 3 at Background of Agreement & § 1.1.)  But Wyoming Valley and Napleton do not dispute that, under the APA as originally negotiated, Wyoming Valley proposed to transfer to NAAS the Acquired Assets of its Audi, Porsche, VW & Mazda Business; Wyoming Valley Motors, Inc. proposed to transfer to NAAS the Acquired Assets

---

[1] For a complete recitation of which parties were purchasing which assets, Wyoming Valley and Napleton refer the Court to the terms of the APA, Audi Ex. 3.

of its BMW Business; Wyoming Valley Motors Subaru, Inc. proposed to transfer to NAAS the Acquired Assets of its Kia/Subaru Business; Millenium Holdings Limited Partnership proposed to transfer to EFN Wyoming Valley Properties, LLC ("EFN") the Current Audi, Porsche, VW & Mazda Property; Millenium Holdings IV, LLC proposed to transfer to EFN the Relocation Property; and Millenium Holdings II, LLC proposed to transfer to EFN the Body Shop Property. (Audi Ex. 3 at Background of Agreement & §§ 1.1, 3.1.)

14.   The APA packaged the sale of all seven dealerships' assets into a single transaction. (Doc. 360 ¶ 9.)

**Response:   Undisputed** that, as originally negotiated in 2016, the APA contemplated the sale of all seven dealership franchises owned by Wyoming Valley and its affiliates, as well as the real estate upon which those franchises were meant to be operated, in a single, integrated transaction. (*See* Audi Ex. 3) Paragraph 14 is **disputed** to the extent that it is an incomplete description of what the APA contemplated. (*See* Audi Ex. 3 at Background of Agreement & § 1.)

15.   The APA does not separately price the assets of any of Wyoming Valley's dealerships, including its Audi dealership. (Doc. 360 ¶ 9.)

**Response:   Undisputed** to the extent that the term "assets" is limited to the Acquired Assets. (Audi Ex. 3 at § 2.1)

16.   The APA does not apportion or separately identify the portion of the total purchase price that is attributable to the Audi Assets. (Doc. 360 ¶ 9.)

**Response:  Undisputed,** to the extent that the phrase "Audi Assets" is limited to the Acquired Assets of the Audi Business. (Audi Ex. 3 at § 2.1)

17.    The APA does not separately identify the other terms of the APA that are attributable to the Audi Assets. (*See* Ex. 3.)

**Response: Disputed.** The APA as originally negotiated expressly contemplates that the buyer would operate the Audi franchise from the "New Audi Sales Facility" on the "Relocation Property." *See* Audi Ex. 3 at p. 4 (chart showing "Proposed Permanent Location" of the Audi business as an "[e]xclusive sales facility to be reconstructed at/on the Relocation Property"); *id.* at §6.1 (incorporating Background of Agreement and contemplating manufacturer approval of dealership operations at "Proposed Permanent Location"); *id.* at § 11.1.4 (acknowledging that manufacturer approval includes approval of the Proposed Permanent Location applicable to each manufacturer).  Wyoming Valley and Napleton respectfully refer the Court to the entire APA as amended for the actual meaning and effect of that contract.

18.    The APA provides that:

> [t]he purchase price for the Acquired Assets, the Motor Vehicle Contracts (as hereinafter defined) and the Assigned Contracts (collectively, the "Acquired Assets Purchase Price") shall be as described in subsections 2.1.1 through 2.1.7 inclusive of the sum of Seventeen Million and 00/100ths ($17,000,000.00) Dollars for Asset Sellers' Intangibles [blue sky]. (Ex. 3. § 2.1; § 1.1.9.)

**Response:**   Wyoming Valley and Napleton do not dispute that—other than

the bracketed language, which Audi has inserted—paragraph 18 correctly recites

the first sentence of Section 2.1 of the APA. This paragraph is **disputed** in that it

misrepresents the definition of "Intangibles" under the APA. The APA defines

"Intangibles" to include all of the following:

> General intangibles, goodwill, franchise rights, going concern
> value, "blue sky," market share advantage, premium for Asset
> Sellers competitive advantage in the marketplace and any and
> all intangibles described in Section 197 of the Internal Revenue
> Code, as well as Asset Sellers customer lists, deal jackets,
> literature, customer service files, all digital Customer Files,
> domain names and billboards as well as consideration. All
> certificates, permits, approvals and licenses, if and to the extent
> assignable by Asset Sellers, pertaining to any of the Dealership
> Properties or any of the subdivision occupancy permits
> pertaining to the Dealership Properties, all of which shall be
> valid; all telephone and facsimile numbers of Asset Sellers; the
> customer sales (new and used), service, and leasing records of
> Asset Sellers (all in electronic format reasonably acceptable to
> Buyer); all Asset Sellers' ADP/CDK Global DMS (and/or such
> other system(s) utilized by Asset Sellers) customer information
> and files; any and all CRM system data, files and information
> of the Asset Sellers; all Asset Sellers' F&I customer records
> and information whatsoever (in electronic format reasonably
> acceptable to Buyer); all Asset Sellers' service repair orders (in
> electronic format and if requested by Buyer, hard copy format);
> Asset Sellers' wholesale parts customer lists; all of Asset
> Sellers' customer leads and/or prospects and a list thereof; all
> Audi, Porsche, VW, Mazda, BMW, Kia and Subaru owner
> follow-up files; all Asset Sellers' deal jackets; all Asset Sellers'
> return privileges with respect to the OEM Parts and
> Accessories; any rights of Asset Sellers relating to or arising
> out of or under any express or implied warranties from
> suppliers with respect to the Acquired Assets; all fictitious
> names; the name, trade name and trademark "Wyoming Valley

> Motors" … ; Asset Sellers' Facebook pages; all Asset Sellers'
> social media sites maintained by or for Asset Sellers, all web
> sites, domain names, URLs and e-mail addresses of Asset
> Sellers' … and the franchise, good will and going-concern
> value of Asset Sellers relating to the conduct of their operation
> of the Business … .

(Audi Ex. 3 at § 1.9.)

19.    The APA also provided for the transfer of certain real estate assets, including (i) the Larksville real estate and facility where Wyoming Valley currently operates its Audi dealership, and (ii) "the Relocation Property", defined as "1492 Highway 315, Wilke Barre, PA, 18704" (Ex. 3 at 2), where, under the APA, the Audi dealership would be relocated (the "Relocation Property"). (Ex. 3, § 3.1.)

**Response:  Undisputed** that the APA as originally negotiated provided for the transfer of certain real estate assets, including (i) the Larksville real estate and facility where Wyoming Valley currently operates its Audi dealership (among other dealerships), and (ii) "the Relocation Property," where the Audi dealership would be located (among other dealerships). **Disputed** to the extent paragraph 19 misstates the definition of the Relocation Property and its intended occupants. The Relocation Property is "that certain unimproved land located at 1492 Highway 315, Wilkes Barre, PA 18704 (Tax Parcel No. 50-G11-00A-29D-000, totaling approximately twelve (12) acres," *see* Audi Ex. 3 at p. 2, that was intended to be the site of not only the Audi dealership, but also the Porsche, BMW, and Subaru dealerships. *See, e.g., id.* at p. 4 (chart reflecting proposed permanent locations of dealerships).

20.     In addition, the APA states:

"Asset Sellers and Property Owners acknowledge and agree that Buyer has allocated (and will continue to allocate) substantial resources and has incurred (and will continue to incur) substantial costs and expenses in connection with structuring this Agreement including, but not limited to, the conducting of due diligence, negotiations with manufacturers, review of development plans, negotiations with contractors and materialmen, reviewing construction and development plans and reviewing estimates for construction costs. In consideration hereof, each of the Asset Sellers, jointly and severally, hereby agree to pay to NIP a structuring fee of Two-Million and 00/100ths ($2,000,000.00) Dollars ("Structuring Fee"). It is expressly understood that Asset Sellers shall be liable to pay NIP the Structuring Fee should (i) the closing contemplated by the Agreement actually occur between the Asset Sellers and Buyer, or (ii) alternatively, if there is an exercise of any right of first refusal, preemptive right or other similar right ("ROFR") with respect to any of the assets described in the Agreement and the closing upon the exercise of the ROFR actually occurs. Should the Sellers be obligated to pay the Structuring Fee to NIP but fail to do so and the transactions contemplated in the Agreement close between Sellers and Buyer, then NIP shall assign its rights to the 13 Structuring Fee to the Buyer and Buyer shall be entitled to deduct the Structuring Fee from the purchase price payable to Asset Sellers at the Closing. If any person (including, without limitation, either Manufacturer or any other person claiming by, through or under Manufacturer(s)) exercise a ROFR or any right of first refusal, preemptive right or other similar right with respect to any of the Acquired Assets and the closing upon same actually occurs between the Asset Sellers and the party exercising such preemptive rights then Asset Sellers will promptly pay (or cause to be paid) to NIP the Structuring Fee in cash upon the closing for the purchase of any of the Acquired Assets. Without limiting the generality of the foregoing, NIP, and the Buyer (should NIP's rights be assigned to Buyer) jointly and severally, agree to hold harmless and indemnify Asset Sellers, their successors and assigns, and their successors and assigns'

shareholders, directors, employees, affiliates, partners, officers, successors and assigns, from and against any claim, action, loss, liability, damage, or cost and expense, including, without limitation, reasonable expert and attorneys' costs and fees, and the costs of defense, enforcement or collection resulting from or arising from Asset Sellers entry into the agreement with NIP to pay the Structuring Fee to NIP, or Buyer, as NIP's assignee." (Ex. 3, § 2.2.)

**Response: Undisputed** that paragraph 20 accurately quotes isolated language from the APA, to which the Court is respectfully referred, except that the APA does not include the number "13" in the fourth sentence of the above-quoted material. (*See* Audi Ex. 3 at § 2.2)



15





23.     Section 8.4 of the APA states:

"Buyer is aware that VW and Audi are currently in litigation as well as various governmental investigations related to new motor vehicle emissions. The foregoing representation shall not in any way diminish the condition for the benefit of Buyer contained in subsection 11.1.18 of this Agreement. Asset Sellers and Property Owners shall assign any and all rights and/or entitlements arising from the aforementioned litigation and/or governmental investigations. Notwithstanding the generality of the foregoing, Buyer has represented to Asset Sellers and Property Sellers that it is presently in litigation with

VW arising out of the foregoing claims related to new motor vehicle emissions." (Ex. 3.)

**Response:   Undisputed** that Section 8.4 of the APA contains the language isolated in paragraph 23.









































63.    On December 2, 2016, AoA sent a letter to Wyoming Valley. (Letter, attached as Exhibit 32.)

**Response:   Undisputed.**



66.   Wyoming Valley responded by letter dated December 9, 2016. (Letter, attached as Exhibit 33.)

**Response:   Undisputed.**





69.     Wyoming Valley stated, "[t]he Sellers believe that they have provided AoA with a breakdown of the franchise value for Audi as a stand-alone in the only way they can." (*Id.*; Doc 186, ¶ 27 (Wyoming Valley "admits that the $8 million figure was a good-faith attempt to provide the stand-alone franchise value for the Audi dealership.").)

**Response:**   It is **undisputed** that that paragraph 69 correctly quotes from a

portion of the December 9 letter, to which the Court is respectfully referred, and

that the $8 million figure was a good-faith attempt to provide a stand-alone

franchise value for the Audi dealership. Paragraph 69 is **disputed** to the extent it

implies that the quoted passage can be evaluated apart from the letter as a whole or

the related correspondence between counsel for Audi and Wyoming Valley. *See*

responses to paragraphs 59-60, and 67-68, *supra*.

70.    Wyoming Valley's counsel explained that because the deal was never structured to have Audi separated, Wyoming Valley provided a value for Audi as a stand-alone franchise. (*Id.*; Doc. 360 ¶ 16.)

**Response:   Undisputed.**

71.    Wyoming Valley also stated that it "feels strongly that it can successfully maintain its rights for approval of this transaction" and that it was "committed to do so." (*Id.*)

**Response:**   It is **undisputed** that that paragraph 71 correctly quotes from a

portion of the December 9 letter, to which the Court is respectfully referred.

Paragraph 71 is **disputed** to the extent it implies that the quoted passage can be

evaluated apart from the letter as a whole or the related correspondence between

counsel for Audi and Wyoming Valley. *See* responses to paragraphs 59-60, and 67-

68, *supra*.

72.    On April 6, 2016 Napleton, by and through three Volkswagen dealerships it owns, initiated a putative class action against VWGoA, among others, on behalf of all Volkswagen dealers in the United States relating to the TDI diesel emissions issue and other issues seeking compensatory, treble and punitive damages in a 348 paragraph complaint. (Class Action Complaint, attached as Exhibit 34).

**Response:**   It is **undisputed** that certain Napleton affiliates filed the class

action complaint attached as Audi Ex. 34. ██████████████████████████

████████████████████████████████████████████████████████████████

The class action complaint raises allegations of criminal conduct, including federal

felony violations that were ultimately admitted as part of a plea agreement entered

into by VWGoA's parent company, as well as in other publicly filed documents.

(*See* Plea Agreement, Ex. 17)

73.    Napleton was not an Audi dealer at the time AoA received the APA. (AoA's Response to Intervenors' First Interrogatories, No. 2, attached as Exhibit 39.)

**Response:   Undisputed.**

74.    At the time Wyoming Valley disclosed the APA in mid-September, no Audi dealer had initiated litigation regarding the TDI diesel emissions issue (whether individually or on behalf of a class of Audi dealers), and AoA had a strong interest in resolving any disputes relating to the TDI diesel emissions issue and to avoid any litigation. (*Id.*)

**Response:   Disputed.** Paragraph 74 is not supported by evidence that

would be admissible at trial. In support of this paragraph, Audi cites its own

responses to Intervenors' First Set of Interrogatories, specifically Interrogatory No.















78.     Napleton had previously sued AoA in federal court in Florida in 2010. (Ex. 39, No. 2; Ex. 40 at 17:5–12.)

**Response:   Undisputed.**

79.     On January 12, 2016, Napleton filed a lawsuit against FCA US LLC. (Email with complaint, attached as Exhibit 42.)

**Response:   Undisputed.**









88.   On April 5, 2017, BMW filed a complaint against Wyoming Valley. (*BMW of North America, LLC v. Wyoming Valley Motors, Inc.*, 17-cv-00603-JEJ.)

**Response:   Undisputed.**





92.  On December 13, 2016, AoA filed its complaint in this matter.
(Doc. 1.)

**Response:   Undisputed.**

93.   On December 14, 2016, AoA filed a Motion for Temporary Restraining Order and Preliminary Injunction, seeking (among other things) to enjoin Wyoming Valley from closing the APA or transferring its Wyoming Valley Audi dealership assets. (Doc. 3.)

**Response:   Undisputed** that Audi filed a motion for TRO and preliminary injunction on December 14 seeking to enjoin Wyoming Valley from closing on the APA and "otherwise transferring Wyoming Valley's Audi assets."  (Doc. 7 at p. 35)

94.   On December 21, 2016, the Court held a telephonic hearing on AoA's motion for a temporary restraining order. (*See* Doc. 9; transcript attached as Exhibit 51.)

**Response:   Undisputed**.

95.   The Court advised the parties that it would enter the requested TRO, and it directed the parties "to allow as fulsome a discovery process, a targeted discovery process as is possible so that everybody can be satisfied" and for AoA to conduct "due diligence." (Ex. 51, 5:19–24.)

**Response:   Undisputed** that the Court advised the parties it would enter the requested TRO.  Paragraph 95 is otherwise **disputed** in that it mischaracterizes the transcript. The Court in fact stated the following:

> … [I]t is important to the court and should be important, I think, to counsel to accomplish your due diligence. I urge everybody to cooperate because of the short time frame that we have here and to allow as fulsome a discovery process, targeted discovery process as is possible so that everybody can be satisfied.

(Audi Ex. 51 at 5)

96.    On December 22, 2016, this Court granted that Motion and entered a 14-day TRO ("December 22 Order"). (Doc. 16.)

**Response:   Undisputed.**

97.    Among other things, the December 22 Order provided that "Wyoming Valley and any person or entity acting on its behalf" were restrained (i) "from closing the [APA] and otherwise transferring Wyoming Valley's Audi dealership assets"; and (ii) "from transferring any and all other of the assets Wyoming Valley possesses in relation to its automobile dealerships … ." (Doc. 16, ¶¶ 2, 3.)

**Response:   Undisputed.**

98.    In response to AoA's lawsuit, Napleton and Wyoming Valley purportedly agreed to remove Wyoming Valley's Audi assets from the APA. (Doc. 171 at 2. ("After Audi commenced this action, Napleton and Wyoming Valley discussed their response to the suit. Part of that response was drafting the First Addendum to the APA.").)

**Response:   Disputed** in that, contrary to what Audi states in paragraph 98, (1) the referenced exhibit (Doc 171 at 2) reflects not that Napleton and Wyoming Valley "purportedly" agreed to remove the Audi assets from the deal, but that they in fact did remove the Audi assets from the deal, and (2) all the parties to the APA, not just Wyoming Valley and the certain entities affiliated with the Napleton Automotive Group, agreed to remove Wyoming Valley's Audi assets from the APA (Audi Ex. 54 at 1). Further **disputed** that the First Addendum arose solely in response to Audi's lawsuit, but rather in response to Audi's entire course of conduct throughout the approval process, including its September 28, 2016 letter,

and subsequent communications, demanding and rejecting the $8 million figure that Wyoming Valley provided in response to the request for a "good faith breakdown."

**Undisputed** that Doc. 171, a letter from Napleton's counsel regarding a discovery dispute, contains the language that Audi quotes in paragraph 98.



100.   On December 19, 2016, Wyoming Valley notified AoA that it had reached an agreement with Napleton that removed the Audi franchise from the APA. (Doc. 219 ¶ 84; Ex. 17, 51:8–21.)

**Response:   Undisputed** that Wyoming Valley notified Audi on December 19 that "the parties to the APA had decided to remove the Audi assets from the transaction through an amendment thereto." Paragraph 100 is **disputed**, however, to the extent it implies this agreement was not among ***all*** the parties to the APA. *See* response to paragraph 98, *supra.*



102. On December 20, 2016, Wyoming Valley and certain Napleton-affiliated entities executed the First Addendum to the APA. (First Addendum, attached as Exhibit 54.)

**Response:   Undisputed.**



104. The First Addendum states, "the Buyer wishes to withdraw Buyer offer to purchase the Audi Business." (Ex. 54 at 1.)

**Response:   Undisputed.**

105. The First Addendum further states:

> The Agreement shall be modified to reflect that the Acquired Assets shall exclude the following: … General intangibles, goodwill, franchise rights, going concern value, "blue sky", market share advantage, premium for Asset Sellers competitive advantage in the marketplace and any and all intangibles described in Section 197 of the Internal Revenue Code, associated with the Audi Business … . Accordingly, the value

established for general intangibles in the Agreement shall be negotiated and agreed upon by the Parties, which mutual agreement shall be a condition precedent to close. (*Id.* §§ 1.1–1.9.)

**Response:   Undisputed.**

106.   The First Addendum further states, "The parties agree to execute such other agreements as may be reasonably necessary to complete the understandings as set forth in this Agreement." (*Id.* § 3.)

**Response:   Undisputed.**

107.   The First Addendum does not withdraw any real estate from the APA. (*See* Ex. 54.)

**Response:   Undisputed.**



109.   On December 21, 2016, Wyoming Valley provided AoA with what it described as a "fully executed First Addendum" to the APA "which excludes the Audi franchise assets from the transaction." (Email, attached as Exhibit 56.)

**Response:   Undisputed.**

110.   Based on the First Addendum, Wyoming Valley's counsel asked AoA to "[k]indly withdraw Audi's Motion for TRO/Preliminary Injunction at this time as there is no basis for same." (*Id.*)

**Response:   Undisputed.**







116.   On December 27, 2016, Wyoming Valley's four principals transferred their membership interests in Millennium Holdings IV, LLC ("MH4") to Accruit Exchange Accommodation Services, LLC ("Accruit"), an entity unaffiliated with Napleton, through a Membership Interest Purchase Agreement (the "MIPA"). (MIPA, attached as Exhibit 62.)

**Response:   Undisputed.**


117.   The Relocation Property was and is owned by MH4. (Doc. 219, Napleton Counterclaim ¶ 56.)

**Response:   Undisputed** that, as of the filing of the parties' summary

judgment motions, MH4 owned the Relocation Property. As Audi and the Court

are aware, however, the Relocation Property is subject to transfer under the APA

by MH4 to EFN Wyoming Valley Properties LLC at the closing, which may have

occurred by the date of this filing.

118.   Under the MIPA, the four owners of Wyoming Valley transferred their membership interests in Millennium Holdings IV, LLC ("MH4") to Accruit. (Ex. 62)

**Response:   Undisputed**.



120.   The MIPA closed on December 27, 2016. (Ex. 62.)

**Response:   Undisputed**.

121.   NIP, a Napleton affiliate, agreed to fund the construction project at the Relocation Property pending the closing of the APA. (Doc. 219, Counterclaim ¶ 62.)

**Response:   Undisputed.**

122.   NIP and the members of MH4 entered into the MIPA to memorialize this exchange for the membership interests in MH4. (Doc. 219, Counterclaim ¶ 63.)

**Response:   Undisputed.**



126.   Napleton plans to transfer the Relocation Property from MH4 to EFN Wyoming Valley Properties, LLC ("EFN Wyoming Valley"). (Doc. 219, Napleton's Counterclaims, ¶ 63.)

**Response:   Undisputed** that MH4 would transfer the Relocation Property to EFN Wyoming Valley under the terms of the as-amended APA at the closing, and may have done so as of the time of this filing. **Disputed** to the extent that the use of the term "Napleton" implies that any other entities are involved in that transfer. (*See* Audi Ex. 64 at NAP028711.)

127.   On June 29, 2017, the Court issued an Order setting forth the parties' "Stipulated Terms." (Doc. 213.)

**Response:   Undisputed.**

128.   The order stated, among other things, that the "Audi and Volkswagen Dealerships currently owned by Wyoming Valley are severed from any contract of sale to Napleton." (*Id.* ¶ 3.)

**Response:   Undisputed.**

129.   The injunction against transfer of the Audi and Volkswagen dealerships remained in place. (Doc. 213; Doc. 360 ¶ 23.)

**Response:   Undisputed.**

130.   Consistent with the Parties' agreement, the Order further stated that, "Napleton **SHALL** forever quit its interest, if any it has, in the ownership of the Wyoming Valley Audi and Volkswagen Dealerships." (*Id.* ¶ 5.)

**Response:   Undisputed.**



133.   Wyoming Valley did not produce relevant documents to AoA in this case until March 8, 2017. (Doc. 173.)

**Response:  Disputed** that Doc. 173 supports the proposition stated in paragraph 133, and further **disputed** that the documents that Wyoming Valley began producing to Audi on March 8, 2017 pursuant to Magistrate Judge Carlson's February 21, 2017 order were the first documents Wyoming Valley identified as "relevant" in this litigation. (*See* Doc. 31 and related attachments) However, it is **undisputed** that, on March 8, 2017, Wyoming Valley began producing documents in response to Magistrate Judge Carlson's order requiring that certain documents be produced by March 13, 2017 (Doc. 46).

134.   Napleton did not produce relevant documents to AoA in this case until April 21, 2017. (Doc. 171.)

**Response:  Disputed** in that that Doc. 171 does not support the proposition set forth in paragraph 134. **Undisputed**, however, that, by April 25, 2017, Napleton had produced 1251 documents, spanning 8468 pages, on behalf of itself and the other entities, as well as a privilege log reflecting documents withheld from production. (Doc. 171)

135. All of the following documents were not produced to AoA by Wyoming Valley until after March 8, 2017:

A. Exhibit 10;

B. Exhibit 11;

C. Exhibit 12. (Doc. 173.)

**Response:**  **Undisputed** that the referenced documents were produced ***on or after*** March 8, 2017.

136.  The following document was not produced to AoA by Napleton until after April 21, 2017: Exhibit 15. (Doc. 171.)

**Response:**  **Undisputed.**















147.   If the APA, as amended, closes, Napleton will own the non-Audi dealerships operating at the Relocation Property. (Ex. 3, 54, 79.)

**Response:   Undisputed.**























## JOINT STATEMENT OF ADDITIONAL FACTS OF WYOMING VALLEY AND INTERVENORS IN OPPOSITION TO AUDI'S MOTIONS FOR SUMMARY JUDGMENT

1.      Audi of America, Inc. and Volkswagen of America, Inc. are two operating units of Volkswagen Group of America, Inc. (11/20/17 Answer to Wyoming Valley's Counterclaims ¶ 3, ECF Doc. 324.) They are not separately incorporated subsidiaries, but rather are fictitious names under which Volkswagen Group of America does business in Pennsylvania. (12/1/17 Tolerico Dep. at 195, Ex. 31; 2/12/18 Audi of America Application for Registration of Fictitious Name, Ex. 32; 2/12/18 Volkswagen of America Application for Registration of Fictitious Name, Ex. 33.) In both its corporate and regional offices, Volkswagen Group of America's employees (whether in the Audi or Volkswagen divisions) work out of the same buildings and interact and communicate each other on a regular basis.

2.      From 2009 to the present, Wyoming Valley's Audi dealership has been located at 126 Narrows Road, Route 11, Larksville, PA (the "Larksville Location"). (Dealer Agreement at AOA0000971, Audi Ex. 1.)

3.     During this time, Wyoming Valley's Audi dealership has been, and currently is, co-located at the Larksville Location with a number of other car dealerships. (6/15/17 Watanabe 30(b)(6) Dep. at 178–180, Ex. 18.) At all relevant times, Audi knew of and approved the co-location of the Wyoming Valley Audi franchise with other dealerships at the Larksville location. (*Id.*)



6.     In part because of these new policies, in late 2015 Wyoming Valley embarked on a plan to upgrade its current, shared Audi facility to a new, exclusive Audi facility. (1/5/18 Phillips Decl. ¶ 4, ECF Doc. 360-1; 8/10/17 Ubaldini Decl. ¶ 2, ECF Doc. 234-8.) In connection with that plan, Wyoming Valley's owners acquired real estate at 1492 Highway 315, Wilkes Barre, Pennsylvania (the "Relocation Property") for the purpose of constructing new dealership facilities. (1/4/18 Davis Dep. at 22–23, Ex. 43; 8/10/17 Ubaldini Decl. ¶ 2, ECF Doc. 234-8.)

7.     Wyoming Valley proposed brand new showrooms for Audi, BMW, Subaru, and a shared service facility for those franchises, along with a Porsche showroom and separate service facility. (1/5/18 Phillips Decl. ¶ 4, ECF Doc. 360-1.)

















     28.    On September 14, 2016, Wyoming Valley submitted the APA to Audi

and the six other auto manufacturers. (9/15/16 Riley Email, Audi Ex. 44.) Among

other things, the APA disclosed Wyoming Valley's owners' intent to sell

substantially all of the assets of the Audi dealership and the six other dealerships to

an affiliate of Napleton. (APA, Audi Ex. 3.)



























































Dated: February 16, 2018                    Respectfully submitted,


s/ Russell R. McRory                        s/ David S. Gustman
Russell P. McRory (*pro hac vice*)          David C. Gustman (*pro hac vice*)
James W. Westerlind (*pro hac vice*)        Jill C. Anderson (*pro hac vice*)
Michael P. McMahan (*pro hac vice*)         Dylan Smith (*pro hac vice*)
Charles A. Gallaer (*pro hac vice*)         Kirk Watkins (*pro hac vice*)
ARENT FOX LLP                               FREEBORN & PETERS LLP
1675 Broadway                               311 South Wacker Drive, Suite 3000
New York, New York 10019                    Chicago, Illinois 60606
212.484.3900                                312.360.6000


Kathryn L. Simpson, Esq.                    Charles O. Beckley, II
METTE, EVANS & WOODSIDE                     John G. Milakovic
3401 North Front Street                     BECKLEY & MADDEN, LLC
Harrisburg, Pennsylvania 17110              212 North Third Street
717.232.5000                                P.O. Box 11998
                                            Harrisburg, Pennsylvania 17108
*Counsel for Intervenors*                   717.233.7691


                                            *Counsel for Wyoming Valley*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 16, 2008, he caused a true and correct copy of the foregoing document to be filed via the Court's Electronic Case Filing (ECF) system and thereby served on counsel of record.


s/ Kirk Watkins

*Counsel for Bronsberg Hughes Pontiac, Inc.*