## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AUDI OF AMERICA, INC., | : | 3:16-cv-2470 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| BRONSBERG & HUGHES | : | |
| PONTIAC, INC. d/b/a WYOMING | : | |
| VALLEY AUDI, | : | |
| | : | |
| Defendant. | : | |
| v. | : | |
| | : | |
| NORTH AMERICAN | : | |
| AUTOMOTIVE SERVICES, INC., | : | |
| *et. al.*, | : | |
| | : | |
| Intervenors. | : | |

## [REDACTED]

## MEMORANDUM & ORDER

### February 16, 2018

Presently pending before the Court are five motions for summary judgment

filed by Plaintiff Audi of America, Inc., ("AoA"), Defendant Bronsberg & Hughes

Pontiac, Inc., ("Wyoming Valley"), and Intervenors North American Automotive

Services, Inc., and affiliated companies. ("Napleton") (Docs. 358, 378, 381, 384,

386). This memorandum concerns only Wyoming Valley's motion for summary

judgment on AoA's affirmative claims ("Wyoming Valley's Motion") (Doc. 358)

and AoA's cross motion for summary judgment in its favor on its affirmative claims. ("AoA's Motion") (Doc. 381).

Wyoming Valley filed its Motion on January 9, 2018, along with a brief in support. (Docs. 358, 359). AoA filed a brief in opposition to Wyoming Valley's Motion on February 2, 2018. (Doc. 431). Wyoming Valley filed a statement of undisputed material facts in support of its motion, and AoA has filed a response. (Docs. 360, 437, att. 2). AoA filed its Motion on January 24, 2018, along with a brief in support and a statement of undisputed material facts. (Docs. 381, 382, 393). Wyoming Valley has not yet filed a brief in reply regarding its own Motion, nor has it filed a brief in opposition to AoA's Motion or a response to AoA's statement of facts. Though the time for such filings has not yet passed, in consideration of the impending trial date and because each party has been able to express its arguments on AoA's affirmative claims through cross-motions, we will dispose of the motions without waiting for full briefing.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Though the procedural history of this case is complex, the underlying facts that give rise to this action are relatively simple once the cloud of inordinate litigiousness is stripped away. Plaintiff AoA is an organizational unit of

---

[1] At the outset, we express our great appreciation for AoA's comprehensive inclusion of all relevant documents and exhibits attached with Docket Entry 394; AoA's organization greatly assisted the Court's consideration of these motions.

Volkswagen Group of America, Inc., and is the United States importer and distributor of Audi-brand vehicles, parts and accessories. Defendant Wyoming Valley owns and operates seven automobile dealerships, including an Audi dealership pursuant to a dealership agreement with AoA. (Doc. 360, ¶ 1). This action arises out of a contract dispute between AoA and Wyoming Valley.

**A. The Dealership Agreement**

Wyoming Valley entered into a Dealership Agreement with AoA to be an authorized Audi dealer on January 1, 1997. (Doc. 394, Ex. 1). The Dealership Agreement incorporates different documents, one of which is entitled The Dealer Agreement Standard Provisions. ("Standard Provisions") (*Id*. at ¶ 2) (*See* Doc. 394, Ex. 2). Article 12 of the Standard Provisions details rights and procedures for succeeding dealers. As these provisions are integral to the dispute at-bar, we will recite the relevant provisions:

> **Procedure**
> (1) If Dealer chooses to transfer its principal assets or change owners, Audi has the right to approve the proposed transferees, the new owners and executives and, if different from Dealer's, their premises. Audi will consider in good faith any such written proposal Dealer may submit to Audi during the term of this Agreement. In determining whether the proposal is acceptable to it, Audi will take into account factors such as the personal, business and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition. In such evaluation, Audi may consult with the proposed new owners and executives on any aspect of the transaction of their proposed dealership operations. Notwithstanding anything set forth in this paragraph to the contrary, Audi shall not be obligated to consider such proposal if it previously had notified Dealer in writing that it would not appoint a

succeeding dealer in Dealer's Area; provided, however, that such notice shall be given only if there is good cause for discontinuing representation of Authorized Automobiles in Dealer's Area.

**Approvals**

(2) Audi will notify Dealer in writing of the approval or disapproval of a proposal by Dealer for transfer of principal assets or change of owners within 45 business days, or the exercise by Audi of its right of first refusal under Article 12(3) within 30 calendar days, after Dealer has furnished to Audi all applications and information reasonably requested by Audi to evaluate such proposal. [. . .]

**Right of First Refusal**

(3) Whenever Dealer proposes to transfer its principal assets or change owners of a majority interest, Audi shall have the right to purchase such assets or ownership interest, as follows:

    (a) Audi may elect to exercise its purchase right by written notice to Dealer within 30 calendar days after Dealer has furnished to Audi all applications and information reasonably requested by Audi to evaluate Dealer's proposal.

    (b) If Dealer's proposed sale or transfer was to a successor approved in advance by Audi, to any of Dealer's Owners, to Dealer's employees as a group or to Dealer's spouse, children or heirs, then Dealer may withdraw its proposal within 30 calendar days following receipt of Audi's notice of election of its purchase right.

    (c) Audi's right under this Article 12(3) shall be a right of first refusal, permitting Audi to

        (i) assume the proposed transferee's rights and obligations under its agreement with Dealer and

        (ii) cancel this Agreement and all rights granted Dealer hereunder.

        Except to the extent specifically inconsistent with the terms of this Agreement, the price and all other terms of Audi's purchase shall be as set forth in any bona fide written purchase and sale

agreement between Dealer and its proposed transferee and in any related documents.

(d) Dealer shall furnish to Audi copies of all applicable liens, mortgages, encumbrances, leases, easements, licenses or other documents affecting any of the property to be transferred, and shall assign to Audi any permits or licenses necessary for the continued conduct of Dealer's operations.

(e) Audi may assign its right of first refusal to any party it chooses, but in that event Audi will remain primarily liable for payment of the purchase price to Dealer.

(f) If Audi exercises its purchase right, Audi will reimburse Dealer's proposed transferee for reasonable documented actual expenses which such proposed transferee incurred through the date of such exercise which are directly and solely attributable to the transaction Dealer proposed.

(g) Nothing contained in this Article 12(3) shall require Audi to exercise its right of first refusal in any case, nor restrict any right Audi may have to refuse to approve Dealer's proposed transfer.

(Doc. 394, Ex. 2).

**B. The Pennsylvania Board of Motor Vehicles Act**

The relationship between AoA and Wyoming Valley is not only governed by the Dealership Agreement and its incorporated documents, but by the Pennsylvania Board of Motor Vehicles Act, 63 P.S. § 818.1 *et. seq.* (the "Act"). Two provisions of the Act are of particular relevance to this action – Sections 12 and 16.

Section 16 provides manufacturers with a "right of first refusal to acquire the new vehicle dealer's assets or ownership in the event of a proposed change of all or substantially all ownership or transfer of all or substantially all dealership

5

assets," provided that certain conditions are met. 63 P.S. § 818.16. The first condition is that "the manufacturer or distributor must notify the dealer in writing within the 60-day or 75-day time limitations established under section 12(b)(5)." *Id*. at § 818.16(1).

Section 12(b) delineates unlawful acts by manufacturers or distributors. As referenced by Section 16, Section 12(b)(5) sets time limits for manufacturers to respond to a dealer's request for the sale, transfer, exchange, or relocation of a franchise and provides that, "[i]n no event shall the total time period for approval exceed 75 days from the date of the receipt of the initial forms." *Id*. at § 818.12(b)(5). Sections 12(b)(3) and (4) provide that a manufacturer may not "[u]nreasonably withhold consent" to the sale, transfer, or exchange of the franchise to a qualified buyer, or to the relocation of an existing new vehicle dealer. *Id*. at § 818.12(b)(3) and (4).

### C. The Asset and Real Estate Purchase Agreement

On or about July 11, 2016, Wyoming Valley and its affiliates entered into an Asset and Real Estate Purchase Agreement ("APA") with Napleton. (Doc. 360, ¶ 7) (Doc. 394, Ex. 3). Through the APA, Wyoming Valley sought to sell its seven dealerships, its properties, and all of its liabilities to Napleton. (Doc. 360, ¶ 8). The APA packaged the seven dealerships into a single transaction and did not

separately price the assets of the Audi dealership. (*Id*. at ¶ 9). The total purchase price agreed to in the APA was seventeen million dollars. (Doc. 394, Ex. 3, § 2.1).

This price included a two million dollar "structuring fee" that was payable to a Napleton affiliate even if a manufacturer of one of the dealerships exercised its right of first refusal. (*Id*. at § 2.2). The section further provided that the two million dollar structuring fee would be assigned to Napleton and, in effect, reduce the purchase price to fifteen million dollars if the APA closed between Wyoming Valley and Napleton without a manufacturer exercising a right of first refusal. (*Id*.). Should a manufacturer exercise a right of first refusal, the structuring fee would still be payable to the Napleton affiliate. (*Id*.). AoA attached with its statement of undisputed material facts an email from Wyoming Valley's broker, Rob Lee. (Doc. 394, Ex. 5). Therein, Mr. Lee wrote to Bruce Etheridge of Napleton and Steve Ubaldini of Wyoming Valley that certain language "was written to avoid a ROFR."[2] (*Id*.).

On or about September 15, 2016, Wyoming Valley's counsel provided AoA with a copy of the APA. (Doc. 360, ¶ 10). On September 28, 2016, AoA sent a letter to Wyoming Valley. (Doc. 394, Ex. 22). AoA states in the letter:

> However, AoA cannot evaluate or exercise its contractual and statutory right of first refusal without the APA being apportioned in a manner that specifically describes the terms of the Audi Transfer. Wyoming Valley's submission of the APA without any such

---

[2] All parties understand "ROFR" to refer to "right of first refusal."

apportionment, therefore, is a material breach of the Audi Dealer
Agreement and a violation of Pennsylvania law.

For this reason, AoA requests that Wyoming Valley provide (i) a good
faith break-down of the purchase price payable under the APA that is
attributable to the Audi Transfer, and (ii) a good faith breakdown of
the other terms of the APA that are attributable to the Audi Transfer.
Alternatively, in the event that Wyoming Valley is either unable or
unwilling to provide such information in compliance with the Audi
Dealer Agreement and Pennsylvania law, AoA requests that
Wyoming Valley withdraw the APA.

(*Id*.). Wyoming Valley responded to AoA on October 5, 2016, attaching the

exhibits and schedules to the APA. (Doc. 394, Ex. 23). Wyoming Valley

responded in the letter that "the issue of allocation of the purchase price and

specific provisions as to each franchise were never part of the negotiations between

the parties" and indicated that providing a breakdown would require "additional

discussions" and an amendment to the APA. (*Id*.).

On November 17, 2016, Wyoming Valley sent a letter to AoA

communicating an eight million dollar value for the transfer of the Audi franchise

within the APA. (Doc. 394, Ex. 30). Wyoming Valley represented in the letter that

the "complexity of the transaction" and "economic impact of selling an individual

franchise in what is considered an auto multiplex" made a price breakdown a

"daunting task." (*Id*.). On November 22, 2016, the parties agreed via email that

AoA's statutory and contractual time period to consider and respond to the request

for consent to transfer the dealership began on October 14 and would expire on December 28, 2016. (Doc. 394, Ex. 31).

On December 2, 2016, AoA sent a letter to Wyoming Valley stating that "Wyoming Valley has failed to provide the good faith breakdown of the purchase price and other terms of the APA attributable to the Audi Transfer." (*Id*.). The letter stated that "it is obvious that [the eight million dollar] amount does not constitute a good faith, proportionate breakdown of the overall blue sky price set forth in the APA." (*Id*.). AoA pointed out in its letter that eight million dollars amounts to almost half of the entire transaction price which was collectively for the BMW, Porsche, Kia, Mazda, Volkswagen, and Subaru dealerships. (*Id*.). The letter ended with a request that "Wyoming Valley provide a legitimate, good faith breakdown of: (i) the blue sky purchase price as set forth in the APA for the Audi Transfer, *and* (ii) the other, non-price terms as set forth in the APA attributable to the Audi transfer" by December 9, 2016. (*Id*.).

Wyoming Valley responded by letter dated December 9, 2016, communicating its belief that it had indeed provided a good faith price breakdown for the Audi franchise. (Doc. 394, Ex. 33).

**D. AoA's Lawsuit**

On December 13, 2016, AoA filed its initial complaint with this Court. (Doc. 1). On December 14, 2016, AoA filed a motion for a temporary restraining

order and preliminary injunction, seeking primarily to enjoin Wyoming Valley from closing the APA or transferring its Wyoming Valley Audi dealership assets. (Doc. 3). On December 22, 2016, we entered a temporary restraining order restraining Wyoming Valley from closing the APA "and otherwise transferring Wyoming Valley's Audi dealership assets." (Doc. 16). We also restrained the transfer of any other assets contemplated by the APA. (*Id.*). On January 18, 2017, we entered a preliminary injunction order to the same effect. (Doc. 30).

On June 29, 2017, following lengthy conversations with all counsel, we entered an order setting forth terms stipulated by the parties. (Doc. 213). Therein, we lifted the preliminary injunction insofar as it restricted the sale or transfer of Wyoming Valley's Subaru, Kia, Mazda, BMW and Porsche dealerships. (*Id.* at ¶¶ 1, 2). The order also provided, among other things, that "[t]he Audi and Volkswagen Dealerships currently owned by Wyoming Valley are severed from any contract of sale to Napleton." (*Id.* at ¶ 3). The parties further agreed that "no changes in the ownership interest of the Audi and Volkswagen Dealerships" shall take place unless by agreement. (*Id.* at ¶ 4). Additionally, the order provided that "Napleton **SHALL** forever quit its interest, if any it has, in the ownership of the Wyoming Valley Audi and Volkswagen Dealerships." (*Id.* at ¶ 5).

The preliminary injunction of the sale of Wyoming Valley's Audi and Volkswagen Dealerships remains in place and this matter is scheduled for trial

beginning March 13, 2018. The only damages that AoA pled in its amended complaint were legal fees, (Doc. 35), and we have ruled that those damages are unavailable under Pennsylvania law. (Doc. 176). AoA's claims seek only declarations of Wyoming Valley's alleged breach of the Dealership Agreement and violation of the Act.

### E. The First Addendum to the APA

Following AoA's initiation of this lawsuit, on December 20, 2016, Wyoming Valley and Napleton entered into a First Addendum to the APA that removed the Audi franchise from the sale. (Doc. 393, ¶ 101) (*See* Doc. 394, Ex. 54). The First Addendum states, "the Buyer wishes to withdraw Buyer offer to purchase the Audi Business." (Doc. 394, Ex. 54). The First Addendum further states that the APA shall exclude Wyoming Valley's Audi assets. (*Id*.). The First Addendum does not reflect a change in the overall purchase price of the APA, but states that "[t]he parties agree to execute such other agreements as may be reasonably necessary to complete the understandings as set forth in this Agreement." (*Id*.).

In light of the First Addendum, on December 20, 2016, Wyoming Valley notified AoA in writing that it "formally withdraws its request for [AoA] to approve" the APA "as [Wyoming Valley] is no longer attempting to sell its Audi

franchise." (Doc. 394, Ex. 55). Wyoming Valley provided AoA with the First Addendum. (Doc. 394, Ex. 56).

AoA filed an amended complaint on January 30, 2017 that addressed the implication of the First Addendum to the APA. (Doc. 35). AoA alleged that the First Addendum was not a valid contract, but rather a collusive attempt to circumvent AoA's right of first refusal; therefore, it did not effectively remove the Audi assets. (Doc. 35, ¶¶ 41-46). Constrained by our duty to accept AoA's allegations in the amended complaint as true, we denied Wyoming Valley's argument within its motion to dismiss that the Audi assets had been removed from the APA. (Doc. 176).

### F. Relocation

Also relevant to the interactions between AoA and Wyoming Valley are issues related to Wyoming Valley's intention to relocate its Audi dealership. On July 14, 2016, Wyoming Valley wrote to AoA requesting approval to relocate its Audi dealership to a new location at 1470 Highway 315, Wilkes-Barre, PA 18711. (the "Relocation Property") (Doc. 394, Ex. 9). The letter requested accelerated consideration. (*Id.*). Wyoming Valley and Napleton had entered the APA three days prior to this letter, but Wyoming Valley did not mention it within its request for approval. (*See* Doc. 360, ¶ 7) (Doc. 394, Ex. 9). As previously stated,

Wyoming Valley did not disclose the APA to AoA until two months later, on September 15, 2016. (Doc. 360, ¶ 10).

Attached with AoA's statement of undisputed material facts is an email chain between Wyoming Valley's attorney and president from July 19, 2016. (Doc. 394, Ex. 10). Wyoming Valley's attorney inquired as to when to submit the APA to the dealer manufacturers and Wyoming Valley's president responded, "we are very close to securing the Audi facility approval so we are going to wait 1 maybe 2 more days to secure it." (*Id.*).

On August 12, 2016, AoA sent a Relocation Agreement to Wyoming Valley. (Doc. 394, Ex. 13). The agreement begins, "[i]n reliance upon the representations, disclosures, and commitments made by you . . . [AoA] is pleased to advise you of our conditional approval of the relocation of the Audi operations . . ." (*Id.*). One of the terms of the agreement was that "Dealer shall retain its current organization and ownership structure as reflected in the Dealer's AoA Dealer Agreement . . . and there shall be no change in Dealer's corporate officers or its beneficial shareholders without AoA's prior written consent." (*Id.*). The terms also required that Wyoming Valley has secured through purchase, option, or lease, the Relocation Property. (*Id.*). The Relocation Agreement provided that "[i]n the event that Dealer sells a complete or partial interest in the dealership prior to the completion of the Facility, or otherwise enters into an Asset Purchase Agreement

involving Dealer's assets prior to the completion of the Facility, Dealer shall immediately repay to AoA" the bonus that it received for relocation. (*Id*.).

Attached with AoA's statement of undisputed material facts are emails between Bruce Etheridge of Napleton and Ed Napleton himself regarding the Relocation Agreement. (Doc. 394, Ex. 15). Napleton states, "[t]ime to sign and wait to get the document back countersigned and then send out the APA." (*Id*.). Etheridge questions, "[y]ou saw we will lose the factory money and COULD be disapproved if a buy sell is sent?" (*Id*.). Napleton responds, "I read it, No choice so we need to be sure that we have our rights to stand in the sellers shoes and take them to the PA motor vehicle board if they fuck with us. Right up my alley." (*Id*.).

On August 16, 2016, Wyoming Valley signed the Relocation Agreement and sent it to AoA. (Doc. 394, Ex. 16). On September 12, 2016, AoA countersigned the Relocation Agreement and emailed a copy to Wyoming Valley. (Doc. 394, Ex. 18). Thereafter, Wyoming Valley disclosed the APA to AoA, as discussed in a previous section.

The Relocation Property was and is owned by Millennium Holdings IV, LLC. ("MH4") (Doc. 219, ¶ 56). On December 27, 2016, Wyoming Valley's four principals transferred their membership interests in MH4 to Accruit Exchange Accommodation Services, LLC ("Accruit") through a Membership Interest Purchase Agreement. (the "MIPA") (Doc. 394, 62). On April 10, 2017, Accruit

transferred the MH4 membership interests to Napleton Investment Partnership, LP ("NIP"), an entity affiliated with Napleton. (Doc. 394, Ex. 64).

On May 22, 2017, AoA sent a letter to Wyoming Valley rescinding its contingent approval for relocation based on "material misrepresentations that Wyoming Valley made to it," namely, failing to disclose the APA. (Doc. 394, Ex. 67). Wyoming Valley is in the process of seeking a ruling from the Pennsylvania Board of Vehicle Manufacturers, Dealers and Sales Persons that AoA is unreasonably withholding its consent to the relocation.

On July 7, 2017, Wyoming Valley and Napleton, through its affiliate NIP as it owns the interests of MH4, executed the Relocation Lease. (Doc. 394, Ex. 72). The Relocation Lease takes effect upon the relocation of Wyoming Valley's Audi dealership to the Relocation Property, which will house a shared service building with other dealerships that Wyoming Valley intends to sell to Napleton. (*Id*.). ▮

▮

### G. The Second Addendum

On November 16, 2017, Wyoming Valley and Napleton executed a Second Addendum to the APA. (Doc. 394, Ex. 79). The Second Addendum contemplates the sale of Wyoming Valley's BMW, Porsche, and Subaru businesses to Napleton, specifically excluding Audi and Volkswagen assets. (*Id*. at ¶ 2). ▮





**H. Issues**

AoA has three outstanding claims against Wyoming Valley. (Doc. 35).
Count I alleges a breach of the Dealership Agreement – AoA alleges that
Wyoming Valley breached the Dealership Agreement when it failed to provide
AoA with the price and other terms of the APA for it to consider its right of first
refusal. (Doc. 35, p. 17). Also incorporated in Count I is AoA's allegation that
Wyoming Valley breached the Dealership Agreement's implied covenant of good
faith and fair dealing. (*Id*.). Count II alleges a breach of Section 16 of the Act, as it
entitles AoA to a right of first refusal. (*Id*. at 20). Count III is a claim for
declaratory judgment that Wyoming Valley breached the Dealership Agreement
and violated AoA's rights under Section 16 of the Act. (*Id*. at 21).

Both AoA and Wyoming Valley have moved for summary judgment on
these claims. In doing so, they express their agreement that there are no disputes of
material fact that would preclude disposition by this Court.

## II.    LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "that there
is no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law." FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a
sufficient evidentiary basis for a reasonable jury to find for the non-moving party,
and a fact is "material" only if it might affect the outcome of the action under the

governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.   DISCUSSION

Despite the protracted history of this case, these motions present rather simple legal issues of contractual and statutory construction. We are tasked with determining the scope of AoA's contractual and statutory rights of first refusal and how those rights are affected by Wyoming Valley and Napleton's actions. As AoA recognized in its brief in support of its Motion, these are legal questions for the Court, rather than a jury. (Doc. 396, p. 16). The material facts relevant to these questions are all available through the documentary evidence submitted, leaving no dispute of material fact that would preclude summary judgment.

"The court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is subject to only one reasonable interpretation." *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 163–64 (3d Cir. 2001) (internal quotation omitted). AoA explains that "the terms of the Dealer Agreement relating to AoA's ROFR are not ambiguous, nor has Wyoming Valley argued at any time that they are" and "[a]ccordingly, this Court has the right to interpret the Dealer Agreement as a matter of law." (Doc.

396, p. 16). We agree. Neither party disputes that the language of the Dealership Agreement granted AoA a right of first refusal; instead, the conflict between the parties arises over the legal effect of that right of first refusal. This is certainly a question of law for the Court to decide. "Construction of the contract determines its legal operation." *Ram Const. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984). "When the question is one of 'construction' as distinguished from 'interpretation' of the contract, the issue is one of law." *Id.* For the same reasons, the scope and legal effect of AoA's statutory right of first refusal are legal issues for the Court as well. *Louis Dreyfus Commodities Suisse, SA v. Fin. Software Sys., Inc.*, 2015 WL 687801, at *7 (E.D. Pa. Feb. 17, 2015) (" . . . issues of statutory construction and contract interpretation are matters of law to be decided by the Court").

Having determined that the motions present questions of law appropriate for judicial disposition, we now move to the arguments presented by the parties. There is surprisingly a great deal of common ground between the two; both agree that AoA has a right of first refusal over any current or future sale of Wyoming Valley's Audi dealership pursuant to the Dealership Agreement and the Act. (Doc. 396, p. 17) (Doc. 359, p. 11). Both parties also agree that the APA as initially drafted triggered AoA's right of first refusal, as it purported to sell the Wyoming Valley Audi assets. (Doc. 396, p. 1) (Doc. 359, p. 12). In agreement with AoA,

Wyoming Valley specifically concedes that Pennsylvania law does not allow a seller to circumvent a right of first refusal by packaging the assets in a bundled sale. (Doc. 359, p. 11); *see*, *Atlantic Ref. Co. v. Wyo. Nat'l Bank of Wilkes-Barre*, 51 A.2d 719, 725 (Pa. 1947).

The parties diverge in their positions over whether AoA's right of first refusal remains active such that AoA has an immediately-exercisable right to purchase the Wyoming Valley Audi assets. Wyoming Valley argues that, while AoA has a right of first refusal over any future sale of its Audi dealership, its unexercised right to purchase the Audi dealership extinguished when Wyoming Valley withdrew it from the APA. (Doc. 359, pp. 3-5). Put simply, Wyoming Valley maintains that AoA does not have an active right of first refusal because Wyoming Valley is not currently selling its Audi dealership. AoA responds in two ways. First, AoA contends that the Wyoming Valley Audi assets are still a part of the APA. (Doc. 396, pp. 19-26). Second, AoA argues that its right of first refusal has become an irrevocable option to purchase the Wyoming Valley Audi dealership. (Doc. 396, pp. 26-38). We will address each argument in turn.

### A. The Audi Assets Under the APA

Again, we reiterate that both parties agree that AoA has a contractual and statutory right of refusal over any sale of the Wyoming Valley Audi dealership. AoA argues that the APA still triggers its right of first refusal because the First and

Second Addendums do not effectively remove the Wyoming Valley Audi assets from the contract for sale to Napleton. (Doc. 396, pp. 19-26). AoA argues that the Court can rely "solely on the express terms of the Second Addendum" to hold that "Wyoming Valley did not remove the Audi Assets from the APA through the First Addendum." (Doc. 396, p. 19).

We start first with an examination of what level of transfer of the Audi dealership triggers AoA's right of first refusal. The specific language of the Standard Provisions to the Dealership Agreement characterizes this right as ripening "[w]henever Dealer proposes to transfer its principal assets or change owners of a majority interest." (Doc. 394, Ex. 2). The Act characterizes it similarly, stating that the right of first refusal arises "in the event of a proposed change of all or substantially all ownership or transfer of all or substantially all dealership assets." 63 P.S. § 818.16.

AoA points to the Second Addendum as evidence "that the Audi Assets remain a critical and essential part of the purchase and sale agreement between Wyoming Valley and Napleton." (Doc. 396, p. 20). However, the proper inquiry is not whether the assets are a "critical and essential part" of the agreement; by the express language of the Act and the Standard Provisions, AoA's right of first refusal is activated only when Wyoming Valley proposes to transfer substantially all of its Audi assets or substantially change the ownership interest of its Audi

dealership. The First Addendum purports to remove all Audi assets from the APA, but AoA argues that the First Addendum is a legally invalid contract because it was entered into in bad faith. (Doc. 396, 19-20, 29). Because we now have the Second Addendum to consider, which also removes all Wyoming Valley Audi assets from the APA, we need not consider the validity of the First Addendum. AoA endorses this approach by repeatedly directing the court to "make such a determination by looking exclusively at the Second Addendum" and even suggests that analysis of the First Addendum is unnecessary. (Doc. 396, pp. 3, 29).

The relevant inquiry, therefore, is whether the Second Addendum "proposes to transfer [Wyoming Valley's] principal assets or change owners of a majority interest" of the Audi dealership.[3] (Doc. 394, Ex. 2).

---

[3] The Court recognizes AoA's contention that the Second Addendum does not remove the Audi assets in good faith; as this argument relates to AoA's contention that its right of first refusal converted to an irrevocable option, we will analyze this argument in the next section. (Doc. 396, p. 30) ("In other words, even were the Court to find that the Audi Assets were removed from the APA, the Second Addendum establishes that they were not withdrawn in good faith, but were withdrawn instead as a part of a broader effort to transfer the benefits of the Audi Assets to Napleton . . . Accordingly, the first exception to the *Lin* decision would apply here").



we cannot hold that this constitutes a proposal "to transfer its principal assets or change owners of a majority interest." (Doc. 394, Ex. 2). Neither can we hold that it constitutes "a proposed change of all or substantially all ownership or transfer of all or substantially all dealership assets," as characterized by the Act. 63 P.S. § 818.16.

The case law that AoA cites in support are unpersuasive. AoA directs us to cases holding that transfer of control constitutes the transfer of an ownership interest. (Doc. 396, p. 22). We do not disagree with that well-established

proposition; however, we must again reiterate that the issue is not whether there is a transfer of *any* ownership interest, but whether there is a change in "majority interest" or "substantially all ownership." (Doc. 394, Ex. 2); 63 P.S. § 818.16.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Were we to read the Second Addendum as a transfer of such control as to effectuate a transfer of ownership, we would stretch the language of the Standard Provisions and the Act to operate as a far greater restraint upon dealers than the plain language supports.

Similarly, AoA cites to equally unpersuasive case law in support of its contention that the transfer of an interest in sale proceeds to Napleton "is the same as an acquisition of an equitable ownership interest in the underlying asset itself." (Doc. 396, p. 23). At the risk of redundancy, we again note that the question is not whether the Second Addendum transfers any ownership interest, but whether it transfers the Wyoming Valley Audi dealership's "principal assets" or "substantially all dealership assets." (Doc. 394, Ex. 2); 63 P.S. § 818.16. We again must hold that it does not. ██████████████████████████████

███████████████████████████████████████████████████



27
27

Accordingly, we hold that the APA, as amended by the Second Addendum, does not propose the transfer of principal assets or majority interest of Wyoming Valley's Audi dealership. The APA, therefore, does not trigger AoA's right of first refusal under the Dealership Agreement or the Act.

In its brief in opposition to Wyoming Valley's Motion, AoA presents an additional argument. Despite maintaining that there are no disputes of material facts that would preclude the Court from determining that the Wyoming Valley Audi assets *are* still a part of the APA through the Second Addendum, AoA argues that factual disputes prevent our ruling that the Audi assets *are not* still a part of the AoA. (Doc. 437, att. 1, pp. 14-15). AoA argues that the evidence is sufficient for a jury to determine that the Second Addendum was a sham transaction entered into in bad faith. (*Id*.). Borrowing a citation from our previous order denying Wyoming Valley's motion to dismiss, AoA reminds the Court that "[i]t is a generally accepted precept of contract law that where two parties knowingly enter into a contract contemplating the breach of the contractual rights of a third party,

such contract is illegal and unenforceable." *Thermice v. Vinstron Corp.*, 528 F. Supp. 1275, 1285 (E.D.Pa. 1981), *aff'd* 688 F.2d 825 (3d Cir. 1982).

We reject this argument as it applies to the posture of the case at bar. Having found that the Second Addendum does not effectuate a breach of AoA's contractual rights with Wyoming Valley, we see no basis for AoA to have standing to invalidate a contract to which it is not a party. The factual issue of Wyoming Valley and Napleton's intent is therefore immaterial and does not preclude summary judgment.

## B.    Irrevocable Option

AoA argues that its right of first refusal remains active and viable even if the Audi assets have been removed from the APA because that right ripened into an irrevocable option to purchase the dealership. (Doc. 396, pp. 26-34). Wyoming Valley disagrees, contending that AoA's unexercised right of first refusal was extinguished when the Audi assets were removed from the APA. (Doc. 359, pp. 3-9). In our previous order denying Wyoming Valley's motion to dismiss AoA's claims for failure to state a claim, we foreshadowed our reliance on *Lin Broadcasting Corp. v. Metromedia, Inc.*, 542 N.E.2d 629 (N.Y. 1989). (Doc. 176, pp. 21-22). Heeding this signal, both parties rely on *Lin* in support of their opposing positions.

*Lin* was issued by New York's highest court in 1989 and addressed "whether a contractual right of first refusal, which has been triggered by a contract to sell to a third party, may be exercised during the specified duration of the right but after the third-party transaction has been abandoned." 542 N.E.2d at 630. The court rejected the argument that a right of first refusal, once triggered, transforms into a binding option, holding that such a rule does not comport with "general principles of contract law or with the theory of first refusal rights." *Id.* at 633.

The court began with a cogent discussion of what is incorporated in a right of first refusal and the differences between a right of first refusal and an option to purchase. *Id.* at 632-634.

> "The effect of a right of first refusal, also called a preemptive right, is to bind the party who desires to sell *not to sell* without first giving the other party the opportunity to purchase the property at the price specified." *Id.* at 632.

> "Unlike an option – in essence, an offer which by contract is to be kept open [. . .] – a right of first refusal does not, at the time it is given, include an operative offer. Rather, it is a restriction on the power of one party to sell without first making an offer of purchase to the other party upon the happening of a contingency: the owner's decision to sell to a third party." *Id.*

> "Also, unlike an option – which creates in the optionee a power to compel an unwilling seller to sell at the agreed price – a right of first refusal contemplates a willing seller who desires to part with the property." *Id.*

The Superior Court of Pennsylvania explains a right of first refusal in these terms: "A right of first refusal does not require the promisor to offer the res at all.

The right of first refusal merely requires that before the promisor accepts an offer of a third party, he must offer the res to the promisee of the right for the consideration he is willing to accept from the third party." *CBS Inc. v. Capital Cities Commc'ns, Inc*., 301 Pa. Super. 557, 572, 448 A.2d 48, 56 (1982).

Before proceeding to analyze the effect of the right of first refusal, the *Lin* court examined the contractual language to determine whether the agreement "can be construed as giving [the holder] anything more than a standard right of first refusal." 542 N.E.2d at 632. Pointing to the caption and text of the provision describing the right as a "right of first refusal," the court found that it did not. *Id*. So too is the case here. The Standard Provisions captions the section as "Right of First Refusal" and the language contained therein even specifically states that "Audi's right under this Article 12(3) shall be a right of first refusal." (Doc. 394, Ex. 2). The Dealership Agreement therefore grants AoA a standard right of first refusal susceptible of interpretation through general contract principles, as was the case in *Lin*.

Even in the face of this specific language, however, AoA argues that the "plain language of the Dealership Agreement" reveals that "the bargained-for effect of AoA's ROFR is not merely to ensure that the Audi Assets are not sold to a third party, but also to ensure that AoA has the right to achieve a change in ownership of the Audi Assets, if it so chooses, whenever a sale transaction for the

Audi Assets is presented to it." (Doc. 396, p. 31). For support of this contention, AoA points out that the Dealership Agreement "contemplates and identifies one specific situation where Wyoming Valley may withdraw a proposal to sell its Audi Assets and thereby defeat AoA's ROFR." (Doc. 396, pp. 31-32).

The provision to which AoA refers provides,

(b) If Dealer's proposed sale or transfer was to a successor approved in advance by Audi, to any of Dealer's Owners, to Dealer's employees as a group or to Dealer's spouse, children or heirs, then Dealer may withdraw its proposal within 30 calendar days *following receipt of Audi's notice of election of its purchase right*.

(Doc. 394, Ex. 2) (emphasis added). AoA contends that this provision provides the only scenario whereby the dealer may withdraw a proposed sale and "in other situations, Wyoming Valley may <u>not</u> withdraw a proposal to sell its Audi Assets, without first providing AoA with an opportunity to exercise its ROFR." (Doc. 396, pp. 31-32) (emphasis in original). Unfortunately for AoA, the plain language cannot support this interpretation. Instead, this provision provides a mechanism whereby a dealer may withdraw a proposed sale *after* Audi has elected to exercise its purchase right. Section 12 of the Standard Provisions refers to AoA's election of its purchase right as something separate from its consideration of its right of first refusal. (Doc. 396, Ex. 2) ("Audi may elect to exercise its purchase right by written notice . . .") ("If Audi exercises its purchase right . . ."). Indeed, AoA has never alleged that it elected its purchase right; the entirety of this

litigation is premised upon AoA's contention that it was *unable* to elect its purchase right because Wyoming Valley failed to provide a good faith price breakdown. This provision cannot be construed as giving AoA anything more than a standard right of first refusal because it concerns the procedure for withdrawal after AoA's acceptance. As this provision is the sole source of support for AoA's contention that its right also encompasses a "right to achieve a change in ownership" in the assets, AoA's argument is of no avail. (Doc. 396, p. 31).

After concluding that the right in question was a standard right of first refusal, the *Lin* court went on to determine whether the holder of the right had received its benefit. 542 N.E.2d at 633-634. The court aptly described that benefit as understood by general principles of contract law and the theory of first refusal rights:

> "The obvious effect of the right of first refusal is to give to the nonselling party a power to control and restrict the other party's right to sell to a third party. The clause itself operates as a restriction by preventing a party from making a sale without first making the first refusal offer. When, as here, the selling party has fully complied with its obligations under the first refusal clause by not selling without first making the required offer, the nonselling party has received the bargained-for performance. The intended effect of the clause as a means of restricting or preventing a sale to a third party has been realized. There is no basis for requiring the selling party to render more than its promised performance [. . .] by keeping the offer open for the period specified in the first refusal clause, thus giving the first refusal offer all of the attributes of an option."

*Id*. at 633. Moreover, the *Lin* court points out that "to read into a right of first refusal such an unspecified additional provision would be contrary to the general rule at common law that an offer may be withdrawn at any time before it is accepted." *Id*. The court goes on to explain the practical implications of a rule that a right of first refusal converts into an irrevocable option, cautioning that "[t]he act of making a first refusal offer would carry with it the risk of ultimate loss of the property even though the offeror later changes its mind and decides to keep the property after renouncing the third-party sale." *Id*. at 634. This is essentially what happened in the case at bar. Wyoming Valley presented the APA to AoA, but when it could not adequately remove the Audi assets from the packaged transaction, it withdrew the Audi assets from the sale altogether. Now AoA seeks to force Wyoming Valley to sell its Audi dealership even in absence of a proposed sale. *Lin* contemplated this situation as an example for why rights of first refusals should *not* be understood as irrevocable options. This example is both logical and compelling.

AoA argues that a ruling that its right of first refusal is not presently viable and exercisable would thwart its rights because "it therefore would never have had the opportunity to receive the bargained-for effect of its ROFR." (Doc. 396, pp. 33-34). Again, however, this argument is premised on the faulty assumption that the bargained-for effect of its right of first refusal includes something more than the

right to prevent the sale of the assets to a third party. As discussed previously, the language of AoA's right of first refusal does not support a right that encompasses anything more than the standard right of first refusal. This right has been realized. The Wyoming Valley Audi dealership has been removed from the APA by the Second Addendum, and AoA has even received the additional benefit of a specific court order severing the Wyoming Valley Audi and Volkswagen dealerships from any sale to Napleton. (Doc. 213). Were we to accept AoA's argument that its right was converted to an irrevocable option, the result would not be to preserve AoA's contractual and statutory rights, but to expand those rights further than any construction of the contract or statute could reasonably support.

In its brief in opposition to Wyoming Valley's Motion, AoA advances an additional argument that it did not receive the bargained-for benefit of its right of first refusal. (Doc. 437, att. 1, p. 19). AoA argues that, unlike the facts in *Lin*, Wyoming Valley did not fully comply with its obligations pursuant to AoA's right because it never made the "required offer" to AoA; according to AoA, Wyoming Valley's failure to provide a good faith apportionment of the price for the Audi assets within the APA amounted to a failure to make such an offer. (*Id*. at pp. 19-20). This argument is severely misguided. As has already been established, AoA never elected to exercise its right of first refusal. AoA now asks that we find that it holds an irrevocable option without an acceptance *or* an offer. This we certainly

cannot do. The right of first refusal requires Wyoming Valley to make the offer to AoA prior to a sale of its Audi dealership. Whether we accept AoA's contention that Wyoming Valley's offer was inadequate, the fact remains that the sale of the dealership was withdrawn prior to AoA's acceptance and AoA successfully prevented its sale to Napleton in the APA. The benefit of AoA's contractual and statutory right of first refusal has therefore been realized.

AoA further argues that *Lin* articulated an exception to its holding for when assets are removed from a packaged transaction in bad faith. (Doc. 396, pp. 29-30). At the end of its opinion, the *Lin* court referenced that its ruling was not inconsistent with *Quigley v. Capolongo*, 53 A.D.2d 714 (N.Y. App. Div. 1976), *aff'd on mem.* 372 N.E.2d 797 (N.Y. 1977). *Lin*, 542 N.E.2d at 635. AoA uses *Quigley* as exclusive support for its argument that *Lin* expressed an exception to its holding that a right of first refusal does not ripen into an irrevocable option. We therefore look to *Quigley*.

In *Quigley*, the owner of property subject to a five year right of first refusal contracted to sell the property to a third party. 53 A.D.2d at 714. When the third party learned that the property was encumbered by a right of first refusal, it withdrew the sale. *Id*. The property owners thereafter executed a five year lease with the third party that granted the third party an exclusive option to purchase the property after expiration of the lease; at that time, the right of first refusal would

have expired. *Id.* The lease called for only a nominal sum to be paid in annual rent, along with an immediate, nonrefundable payment for the exclusive option to purchase. *Id.* at 714-715. The holders of the right of first refusal argued that the withdrawn contract for sale and the lease violated its rights. *Id.*

After first clarifying that "[a] right of first refusal is an option to buy conditioned on the seller's willingness to sell," the court determined that the lease was effectively a sales agreement that still implicated the right of first refusal. *Id.* at 715. The court held that the lease "actually reduced the defendants' present intention of selling the property to a contract under which the actual transfer of title would be postponed." *Id.* The court therefore held that the property owners breached the right of first refusal by execution of the lease. *Id.* With regard to the withdrawn sales contract, the *Quigley* court stated, "we do not feel it necessary to decide whether the acceptance of a bona fide purchase offer is enough by itself to activate a right of first refusal if the offer and acceptance are subsequently withdrawn in good faith." *Id.*

*Lin* squared its holding with *Quigley* by citing the differing facts and noting that the court did not consider a situation where the third party sale had been cancelled in good faith. 542 N.E.2d at 635. AoA interprets this as the *Lin* court's articulation of an exception to its holding that applies when the seller acts in bad faith. (Doc. 396, pp. 29-30). AoA's right of first refusal, according to AoA,

therefore ripened into an irrevocable option because of Wyoming Valley and Napleton's manipulative and deceptive conduct in removing the Audi assets and executing the First and Second Addendums. (*Id*.).

We cannot read *Lin* and *Quigley* to create such a broad exception. While *Quigley* indeed addressed a circumstance where a seller acted "in the hope of circumventing plaintiff's rights," bad faith was not the only basis for its holding. 53 A.D.2d at 715. The facts giving rise to the holding in *Quigley* are markedly different than those at bar for two very evident reasons.

First, the lease in *Quigley* was meant to completely extinguish the holder's right of first refusal. The sellers in *Quigley* never disclosed their initial contract for sale of the property, leaving the lease as the only contract by which the holder could exercise its right to prevent a sale to a third party. *Id*. at 714. The lease, by its terms, ensured that the right of first refusal could never be exercised because it prevented a sale during the entire life of that right, while contemporaneously securing an immediate purchase following the expiration of the right of first refusal. *Id*. The court was given the option of analyzing the lease in light of the parties' intentions or ruling that the holders of the right of first refusal would never receive its bargained-for benefit to prevent a sale of the property for a set amount of time. This of course is highly distinguishable from AoA's right of first refusal, as even Wyoming Valley concedes that "Audi has a ROFR over any ***future***

transfer" and "Audi's right to choose a successor dealer remains intact." (Doc. 359, p. 5) (emphasis in original). Second, in contrast to the Second Addendum, the lease in *Quigley* "was no different in practical consequence" from a contract for the sale of the property with delayed transfer of title. 53 A.D.2d at 715. We have already discussed at length the reasons why the Second Addendum is *not* effectively a contract for sale of the Audi assets. We therefore decline to apply *Quigley* as a means for holding that AoA's right of first refusal became an irrevocable option to purchase.

Finally, we must address AoA's contention in its brief in opposition to Wyoming Valley's Motion that "*Lin* is inconsistent with the majority rule that a ROFR ripens into an option that is irrevocable during the option period." (Doc. 437, att. 1, p. 27). AoA twists the legal question at issue, citing various cases for its proposition that "*Lin* is an outlier" that is contrary to the majority view. (*Id*. at pp. 27-28). Every case cited by AoA concerns whether a right of first refusal ripens into an irrevocable option *after* the holder of the right accepts the offer, concerns contractual language that specifically leaves the right open for a period of time or mandates that the holder be granted a period of time to consider its right, or grants an option in addition to a right of first refusal. We reiterate that the Dealership Agreement with Wyoming Valley did *not* grant AoA anything more than a general right of first refusal and that AoA did *not* accept Wyoming Valley's offer prior to

the withdrawal of the Audi assets from the APA. We are thus unmoved by AoA's attempt to mold the cited case law to fit its situation.

We therefore conclude that AoA's right of first refusal did not convert to an irrevocable option, and AoA's failure to exercise that right prior to the withdrawal of the Audi assets from the APA extinguished its present right to purchase. While AoA certainly has a valid and enforceable right of first refusal over any future sale of the Audi dealership, the evidence establishes as a matter of law that Wyoming Valley is not in breach AoA's right of first refusal within the Dealership Agreement or the Act. Thus, we will grant summary judgment in Wyoming Valley's favor.

AoA incorporates in Count I an allegation that Wyoming Valley also breached the implied covenant of good faith and fair dealing. (Doc. 35, ¶ 60). However, "Pennsylvania law does not recognize a separate breach of contractual duty of good faith and fair dealing where said claim is subsumed by a separately pled breach of contract claim." *Simmons v. Nationwide Mut. Fire Ins. Co.*, 788 F.Supp.2d 404, 409 (W.D. Pa. 2011). "In Pennsylvania, the implied duty of good faith is 'tied specifically to and is not separate from the duties a contract imposes on the parties.'" *Rapid Circuits, Inc. v. Sun Nat. Bank*, 2011 WL 1666919, at *17 (E.D. Pa. May 3, 2011) (*quoting Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 434 (Pa. 2001)). Accordingly, having found that Wyoming Valley did

not breach the Dealership Agreement, AoA's claim for breach of the implied warranty of good faith and fair dealing does not survive our grant of summary judgment in Wyoming Valley's favor.

## IV.    CONCLUSION

For the foregoing reasons, we shall grant summary judgment in favor of Wyoming Valley on all of AoA's claims. In doing so, we also lift our preliminary injunction restricting the sale or transfer of Wyoming Valley's Audi and Volkswagen Dealerships. The only remaining claims in this action are Wyoming Valley and Napleton's counterclaims against AoA, which are the subject of three other pending motions for summary judgment. (Docs. 378, 385, 387). In consideration of the fast approaching trial date and the numerous motions *in limine*, counsel for Wyoming Valley and Napleton shall expeditiously notify the Court if any or all of the remaining counterclaims will be withdrawn in light of this ruling.[5] The Court will otherwise promptly begin consideration of the remaining three pending motions for summary judgment. The parties shall also notify the Court by a letter on the docket if any of its pending motions *in limine* are rendered moot by this ruling or will otherwise be withdrawn.

---

[5] We would be remiss not to express our strong, if perhaps overly optimistic, hope that the remaining counterclaims will be withdrawn or otherwise resolved short of a determination by this Court. With AoA's affirmative claims before the Court resolved, these counterclaims may be better suited for resolution before the Pennsylvania Board of Vehicle Manufacturers, Dealers, and Salespersons than a jury in federal court.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. AoA's motion for summary judgment on its affirmative claims against Wyoming Valley (Doc. 381) is **DENIED**.

2. Wyoming Valley's motion for summary judgment on AoA's affirmative claims (Doc. 358) is **GRANTED**.

3. The preliminary injunction issued on January 18, 2017 (Doc. 30) is **LIFTED** in its entirety.

4. Wyoming Valley and Napleton **SHALL PROMPTLY** notify the Court of any intention to withdraw all or part of the counterclaims asserted against AoA.

5. All parties **SHALL** notify the Court, by 12 o'clock noon EST on February 20, 2018, if any of its pending motions *in limine* are rendered moot by this ruling or will otherwise be withdrawn.

6. This memorandum and order is filed under seal pursuant to the Court's reliance on sealed exhibits and filings, though we are unsure whether any sensitive information has been revealed within this opinion. By or before the close of business on Thursday, February 22, 2018, any party wishing this memorandum and order to remain under seal **SHALL FILE** a letter on the docket explaining its justifications for that position and a proposed

redaction, if practical. If no such letter is filed, we shall direct the Clerk of

Court to unseal this memorandum and order.

<u>s/ John E. Jones III</u>
John E. Jones III
United States District Judge