# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

AUDI OF AMERICA, INC.,    :    3:16-cv-2470
:
    Counterclaim-Defendant,    :
:
    v.    :    Hon. John E. Jones III
:
BRONSBERG & HUGHES    :
PONTIAC, INC. d/b/a WYOMING    :
VALLEY AUDI,    :
:
    Counterclaim-Plaintiff    :
    v.    :
:
NORTH AMERICAN    :
AUTOMOTIVE SERVICES, INC.,    :
*et. al.*,    :
:
    Counterclaim-Plaintiff    :

## UNDER SEAL

## MEMORANDUM & ORDER

### March 16, 2018

On February 16, 2018, we entered summary judgment in favor of Defendant

Bronsberg & Hughes Pontiac, Inc., ("Wyoming Valley") on the claims asserted by

Plaintiff Audi of America, Inc. ("AoA") (Doc. 479). On March 13 and 14, the

parties engaged in a lengthy mediation facilitated by the undersigned. Despite good

faith efforts by all, the mediation did not culminate in a settlement. Presently

pending before the Court are two[1] motions for summary judgment. AoA moves for summary judgment on Wyoming Valley's two counterclaims (Doc. 394) and on the four remaining counterclaims asserted by Intervenors North American Automotive Services, Inc., and affiliated companies. ("Napleton"). (Doc. 386). These motions have been fully briefed and are therefore ripe for our review. (Docs. 397, 495 att. 1, 517, 395, 491 att. 1, 518).

## I.   BACKGROUND

The Court incorporates the factual and procedural background contained within our February 16, 2018 memorandum and order granting summary judgment to Wyoming Valley on AoA's affirmative claims. (Doc. 479). To the extent that additional background facts are necessary to analyze the pending motions, those facts will be discussed in the analysis section of this memorandum.

## II.   LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the

---

[1] Also pending before the Court is Napleton's motion for partial summary judgment regarding the legal effect of the First and Second Addenda on AoA's right of first refusal, to the extent that right is still active. (Doc. 378). This motion has been rendered moot by our February 16, 2018 order granting summary judgment in favor of Wyoming Valley on AoA's affirmative claims and will therefore be summarily denied. (Doc. 479).

governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of

*some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.   DISCUSSION

We will begin with AoA's motion for summary judgment on Wyoming Valley's two counterclaims and then move on to AoA's motion for summary judgment on Napleton's four counterclaims.

### A. Wyoming Valley's Counterclaims

Wyoming Valley asserts two counterclaims against AoA. (Doc. 186). Counterclaim Count I alleges a violation of the Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221*, et. seq.* ("ADDCA"). Counterclaim Count II alleges breaches of the Dealership Agreement. Both counterclaims are premised on the allegation that AoA acted in bad faith when it refused to approve the APA and rescinded its consent for relocation.

### 1.   Counterclaim Count I: ADDCA

"In order to sustain a claim under the ADDCA, a plaintiff must allege and prove a breach of the manufacturer's duty to act in 'good faith,' which is defined in terms of 'coercion, intimidation, or threats of coercion or intimidation.'" *Cutrone v. Daimler-Chrysler Motors Co*., LLC, 160 F. App'x 215, 218 (3d Cir. 2005)

4

(*quoting* 15 U.S.C. §§ 1222, 1221(e)) (internal citations omitted). "The type of coercion or intimidation rendered actionable by the ADDCA occurs only when the automobile manufacturer makes a wrongful demand which will result in sanctions if not complied with." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc*., 263 F.3d 296, 326 (3d Cir. 2001) (internal quotations omitted).

The Third Circuit has explained "that while a manufacturer does not make a wrongful demand if it merely insists that the dealer comply with a reasonable obligation imposed by the franchise agreement, a dealer can state a claim for relief under the ADDCA by alleging that the manufacturer's reliance on those objectively reasonable provisions is, in fact, motivated by a pretextual, bad-faith reason." *Id*. at 304. However, the Third Circuit also cautioned that "it is well established that the duty of 'good faith' dealing imposed by the Act must be given a narrow, rather than expansive, construction." *Northview Motors, Inc. v. Chrysler Motors Corp*., 227 F.3d 78, 93 (3d Cir. 2000). "Crucial at this point is the understanding that the definition of 'good faith' contained in the ADDCA is specialized and narrow." *Gen. Motors Corp.*, 263 F.3d at 325.

Other circuits have similarly limited the scope of what constitutes bad faith under the ADDCA, holding that "good faith ... has a limited and restricted meaning. It is not to be construed liberally*." Autohaus Brugger, Inc. v. Saab Motors, Inc*., 567 F.2d 901, 911 (9th Cir. 1978); *see also Carroll Kenworth Truck*

*Sales, Inc. v. Kenworth Truck Co.*, 781 F.2d 1520, 1525 (11th Cir. 1986) ("Bad faith under [ADDCA] has been defined narrowly and construed strictly. It does not mean simply a lack of fairness but entails a showing of coercion."); *Empire Volkswagen v. World–Wide Volkswagen*, 814 F.2d 90, 95 (2d Cir. 1987) (bad faith has a "narrow, restricted meaning."). "Moreover, in order to lack good faith, the manufacturer's actions must be unfair and inequitable in addition to being for the purpose of coercion and intimidation." *Bensco One, LLC v. Volkswagen of Am., Inc.*, 2008 WL 907521, at *4 (E.D. La. Mar. 31, 2008).

Wyoming Valley alleges in Counterclaim I that AoA violated the ADDCA through the following actions:

> "AoA's insistence that presentation of the APA as a 'package' transaction violated the Dealer Agreements and would not be considered for approval; AoA's litigation conduct in seeking injunctive relief barring the transfer of non-Volkswagen Group dealerships; and AoA's pre-textual, bad-faith decision to rescind its prior conditional approval of the Audi dealership relocation."

(Doc. 186, ¶ 65). Wyoming Valley does not appear to maintain its allegation that the second alleged breach, namely, "AoA's litigation conduct in seeking injunctive relief," constitutes a violation of the ADDCA. (*Id.*). For the reasons elucidated in our order dismissing certain aspects of Napleton's counterclaims, such an allegation would be barred by the *Noerr-Pennington* doctrine regardless. (Doc. 321). A review of Wyoming Valley's countercomplaint and brief in opposition to AoA's motion for summary judgment makes clear that Wyoming

Valley's ADDCA claim is premised on two actions: (1) AoA's insistence that Wyoming Valley must provide a price breakdown of the APA in order for AoA to evaluate its right of first refusal; and (2) AoA's rescission of the Relocation Agreement. (Doc. 491, att. 1, pp. 10, 20). We will analyze each action in turn.

First, AoA moves for summary judgment because Wyoming Valley has not adduced sufficient evidence from which a rational trier of fact could determine that AoA's demand of a price breakdown for the APA was made in bad faith. (Doc. 395, pp. 10-14). AoA argues that the evidence demonstrates that it demanded a price breakdown in furtherance of determining whether to enforce its statutory and contractual rights of first refusal. (*Id*.).  Wyoming Valley counters that AoA's insistence on receiving a price breakdown of the APA was not for the purpose of "evaluating its ROFR," but rather was a motivated by a pre-textual, ulterior motive – "Audi simply wanted to block Napleton from closing on the APA." (Doc. 491, att. 1, p. 10).

In support of this contention, Wyoming Valley points out that "Audi now admits that its demands on Wyoming Valley were not designed to assist Audi in assessing whether to buy Wyoming Valley's Audi Dealership," but "[r]ather, Audi had already decided that it would not allow that dealership to be transferred to Napleton and chose to use its ROFR as a mechanism to frustrate the legitimate business interests of Wyoming Valley and Napleton." (*Id*. at p. 11). "Audi used its

ROFR as a ploy to prevent the sale of assets to Napleton – not because Audi believed Napleton had any shortcomings as a dealer but because Audi harbored a grudge." (*Id*. at p. 12). Wyoming Valley maintains that "Audi feigned a desire to evaluate its ROFR" and "never earnestly pursued the idea of buying Wyoming Valley's Audi assets and transferring them to another dealer," but acted "out of a desire to punish Napleton." (*Id*. at pp. 15-16).

For evidentiary support of these arguments and conclusions, Wyoming Valley points to three facts: (1) AoA has approved package sales previously without requesting a purchase price breakdown; (2) AoA has not lined up a third-party transferee for the sale; and (3) AoA has expressed its opinion that Napleton presents an exceptional litigation risk as a potential franchisee. (*Id*. at pp. 13, 14, 18). According to Wyoming Valley, "[t]hese facts plainly create a jury question on whether Audi violated its duty of good faith under the ADDCA." (*Id*. at p. 16). We disagree.

Even taking all inferences in Wyoming Valley's favor and assuming that AoA had immediately determined upon receipt of the APA that it would not allow the sale of the Audi dealership to Napleton, AoA has not violated its duty to act in good faith. As Wyoming Valley recognized in its brief in support of summary judgment on AoA's affirmative claims, the entire purpose of a right of first refusal is "to ensure that no sale is made to an unwanted outsider without first affording

the same opportunity to the right-holder." (Doc. 359, p. 4). AoA's contractual and statutory rights of first refusal are not encumbered by any caveats regarding the *reason* that AoA chooses to exercise its right, so long as it steps into the shoes of the prospective purchaser. AoA is constrained by the Dealership Agreement to "consider in good faith" any proposal to transfer the assets under the consent requirement of Article 12(1), but its right of first refusal is an *alternate* route under Article 12(3) by which AoA is entitled to prevent the sale of the assets to an unwanted successor by purchasing the assets itself. (Doc. 394, Ex. 2). As recognized by the Third Circuit, "[b]oth a right of first refusal and a consent requirement provide a mechanism by which the franchisor can control the selection of its franchisees, but a right of first refusal is a less restrictive form of control, as it requires that the franchisor match the terms offered for the franchise by the third party." *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 390 (3d Cir. 2000).

Wyoming Valley has conceded that the APA implicated AoA's right of first refusal because it purported to sell the Wyoming Valley Audi and Volkswagen dealerships in a bundled transaction. (Doc. 359, p. 11). In order to step into Napleton's shoes as a purchaser of the Audi and Volkswagen dealerships, AoA needed to know the price of the Audi and Volkswagen dealerships standing apart from the bundled transaction in the APA. A demand to furnish that price breakdown was a reasonable action taken in furtherance of AoA's rights under the

9

Dealership Agreement, and Wyoming Valley's evidence does not establish that this action was "motivated by a pretextual, bad-faith reason." *General Motors Corp.*, 263 F.3d at 327. Even taking as true Wyoming Valley's contention that AoA's actions were motivated by a conclusion to "never approve the sale to Napleton," this motivation is not wrongful as a matter of law. (Doc. 491, att. 1, p. 16). This motive embodies the very purpose of a right of first refusal – to grant the holder a right to "control the selection of its franchisees." *Crivelli*, 215 F.3d at 390. Wyoming Valley has not pointed to sufficient evidence from which any rational juror could find that AoA's demand of a price breakdown of the APA constituted a violation of the narrowly-interpreted duty of good faith under the ADDCA.

Next, AoA argues that it is entitled to summary judgment on Wyoming Valley's remaining claim because AoA's rescission of the Relocation Agreement did not constitute a wrongful demand under the ADDCA. (Doc. 395, pp. 14-20). The dealings relating to the Relocation Agreement are more fully elucidated in the background section of our February 16, 2018 memorandum and order granting summary judgment to Wyoming Valley on AoA's affirmative claims, which we have incorporated by reference. (Doc. 479). To summarize, the evidence shows that Wyoming Valley purposefully waited to disclose the APA to AoA until after it had received AoA's approval to relocate. (*See* Doc. 394, Ex. 10). The Relocation Agreement begins, "[i]n reliance upon the representations, disclosures, and

10

commitments made by you . . . [AoA] is pleased to advise you of our conditional

approval of the relocation of the Audi operations . . ." (Doc. 394, Ex. 13).

AoA was made aware through discovery of emails revealing Wyoming

Valley and Napleton's purposeful concealment of the APA in procuring the

Relocation Agreement. On March 10, 2017, AoA filed a motion asking the Court

to issue an order to show cause because it became aware that the vast majority of

the ownership interests of MH4, the entity that owns the Relocation Property, were

transferred to a Napleton affiliate. (Doc. 65). AoA argued that the transfer violated

the preliminary injunction against transferring any of the APA assets. (*Id.*). During

the pendency of that motion, on April 10, 2017, a Napleton affiliate acquired all of

the membership interests of MH4. (Doc. 394, Ex. 64). On May 16, 2017,

Magistrate Judge Carlson denied the motion for an order to show cause, finding it

most appropriate to leave the issue of injunction violations to this Court during its

June preliminary injunction hearing. (Doc. 167). Following the denial of its

motion, on May 22, 2017, AoA sent a letter rescinding the Relocation Agreement.

(Doc. 394, Ex. 67). The letter stated, in part:

> As a result of the parties' ongoing litigation, AoA recently learned
> that Wyoming Valley knowingly, purposefully, and intentionally
> made material misrepresentations to it in connection with its July 14,
> 2016 relocation request, and that Wyoming Valley and the Napleton
> Automotive Group knowingly, purposefully, and intentionally have
> engaged in other deceptive and improper conduct relating to the
> proposed relocation

[ . . . ]

Because AoA's contingent approval of Wyoming Valley's July 14, 2016 relocation request was based on material misrepresentations that Wyoming Valley made to it, AoA now is rescinding its conditional approval of the July 14, 2016 relocation request.

AoA is not absolutely withholding its consent to a relocation by Wyoming Valley of its Audi dealership. AoA is willing to accept and consider a new request from Wyoming Valley to relocate its Audi dealership, including to the Relocation Property.

Please be advised, however, that for AoA to be able to grant its consent to any new relocation request, the request would need to be accompanied by full, complete, and accurate disclosures and would need to fully rectify the misrepresentations associated with Wyoming Valley's July 14, 2016 request to relocate and the deceptive and improper conduct of Wyoming Valley and the Napleton Automotive Group relating to the proposed relocation. This would require that the improper dealings and transactions between Wyoming Valley and Napleton be unwound.

(*Id*).

AoA first argues that it was entitled to rescind the Relocation Agreement because Wyoming Valley breached first. (Doc. 395, pp. 15-16). We are unpersuaded by this argument and will reject it without further discussion. Next, AoA argues that the evidence demonstrates that its rescission of the Relocation Agreement was not motivated by a pre-textual, bad faith reason, but undertaken as a result of AoA's discovery that the Relocation Agreement was procured by fraud. (*Id*. at pp. 16-19). In support, AoA points out that the discovery provided by Wyoming Valley beginning in March 2017 demonstrated that Wyoming Valley

purposefully waited to disclose the APA to AoA until after receiving approval for relocation. (*Id*.). AoA argues that no rational trier of fact could determine that its rescission was made in bad faith in light of the evidence that Wyoming Valley intentionally concealed the existence of the APA in procuring AoA's consent to relocation.

Wyoming Valley argues that a rational jury could conclude that AoA's rescission was made in bad faith because "Audi pulled the rug out from under [the relocation project] at a time that would be most harmful to the other parties to the litigation." (Doc. 491, att. 1, p. 24). Wyoming Valley points to evidence concerning the timing of AoA's rescission letter and notes that AoA became aware of the APA in September 2016, but waited until eight months later to rescind the Relocation Agreement. (*Id*. at pp. 8-9). By that time, Wyoming Valley and Napleton had spent more than a million dollars on the Audi showroom at the Relocation Property and AoA was aware that Wyoming Valley was preparing to relocate. (*Id*.).

However, the Court must note that Wyoming Valley and Napleton were undoubtedly aware of AoA's objections to the APA by December 2016 when AoA initiated this lawsuit, and they chose to continue the relocation project regardless. The Relocation Agreement expressly allows for AoA's rescission if Wyoming Valley transferred ownership of its Audi dealership, which is what it purported to

do through the APA. (Doc. 394, Ex. 13). Though we have now held that the APA, as amended by the Second Addendum, does not purport to transfer the Audi assets, all parties have always been aware of AoA's pursuit of a judicial declaration that the Audi assets remained a part of the APA, which would implicate AoA's right of rescission of the Relocation Agreement. Thus, any reasonable inference that a trier of fact could draw from the timing of AoA's rescission must also take into account Wyoming Valley's awareness of AoA's objections as it continued efforts to relocate and assumptions of risk undertaken in doing so. Furthermore, the ownership of the Relocation Property was not transferred to a Napleton affiliate until the month prior to AoA's rescission. (Doc. 394, Ex. 64). Upon receipt of discovery indicating a transfer of ownership in the Relocation Property, AoA filed a motion for contempt; when that was denied, it rescinded its approval. (Doc. 167) (Doc. 394, Ex. 67).

Beyond the timing of AoA's rescission, Wyoming Valley has not directed the Court to any other evidence from which a rational trier of fact could determine that AoA violated the ADDCA. In light of the evidence of Wyoming Valley's intentional concealment of the APA when procuring the Relocation Agreement and "the understanding that the definition of 'good faith' contained in the ADDCA is specialized and narrow," we hold that no rational trier of fact could find that AoA's rescission violated the ADDCA. *Gen. Motors Corp.*, 263 F.3d at 325.

In coming to this conclusion, we emphasize that a jury would need to consider the evidence that the parties have directed us towards, the history and timing of this litigation, the effect of previous court orders, the narrow interpretation of good faith under the statute, and the concepts of fraudulent inducement into a contract. Though we have high regard for the intelligent and experienced counsel in this litigation, we harbor serious concerns over any attorney's ability to present this claim to a panel of laypersons in a comprehensible manner. Our concern extends to our own ability to ensure that the jury gives proper scope to the "good faith" provision of the ADDCA, as the Third Circuit has expressly mandated that it "must be given a narrow, rather than expansive, construction." *Northview Motors, Inc.*, 227 F.3d 93.

The evidence of Wyoming Valley's concealment of the APA in procuring the Relocation Agreement is clear. On July 14, 2016, Wyoming Valley wrote to AoA requesting approval to relocate its Audi dealership and seeking accelerated consideration. (Doc. 394, Ex. 9). Wyoming Valley and Napleton had entered the APA three days prior to this letter, but Wyoming Valley pointedly did not mention the APA within its relocation request. (*See* Doc. 360, ¶ 7) (Doc. 394, Ex. 9). Instead, Wyoming Valley waited to disclose the APA to AoA until two months later, on September 15, 2016. (Doc. 360, ¶ 10). Wyoming Valley's attorney emailed Wyoming Valley's president on July 19, 2016 and inquired as to when to

submit the APA to the dealer manufacturers; Wyoming Valley's president

responded, "we are very close to securing the Audi facility approval so we are

going to wait 1 maybe 2 more days to secure it." (Doc. 394, Ex. 10). In emails

between Bruce Etheridge of Napleton and Ed Napleton himself regarding the

Relocation Agreement, Napleton states, "[t]ime to sign and wait to get the

document back countersigned and then send out the APA." (Doc. 394, Ex. 15). The

month prior to AoA's rescission, a Napleton affiliate acquired full ownership

interest in the Relocation Property. (Doc. 394, Ex. 64).

AoA states in its rescission letter that its rescission is based on this

"deceptive and improper conduct." (Doc. 394, Ex. 67). Indeed, the Relocation

Agreement expressly begins that it was made "[i]n reliance upon the

representations, disclosures, and commitments made by you . . ." and contemplates

rescission if Wyoming Valley does not retain its current organization and

ownership structure. (Doc. 394, Ex. 13). In the face of this, Wyoming Valley's

evidence pertaining to the timing of AoA's rescission is insufficient to establish

bad faith under the ADDCA. Even taking as true Wyoming Valley's contention

that the reasonable inference to be drawn is that AoA intentionally made its

rescission "at a time that would be most harmful to other parties to the litigation,"

no reasonable juror interpreting the ADDCA under the proper, narrow scope could

find that AoA's rescission itself was wrongful in light of Wyoming Valley and Napleton's deception. (Doc. 491, att. 1, p. 24).

We shall therefore grant summary judgment in favor of AoA on Wyoming Valley's Counterclaim Count I.

### 2. Counterclaim Count II: Breach of Contract

Wyoming Valley alleges in Counterclaim Count II that AoA breached Articles 1 and 12 of the Standard Provisions to the Dealership Agreement, as well as the implied duty of good faith and fair dealing. (Doc. 186, ¶¶ 67-74). The specific breaches alleged in Counterclaim Count II are the same as those alleged in Counterclaim Count I. (Doc. 186, ¶ 73). Again, Wyoming Valley does not appear to maintain its claim that AoA's pursuit in this litigation constituted a breach of contract, as it would be barred by the *Noerr-Pennington* doctrine. Instead, Counterclaim Count II is premised upon the same two actions as the previous claim: (1) AoA's insistence that Wyoming Valley must provide a price breakdown of the APA in order for AoA to evaluate its right of first refusal; and (2) AoA's rescission of the Relocation Agreement.

To start, Wyoming Valley did not provide any response to AoA's argument for summary judgment on Wyoming Valley's claim for a breach of the covenant of good faith and fair dealing. Moreover, we note that Wyoming Valley's claim for a breach of the covenant of good faith and fair dealing is based on the same set of

facts as its claims for breaches of Articles 1 and 12, and its claim of bad faith under the ADDCA. The Third Circuit, examining Pennsylvania law, has held that "a party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" *Northview Motors, Inc*., 227 F.3d at 92 (citation omitted). "Overall, we are satisfied that, in the face of these detailed provisions setting forth both contractually and statutorily the parties' obligations and rights, we should not recognize an independent cause of action for breach of the implied covenant of good faith in this case." *Id*. Because Wyoming Valley's claim for a breach of the implied covenant of good faith and fair dealing is encompassed entirely by its other contractual and statutory claims, we will grant summary judgment in AoA's favor on Wyoming Valley's Counterclaim Count II in this regard.

We move to the contractual provisions that Wyoming Valley alleges that AoA has breached – Articles 1 and 12 of the Standard Provisions to the Dealership Agreement. Article 1 provides in relevant part, "[i]n the conduct of its business, Audi will: [. . . ] [a]void all discourteous, deceptive, misleading, unprofessional, or unethical practices." (Doc. 394, Ex. 2). Wyoming Valley makes clear in its brief in opposition that the provision of Article 12 that it alleges AoA has breached is Article 12(1), which provides:

**Procedure**

(1) If Dealer chooses to transfer its principal assets or change owners, Audi has the right to approve the proposed transferees, the new owners and executives and, if different from Dealer's, their premises. Audi will consider in good faith any such written proposal Dealer may submit to Audi during the term of this Agreement. In determining whether the proposal is acceptable to it, Audi will take into account factors such as the personal, business and financial qualifications of the proposed new owners and executives as well as the proposal's effect on competition. In such evaluation, Audi may consult with the proposed new owners and executives on any aspect of the transaction of their proposed dealership operations. Notwithstanding anything set forth in this paragraph to the contrary, Audi shall not be obligated to consider such proposal if it previously had notified Dealer in writing that it would not appoint a succeeding dealer in Dealer's Area; provided, however, that such notice shall be given only if there is good cause for discontinuing representation of Authorized Automobiles in Dealer's Area.

(*Id.*). Article 12(2) clarifies that AoA shall approve or disapprove a proposed transferee within a certain time period "after Dealer has furnished to Audi all applications and information reasonably requested by Audi to evaluate such proposal." (*Id.*).

AoA advances three arguments in support of its motion for summary judgment on Counterclaim Count II: (1) the duties of Article 1 do not apply to the actions that Wyoming Valley claims effectuated breaches of the contract; (2) AoA was relieved of its contractual performance because Wyoming Valley breached the contract first; and (3) AoA's duty to perform under the contract has not yet been triggered.

We easily reject AoA's first argument. AoA offers just one paragraph of argument for why the duties of Article 1 do not apply to AoA's conduct, contending simply that the general provisions of Article 1 are overridden by the more specific provisions of Article 12. (Doc. 395, p. 27). We find no support for this contention in the contract itself and are unpersuaded AoA's argument. The general and amorphous terms of Article 1 could reasonably be interpreted to apply to all of AoA's actions, and that determination is properly left for a jury.

AoA's second argument is easily rejected as well. AoA argues that its obligations under the Dealership Agreement are excused because Wyoming Valley breached the contract when it did not supply AoA with a price breakdown of the APA. (Doc. 395, p. 23). While it is true that AoA's obligations under the Dealership Agreement may be excused if Wyoming Valley breached the contract, whether Wyoming Valley's actions constituted a material breach of the agreement such that AoA's performance was excused is for the jury to determine. While that question may in certain cases be determined as a matter of law, AoA has not presented the Court with evidence sufficient to take this issue away from the jury in the case at bar. *See Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 867 (E.D. Pa. 2016) ("Pennsylvania precedent reflects that the materiality of a breach is generally an issue of fact to be decided by a jury . . . Nevertheless, Pennsylvania appellate courts have affirmed lower courts' findings of

materiality as a matter of law where the breach goes directly to the essence of the contract.").

Finally, AoA argues that its obligations under Article 12 have not yet been triggered because Wyoming Valley has not performed its duty to "furnish[] to Audi all applications and information reasonably requested by Audi to evaluate such proposal." (Doc. 394, Ex. 2). Again, we must hold that whether the Wyoming Valley has fulfilled its obligation requires a jury determination of the sufficiency of the information provided by Wyoming Valley and the reasonableness of AoA's requests for further information. We have not been presented with ample evidence to warrant taking this question away from the jury.

We therefore will deny summary judgment on Wyoming Valley's Counterclaim Count II for breach of Articles 1 and 12 of the Standard Provisions to the Dealership Agreement. Thus, AoA's motion for summary judgment on Wyoming Valley's counterclaims (Doc. 394) is granted in part and denied in part.

### B. Napleton's Counterclaims

Napleton originally brought eight counterclaims against AoA, but we dismissed Counterclaim Count VIII in a previous order. (Doc. 219) (Doc. 321). Along with our dismissal of Counterclaim Count VIII, we limited Counterclaim Counts III and IV by holding that those claims, in light of the *Noerr-Pennington* doctrine, may not be premised upon AoA's conduct in furtherance of this

litigation. (*Id.*). Additionally, Napleton has filed a stipulation to dismiss Counterclaim Counts I, II, and VII, reserving rights to revive those claims if AoA's affirmative claims are reinstated. (Doc. 515).

Napleton has four remaining counterclaims. Counterclaim Count III alleges that AoA tortiously interfered with the APA. Counterclaim Count IV alleges that AoA tortiously interfered with prospective contractual relations with regard to the APA. Counterclaim Counts V and VI allege that AoA tortiously interfered with several contracts relating to the Relocation Property – the APA, to the extent that it contemplates transferring the Relocation Property to EFN Wyoming Valley, the MIPA, which transferred the ownership interests of MH4 to NIP, and the current and prospective leases for dealerships to occupy the Relocation Property. Counterclaim Counts V and VI are premised on AoA's May 22, 2017 letter revoking its approval of the Wyoming Valley's plan to relocate its Audi dealership to the Relocation Property under the Relocation Agreement. (*Id.* at ¶¶ 151, 165).

AoA argues that all of Napleton's counterclaims must fail as a matter of law because they are not cognizable under Pennsylvania law. AoA then argues that each counterclaim must fail because AoA's interference was either justified or did not cause any damages. We will address each argument in turn.

Before beginning our analysis, however, we feel compelled to note our chagrin with aspects of Napleton's brief in opposition to AoA's motion for

summary judgment. (Doc. 495, att. 1). The brief is riddled with *ad hominin* attacks upon AoA's attorneys, off-the-cuff argumentative prose, and hyperbolic insults of AoA's arguments. It screams of disrespect towards the solemnity of this Court and the legal profession, and smacks of grandstanding to please a demanding client. As such, it has no place in a federal court brief. We expect more of the able counsel who appear before our Court and admonish counsel that they should conduct themselves with greater restraint and professionalism. When the Court engaged in mediation in this matter, each and every party acted in a good faith, respectable, and professional manner. We were heartened to have had the opportunity to engage with the parties in a way that illustrated their true level of collegiality and professionalism. However, had this brief in opposition been our only interaction with Intervenors and counsel, we admit that it would have been a far more difficult task to look past the juvenile and inappropriate content to properly analyze the cogent legal arguments contained therein.

### 1. Tortious Interference Under Pennsylvania Law

AoA argues that Napleton's tortious interference claims are not cognizable under Pennsylvania law. AoA seeks to distinguish claims for tortious interference of contracts for actions that "induce" a third party to breach a contract and actions that "hinder" a third party's ability to perform a contract. (Doc. 397, pp. 10-12). AoA argues that "inducement" type claims are covered by Section 766 of the

Restatement (Second) of Torts and have been adopted by Pennsylvania, whereas the "hindrance" type claims are covered by Section 766A and have not been adopted by Pennsylvania courts. (*Id*.). Because Napleton's counterclaims do not allege that AoA caused third parties to breach a contract, but rather allege that AoA hindered performance of those contracts, AoA argues that they are not cognizable under Pennsylvania law. (*Id*. at pp. 14-15).

A plain reading of the language of Sections 766 and 766A, and indeed the case law cited by AoA, makes clear that the distinction concerns not the level of interference, but toward whom the interference is directed. *See Leopold Graphics, Inc. v. CIT Grp./Equip. Fin., Inc*., 2002 WL 1397449, at *4 (E.D. Pa. June 26, 2002) ("In contrast to § 766, § 766A of the Restatement (Second) of Torts 'covers situations where, as here, the defendant's alleged tortious interference is directed toward the plaintiff, rather than toward a third person with whom the plaintiff has a contractual relation.'"); *Kernaghan v. BCI Commc'ns, Inc*., 802 F. Supp. 2d 590, 597 (E.D. Pa. 2011) ("Under Pennsylvania law, a claim for tortious interference will survive only if a defendant is not a party to the contract alleged to have been tortiously interfered with."). Each of Napleton's counterclaims alleges that AoA's actions interfered with a third party with whom Napleton had a contractual relationship or a prospective contractual relationship; these allegations are the paradigmatic examples of tortious inference claims and are certainly recognized by

Pennsylvania law. *Reis v. Barley, Snyder, Senft & Cohen LLC*, 667 F. Supp. 2d 471, 495 (E.D. Pa. 2009), aff'd, 426 F. App'x 79 (3d Cir. 2011) ("Pennsylvania law recognizes a tortious interference claim only where defendant has interfered with a plaintiff's contract with a third party."). AoA's argument in this regard is of no avail.

### 2. Counterclaim Count III

In Counterclaim Count III, Napleton claims that AoA tortiously interfered with the APA. (Doc. 219, pp. 42- 45). Counterclaim Count III is premised on three alleged interferences: (1) AoA "seeking out and communicating with potential alternative buyers for not just the Audi and Volkswagen franchises, but for all seven franchises that are part of the Proposed Transaction" (*Id.* at p. 43); (2) AoA communicating with executives at Porsche (Doc. 495, att. 1, p. 6); and (3) AoA "unreasonably rejecting Napleton as a proposed purchaser of Wyoming Valley Volkswagen." (Doc. 219, ¶ 129). Napleton's brief in opposition indicates that this third allegation relates to AoA's insistence that Wyoming Valley was in breach of the Dealership Agreement if it did not provide a good-faith price breakdown of the APA. (Doc. 495, att. 1, p. 44).

To prove tortious interference with a contractual relationship under Pennsylvania law, the evidence must establish the following elements:

> (1) [T]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the

defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. 2009), *aff'd*, 610 Pa. 371, 20 A.3d 468 (2011) (*citing* Restatement (Second) of Torts § 766 (1979)). AoA does not dispute the first two elements for any of Napleton's counterclaims; instead, AoA argues that each of the three alleged interferences was either justified or did not result in actual damages.

Beginning with the first alleged interference, Napleton points to evidence that by September 2016, AoA was seeking out other purchasers for the entire APA, including the non-Audi and non-Volkswagen dealerships. (Doc. 495, att. 1, p. 7). AoA does not dispute this fact, but argues that it was justified to do so and that it did not cause any damages regardless. (Doc. 397, p. 37). We need not consider whether AoA was justified to seek out potential candidates for the entire APA because nowhere in Napleton's brief in opposition does it point the court to *any* facts whatsoever to support a finding of harm or damages resulting from this conduct. Without any facts to support a finding of "the occasioning of actual damage as a result of" AoA's efforts to seek out potential alternate buyers, that "interference" cannot, as a matter of law, constitute tortious interference with a contractual relationship. *Corr. U.S.A. v. McNany*, 892 F. Supp. 2d 626, 642 (M.D. Pa. 2012) ("Under the fourth element, a plaintiff claiming interference with an

existing contractual relationship in Pennsylvania must demonstrate 'lost pecuniary benefits flowing from the contract itself; other losses, such as emotional distress and loss of reputation, are consequential harms.'") (*quoting Shiner v. Moriarty*, 706 A.2d 1228, 1238 (Pa. Super. Ct. 1998), *re-argument denied*, (Pa. 1998)).

Next, Napleton points to AoA's communication with a Porsche executive as a basis for its claim of tortious interference with the APA. (Doc. 495, att. 1, p. 6). Napleton references an email in which a Porsche executive indicates to AoA that "[i]t was great talking," but that it did not intend to exercise its right of first refusal. (*Id.*). From this, Napleton argues that the jury could reasonably infer that AoA had called Porsche to encourage it to block the APA as applied to Porsche. (*Id.*). Even accepting this inference as true, this cannot constitute tortious interference for the same reason as the previous alleged interference – Napleton has not pointed to any evidence that it was damaged by AoA's communication with Porsche.

Finally, Napleton bases Counterclaim Count III on AoA's demand for a price breakdown of the APA from Wyoming Valley and its insistence that failure to do so or to otherwise withdraw the APA constitutes a breach of Wyoming Valley's Dealership Agreement. (*Id.* at pp. 42-44). On September 28, 2016, AoA sent a letter to Wyoming Valley demanding either a price breakdown of the APA or the withdrawal of the APA altogether. (Doc. 394, Ex. 22). AoA sent a similar letter on December 2, 2016. (Doc. 394, Ex. 33). Napleton certainly has pointed to

evidence of damages as it relates to the Audi franchise; Wyoming Valley and

Napleton executed the First and Second Addenda to remove the Audi assets from

the APA in response to AoA's actions. (*Id*. at p. 51). However, AoA argues that

Napleton has not adduced evidence sufficient to establish the third element of

tortious interference with a contract, namely, the absence of privilege or

justification.

      As previously mentioned, "to recover on a tortious intentional interference

with existing or prospective contractual relationships claim in Pennsylvania, a

plaintiff must prove that the defendant was not privileged or justified in interfering

with its contracts." *Acumed LLC v. Advanced Surgical Servs., Inc*., 561 F.3d 199,

214 (3d Cir. 2009). The burden of proving the absence of any privilege or

justification is on the plaintiff. *See Buskirk v. Apollo Metals*, 307 F.3d 160, 172 (3d

Cir. 2002). In determining whether a defendant's conduct was without privilege or

justification, "the sole dispute is whether [the] conduct is 'improper.'" *Adler,*

*Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1183 (1978). "What

is or is not privileged conduct in a given situation is not susceptible of precise

definition," but, generally, conduct that is "sanctioned by the rules of the game

which society has adopted" is privileged. *Id*. at 1183-1184 (internal quotation

omitted).  Pennsylvania courts look to the factors enumerated in Section 767 of

Restatement (Second) of Torts in considering whether conduct is "improper."

> In determining whether an actor's conduct in intentionally interfering
> with an existing contract or a prospective contractual relation of
> another is improper or not, consideration is given to the following
> factors:
> (a) The nature of the actor's conduct,
> (b) The actor's motive,
> (c) The interests of the other with which the actor's conduct interferes,
> (d) The interests sought to be advanced by the actor,
> (e) The proximity or remoteness of the actor's conduct to the
> interference and
> (f) The relations between the parties.

Restatement (Second) of Torts § 767 (1979). The Pennsylvania "Supreme

Court has advised that when the purpose of the defendant's conduct is, in whole or

in part, to protect a legitimate right or interest that conflicts with the interests of the

plaintiff, 'a line must be drawn and the interests evaluated.'" *Phillips v. Selig*, 959

A.2d 420, 430 (2008) (*quoting Glenn v. Point Park Coll.*, 272 A.2d 895, 899

(1971)). The Third Circuit has summarized, "[o]ur cases accord substantial

deference to defendants whose conduct, despite its conflict with plaintiff's interest,

protects an existing legitimate business concern." *Windsor Sec., Inc. v. Hartford*

*Life Ins. Co.*, 986 F.2d 655, 665 (3d Cir. 1993). Referring to previous precedent,

the Court stated, "[w]e also emphasized the importance of allowing actors freedom

to protect their legitimate business interests." *Id.* Thus, "an actor is privileged to

interfere with another's performance of a contract when: (1) the actor has a legally

protected interest; (2) he acts or threatens to act to protect the interest; and (3) the

threat is to protect it by proper means." *Ruffing v. 84 Lumber Co.*, 600 A.2d 545, 548 (1991) (*citing Gresh v. Potter McCune Co.*, 344 A.2d 540, 742 (1975)).

AoA argues that its conduct in demanding a price breakdown of the APA was justified because that conduct was aimed at protecting AoA's legitimate contractual and statutory rights of first refusal. (Doc. 397, pp. 18-23). No party to this litigation would dispute that AoA has a legally protected right of first refusal over the sale of the Wyoming Valley assets or that AoA's right was implicated by the original APA. AoA argues that Napleton cannot meet its burden of proving that AoA acted without justification as a matter of law for two reasons: (1) AoA's actions in furtherance of its right of first refusal are *per se* justified as conduct protecting its legal interests; and (2) even if AoA's conduct was not *per se* justified, it was an appropriate means of pursing its legally protected interest. (*Id.*).

AoA brings up much of the same analysis that we employed in granting summary judgment on Wyoming Valley's Counterclaim Count I; namely, AoA's right of first refusal was not encumbered by any caveats regarding the *reason* that AoA chooses to exercise its right, so long as it steps into the shoes of the prospective purchaser. AoA's right of first refusal is a legally protected interest to "control the selection of its franchisees." *Crivelli*, 215 F.3d at 390. In order to do so, AoA needed to know the terms of the APA as they applied to the Wyoming Valley Audi assets within the bundled transaction. As the Third Circuit recognized

in *Crivelli*, "the exercise of a right of first refusal is not a withholding of consent" and a manufacturer is not required "to justify its decision to the jury to enforce its contractual right of first refusal." 215 F.3d at 394. Thus, AoA argues that its actions in demanding a price breakdown of the APA or otherwise requiring its withdrawal were justified as an appropriate means of protecting its legally protected right of first refusal, no matter AoA's reasoning for pursuing that right and blocking the sale of the Audi dealership.[2]

We reiterate that Napleton carries the burden of adducing sufficient evidence from which a rational juror could conclude that AoA's conduct was without privilege or justification. Napleton advances several arguments in support of its contention that AoA was not justified in demanding that Wyoming Valley provide a price breakdown of the APA or withdraw the entire transaction. First, Napleton points out that AoA relies on case law where the manufacturer actually exercised its right of first refusal, whereas AoA never exercised its right. (Doc. 495, att. 1, pp. 44-45). We fail to see the significance of this distinction. AoA contends that it acted in furtherance of protecting its right of first refusal, but this does not necessitate that AoA ultimately exercised that right. Indeed, AoA's entire lawsuit was premised on the contention that it was unable to determine whether it was able

---

[2] Both here, and elsewhere, Napleton elects to ignore the abundant and undisputed evidence pointing to a collusive effort between it and Wyoming Valley to not only delay notifying AoA concerning the APA, but also to play "hide the ball" as to its price breakdown.

to exercise its right of first refusal because Wyoming Valley did not provide a price breakdown of the APA. The relevant inquiry is whether AoA has a legally protected interest, acted to protect the interest, and did so by proper means. *Ruffing* 600 A.2d at 548 (*citing Gresh* 344 A.2d at 742). Napleton has not pointed to any authority that would suggest an additional element that the defendant ultimately exercised its rights under that legally protected interest. To be sure, AoA *could not* exercise its right of refusal because Wyoming Valley and Napleton responded to AoA's conduct by removing the Wyoming Valley assets from the APA.

Second, Napleton argues that AoA acted outside of its protected interests because it demanded that Wyoming Valley withdraw the *entire* APA or else be in breach of the Dealership Agreement. (Doc. 495, att. 1, p. 44). Napleton points to testimony from an AoA representative where the representative explained that AoA's demand sought the withdrawal of the entire APA, as opposed to withdrawing only the non-Audi and Volkswagen dealerships. (Doc. 495, att. 1, p. 7). This action, Napleton argues, cannot be construed as protecting any of AoA's legally protected interests because it exceeds AoA's legally protected interest in its own dealerships. (*Id.* at p. 44).

Napleton does not cite to any legal authority to support its position that this distinction is of any importance. Furthermore, Napleton's argument assumes that AoA was justified to demand the withdrawal of the APA as it relates solely to the

Audi and Volkswagen dealerships; this would mean that the damage of losing

those dealerships cannot be attributed to the alleged interference with the non-Audi

and Volkswagen parties to the APA. To the extent that Napleton's tortious

interference with a contract claim is premised on AoA demanding the withdrawal

of the entire APA as opposed to just the Audi and Volkswagen dealerships,

Napleton has not pointed to any evidence of causation or damages *even if* AoA's

conduct was unjustified.

While Mazda did ultimately withdraw its approval of the APA, there is no

indication in its rejection letter that Mazda withdrew as a result of AoA's demand

that Wyoming Valley withdraw the entire APA. (Doc. 492, Ex. 30). Mazda's letter

references the "Volkswagen situation" and Mazda's concern that it "cannot have

its operations housed in a facility with other brands that have a separate ownership

and are not part of the Mazda entity." (*Id*.). Beyond that language, however, there

is no evidence from which a rational trier of fact could connect Mazda's

withdrawal to this specific alleged interference by AoA. Further attenuating any

inference of causation is that Mazda's letter is dated September 29, 2017, more

than a year after AoA's alleged interference in demanding that Wyoming Valley

withdraw the APA. (*Id*) (*see also* Doc. 395, Ex. 22). Napleton's argument that

AoA's alleged interference was unjustified because it exceeded AoA's legally

protected interests not only does not support Napleton's burden to prove a lack of

justification, but implicates issues with proving causation and damages.

Third, Napleton argues that AoA's conduct was not justified because it was

not sanctioned by the "rules of the game," as set out by the Pennsylvania Dealer

Act. (Doc. 495, att. 1, pp. 45-46). As aforementioned, whether alleged interference

is "improper," and therefore unjustified, depends generally on whether the conduct

is "sanctioned by the rules of the game which society has adopted." *Adler, Barish,*

*Daniels, Levin & Creskoff*, 393 A.2d at 1183-1184. We agree with Napleton that

the Pennsylvania Dealer Act sets out certain "rules of the game" that are important

to the consideration of whether AoA's actions were justified. (Doc. 495, att. 1, p.

46). However, we disagree with Napleton that the evidence would support a

rational trier of fact to infer that AoA's conduct was violative of the Act in a way

that would support Napleton's burden to prove AoA lacked justification.

Napleton argues that AoA violated the Act's provision prohibiting

manufacturers from "unreasonably withhold[ing] consent to the sale, transfer or

exchange of the franchise to a qualified buyer." 63 P.S. 818.12(b)(3). We again

must note that this provision relates to a consent requirement, which is separate

and distinct from AoA's right of first refusal. *Crivelli*, 215 F.3d at 390. AoA's

demand that Wyoming Valley withdraw the APA related to its exercise of its right

of first refusal and was unencumbered by a requirement that AoA's decision to pursue that right was "reasonable." *Id.*

Next, Napleton argues that AoA's demand that the APA be withdrawn was unjustified because AoA did not exercise its right of first refusal within the 75 day time period proscribed by the Act. (Doc. 495, att. 1, p. 46); *see also* 65 P.S. 818.12(b)(5). This argument has no merit. Napleton alleges that AoA's conduct in demanding the withdrawal of the APA tortiously interfered with its contractual relations. AoA made that demand on September 28, 2016. (Doc. 395, Ex. 22). This is certainly within 75 days of when the initial forms were submitted to AoA in October 2016. (Doc. 495, att. 1, p. 46). Through this argument, Napleton appears to allege that AoA's interference also includes its "refus[al] to make a decision" on its right of first refusal throughout the pendency of this action. (Doc. 495, att. 1, p. 46). This undoubtedly would bring in AoA's litigation conduct in seeking a preservation of the *status quo* pending a court determination of whether the APA, as amended, implicated AoA's right. As we have already held, this conduct cannot be the basis of Napleton's counterclaims in light of the *Noerr-Pennington* doctrine. (Doc. 321). The interference alleged in Counterclaim Count III is AoA's demand of a price breakdown or withdrawal of the APA; Napleton must prove that this specific conduct was unjustified and the Act offers no support to Napleton in doing so.

Finally, Napleton argues that the evidence indicates that AoA did not act in good faith to protect a legitimate business interest. (Doc. 495, att. 1, pp. 46-48). To this end, Napleton points to evidence from which a rational juror could conclude that AoA acted to "punish[] Napleton for asserting its legal rights in the TDI Diesel case." (Doc. 495, att. 1, p. 47). According to Napleton, "[t]his isn't a 'legitimate business purpose,'" but "an attempt to evade responsibility for admitted criminal wrongdoing." (*Id*. at p. 48). This argument misses the mark. We can take all inferences in Napleton's favor and assume that AoA was angry with Napleton and pursued its right of first refusal out of a purely personal and retributive motive to block Napleton as an Audi franchisee, and Napleton still cannot prove a lack of justification.

We again must return to *Crivelli* and reiterate that a right of first refusal is not burdened by any limitation on the manufacturer's motive for exercising that right. 215 F.3d at 394. AoA's protected legal interest is not, as Napleton seems to believe, AoA's business interest in preferring not to have Napleton has a franchisee; the protected legal interest at issue, the interest that AoA argues justifies its alleged interference, is AoA's statutory and contractual rights of first refusal in general. Napleton has not pointed to any evidence, and our review has revealed none, to support an inference that AoA's demand of a price breakdown or withdrawal of the APA was made for anything other than the protection of its right

of first refusal. Even if it was unreasonable for AoA to avoid Napleton as a franchisee, and even if AoA acted out of an unfounded personal bias, AoA acted in furtherance of a legally protected right of first refusal that allows for AoA to act choose its franchisees.

Though whether alleged interfering conduct is "improper" or "sanctioned by the rules of the game" is ordinarily a fact intensive inquiry that necessitates jury consideration, we hold that Napleton has not adduced evidence sufficient to meet its burden of proving that AoA's actions were not justified. *Adler, Barish, Daniels, Levin & Creskoff*, 393 A.2d at 1183-1184. The undisputed facts show that AoA had a contractual and statutory right of first refusal over the Wyoming Valley Audi assets and that the APA originally implicated that right of first refusal. Napleton has not pointed to any evidence from which a jury could determine that AoA's demands were not made in furtherance of this protected interest or were otherwise improper. We therefore must grant summary judgment to AoA on Napleton's Counterclaim Count III.

### 3.  Counterclaim Count IV

In Counterclaim Count IV, Napleton claims that AoA tortiously interfered with its prospective contractual relationships with the six non-Audi manufacturers that were a part of the APA. (Doc. 219, pp. 45-47). As we noted in our order denying AoA's motion to dismiss Napleton's counterclaims, "Napleton's

allegations within Count IV are somewhat unclear." (Doc. 321, p. 12). Napleton does not provide much clarification in its brief in opposition to the instant motion, stating only that the "Fourth Cause of Action is about interference with Napleton's prospective contractual relations with other manufacturers – VWGoA's interference has delayed the other manufacturers' approval of Napleton as a dealer, or in Mazda's case, removed them from the running altogether." (Doc. 495, att. 1, pp. 36-37). This still does not clarify the alleged actions of interference committed by AoA with respect to Counterclaim Count IV. Napleton goes on to discuss two actions by AoA at length – the same two actions relied on by Wyoming Valley's counterclaims: (1) AoA's insistence that Wyoming Valley must provide a price breakdown of the APA in order for AoA to evaluate its right of first refusal; and (2) AoA's rescission of the Relocation Agreement. Because Napleton relies on these two actions in its brief in opposition, we assume that these actions are the basis of Napleton's Counterclaim Count IV.[3]

"To prove a claim for tortious interference with prospective contracts, a plaintiff must prove all of the same elements, listed above, of a claim for tortious interference with an existing contract, although the first element requires proof of the existence of a prospective contractual relationship." *BP Envtl. Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 412 (E.D. Pa. 2013). To prevail on

---

[3] To the extent that Counterclaim Count IV is also based upon AoA's communication with Porsche, it fails due to lack of damages in the same way as it did for Counterclaim III.

Counterclaim Count IV, Napleton must prove the following elements: "(1) a prospective contractual relation; (2) purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) absence of privilege or justification on the part of the defendant; (4) occasioning of actual damage resulting from the defendant's conduct." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 925 (3d Cir. 1990). AoA again does not dispute the first two elements in its motion for summary judgment, arguing instead that the evidence cannot support a finding that its actions were not justified or that they otherwise did not cause damages.

We have already concluded that AoA's actions in demanding that Wyoming Valley either provide a price breakdown of the APA or withdraw the agreement were justified. Because the absence of privilege or justification is also an essential element for tortious interference with prospective contractual relationships, those actions cannot form the basis of Napleton's Counterclaim Count IV for the same reasons it could not support Counterclaim Count III. This leaves AoA's rescission of the Relocation Agreement as the only remaining basis for Napleton's tortious interference claim.

AoA argues that Napleton has not adduced sufficient evidence from which a rational juror could find that AoA lacked justification to rescind the Relocation Agreement. (Doc. 397, pp. 23- 28). Whether this action is justified is subject to the

same legal framework discussed at length in our analysis of Counterclaim Count III; Napleton again has the burden to prove the "absence of any privilege or justification." *Buskirk*, 307 F.3d at 172. The inquiry turns on whether the conduct is "improper," while affording "substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern." *Adler, Barish, Daniels, Levin & Creskoff*, 393 A.2d at 1183-1184; *Windsor*, 986 F.2d at 665. AoA argues that its rescission of the Relocation Agreement was justified because "[f]ollowing AoA's receipt and review of discovery in this action, it had a good-faith basis to conclude that Wyoming Valley, with Napleton's knowledge and at Napleton's direction, fraudulently induced AoA to enter into the Relocation Agreement." (Doc. 397, p. 23).

Napleton argues that AoA was not justified in rescinding the Relocation Agreement because AoA did not act to protect its business interests, but out of a motivation to inflict as much harm upon Wyoming Valley and Napleton as possible. In support, Napleton points to several facts regarding the timing of AoA's rescission. Napleton notes that AoA continued construction of the Relocation Property even after finding out about the APA and that AoA did not halt construction even after being made aware that a potential purchaser was interested in purchasing the dealership without the Relocation Property. (Doc. 495, att. 1, pp. 11-12). As we noted within our discussion of Wyoming Valley's claim that AoA's

rescission was made in bad faith, we again point out that Wyoming Valley and Napleton were undoubtedly aware of AoA's objections to the APA by December 2016 when AoA initiated this lawsuit, and they chose to continue the relocation project regardless. Furthermore, each of the actions cited by Napleton where AoA affirmatively continued construction of the Relocation Property occurred prior to the April 10, 2017 transfer of ownership of the Relocation Property from Accruit Exchange Accommodation Services, LLC, to a Napleton affiliate. (Doc. 394, Ex. 64).

Napleton also points to the timing of Wyoming Valley's planned move to the Relocation Property. On May 10, 2017, notes detailing construction progress and Wyoming Valley's intent to move in July were forwarded to AoA's litigation counsel. (Doc. 495, att. 1, pp. 12-13). After a privileged email chain, AoA sent its rescission letter on May 22, 2017. (Doc. 394, Ex. 67). Napleton argues that a rational juror could infer from this evidence that AoA did not rescind its approval for relocation for a legitimate business purpose, but out of a desire to inflict harm on Wyoming Valley and "maximize leverage." (Doc. 495, att. 1, p. 43).

Wyoming Valley also relied on this evidence concerning the timing of AoA's rescission for its claim that AoA violated the ADDCA's requirement of good faith. We noted that a jury would not only need to consider the timing of AoA's rescission, but the history of this litigation, our previous court orders, and

the concepts of fraudulent inducement to a contract. In light of that evidence, particularly the stark evidence of Wyoming Valley and Napleton's fraudulent inducement of AoA into the Relocation Agreement, we concluded that no rational juror could find that AoA acted in bad faith in rescinding that agreement. For the same reasons, we conclude that no rational juror could find that AoA's rescission was without privilege or justification.

Even taking as true that AoA waited until an opportune time to rescind the Relocation Agreement, it was justified to do so as a proper means of protecting its legal rights. The evidence uncovered in discovery painted a picture of Wyoming Valley and Napleton intentionally concealing the existence of the APA until after securing approval for relocation. Under Pennsylvania law, fraudulent inducement may be found where a contracting party made false representations "that induced the complaining party to agree to the contract." *Toy v. Metropolitan Life Ins. Co*., 928 A.2d 186, 205 (2007) (internal quotation marks and citations omitted). "'Fraud' consists of "anything calculated to deceive, whether by single act or combination, or by suppression of truth." *Martin v. Hale Products, Inc*., 699 A.2d 1283, 1287–88 (Pa. Super. Ct. 1997). "Under Pennsylvania law, when a party is induced to enter a transaction by means of fraud or a material misrepresentation, the transaction is voidable at the option of the innocent party." *R & R Capital, LLC*

*v. Merritt*, 632 F. Supp. 2d 462, 479 (E.D. Pa. 2009), *aff'd*, 426 F. App'x 85 (3d Cir. 2011).

It would defy logic for any juror to find that AoA's rescission was "improper" or violated the "rules of the game" in light of Wyoming Valley and Napleton's initial deception in securing the contract. Following the Third Circuit's lead of according substantial deference to a defendant's conduct in protecting its legitimate business interest, we hold that AoA's rescission of the Relocation Agreement cannot support a tortious interference claim. *Windsor*, 986 F.2d at 665.

### 4. Counterclaim Counts V and VI

In Counterclaim Counts V and VI, Napleton claims that AoA tortiously interfered with several contracts when it sent its May 22, 2017 letter rescinding the Relocation Agreement. (Doc. 219, pp. 47-51). Napleton confirms in its brief in opposition to AoA's motion that Counterclaim Counts V and VI are both premised on AoA's rescission of the Relocation Agreement. (Doc. 495, att. 1, p. 37). Again, an essential element of Napleton's claims of tortious interference with contractual relationships is that AoA's rescission of the Relocation Agreement was not privileged or justified. *Walnut St. Assoc., Inc.*, 982 A.2d at 98. For the same reasons discussed at length with regard to Counterclaim Count IV, the evidence is insufficient as a matter of law to support a finding that AoA's rescission of the Relocation Agreement was without privilege or justification. Accordingly,

43

Napleton is unable to establish an essential element of Counterclaim Counts V and VI and we must grant summary judgment in favor of AoA.

## IV.    CONCLUSION

We shall therefore grant AoA's motion for summary judgment on Wyoming Valley's counterclaims in part and deny the motion in part. (Doc. 394). The motion will be granted to the extent that summary judgment is awarded in favor of AoA on Wyoming Valley's Counterclaim Count I in its entirety and on Counterclaim Count II to the extent that it alleges a breach of the implied covenant of good faith and fair dealing. The motion will be denied in all other respects. We shall grant AoA's motion for summary judgment on Napleton's remaining counterclaims in its entirety. (Doc. 396). The only remaining claim in this action is Wyoming Valley's Counterclaim Count II as it alleges that AoA breached Articles 1 and 12 of the Standard Provisions of the Dealership Agreement.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. AoA's motion for summary judgment on Wyoming Valley's counterclaims (Doc. 384) is **GRANTED**, in part, and **DENIED**, in part:

   a. Summary judgment is granted in favor of AoA on Wyoming Valley's Counterclaim Count I.

b.  Summary judgment is granted in favor of AoA on Wyoming Valley's Counterclaim Count II to the extent that it alleges a breach of the implied covenant of good faith and fair dealing.

c.  Summary judgment is denied in all other respects.

2.  AoA's motion for summary judgment on Napleton's counterclaims (Doc. 386) is **GRANTED** in its entirety.

3.  Napleton's motion for partial summary judgment (Doc. 378) is DENIED, without prejudice, as moot.

4.  The Clerk of Court shall **TERMINATE** as parties to this action: North American Automotive Services, Inc.; Napleton Orlando Imports, LLC; Napleton Sanford Imports, LLC; Napleton Automotive of Urbana, LLC; EFN Wyoming Valley Properties, LLC; Millennium Holdings, IV, LLC; Napleton Investment Partnership, LP; and Napleton Wyoming Valley Imports, LLC;

5.  Trial remains set to begin on May 14, 2018. The Court shall **SCHEDULE** a conference call with the remaining parties on April 25, 2018, at noon, to briefly discuss pretrial matters. Counsel for AoA shall initiate the call to Chambers, (717) 221-3986, with all counsel on the line and prepared to proceed.

6. This memorandum and order is filed under seal pursuant to the Court's reliance on sealed exhibits and filings, though we are unsure whether any sensitive information has been revealed within this opinion. By or before the close of business on Tuesday, March 20, 2018, any party wishing this memorandum and order to remain under seal **SHALL FILE** a letter on the docket explaining its justifications for that position and a proposed redaction, if practical. If no such letter is filed, we shall direct the Clerk of Court to unseal this memorandum and order.

<u>s/ John E. Jones III</u>
John E. Jones III
U.S. District Judge